

# THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FELIX A. SALCIDO<br>      Petitioner, | )<br>)<br>)<br>) |
|  | )<br>) |
| V. | )<br>)<br>) |
|  | )<br>) |
| JAMES A. YATES<br>Warden of Pleasant<br>Valley State Prison<br>      Respondent. | )<br>)<br>)<br>)<br>) |

CV No 08 — 4083 CW

Santa Clara Co. Superior
Court No. B9842667
Cal. Ct. Appeal 6th Dist.
No. H023965
Cal. S.Ct.No.------------



## PETITION FOR WRIT OF HABEAS CORPUS

### 18 U.S.C. §2254

FELIX A. SALCIDO, T-38674
Pleasant Valley State Prison
Facility "D,"   D3-124
P.O.Box 8504
Coalinga, CA 93210


FELIX A. SALCIDO
In Pro Se

THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIX A. SALCIDO<br>        Petitioner,<br><br><br>              V.<br><br><br><br>JAMES A. YATES<br>Warden Of Pleasant<br>Valley State Prison<br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)  No._____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Felix A. Salcido, In Pro Se, petitions this court for a writ of habeas corpus, and by this verified petition alleges as follows:

1.    Petitioner is unlawfully in the custody of the California Department of Corrections in Pleasant Valley State Prison in Coalinga, California.

2.    Petitioner makes this application pursuant to 18 United States Code section 2254.

3.    On December 14, 2001, in the Superior Court of the  State of California, County of Santa Clara, in case number B9842667, before Judge Robert Ahern, Petitioner was convicted of one count of murder in the second degree in violation of California Penal Code section 187.  Petitioner was sentenced to 15 years to life imprisonment.

4.    Petitioner filed his notice of appeal on December 20, 2001.  On February 17, 2004, Division Six of the Sixth District Court of Appeal for the state of California, in court of appeals case number H023965, affirmed the judgment and conviction in Petitioner's case.  The California Supreme Court, is case number -------, denied review on April 27, 2004.

5.    On July 25, 2005 Petitioner filed an application for a writ of habeas corpus in the Superior Court for the State of California, County of Santa Clara. Petitioner's writ is denied on January 11, 2007.  The California Supreme Court, in case number-------, denied on August 22, 2007.

6.    Petitioner has not filed any other applications in Federal Court seeking a writ of habeas corpus in regards to his detention.  Petitioner did not file a petition for certiorari in the United States Supreme Court seeking review of the decision of the California Supreme Court.

## THE UNDERLYING KILLING AND MR. SALCIDO'S INITIAL ARREST

7.    In the early morning hours of January 18, 1994, Santa Clara County Sheriff's Deputies found the body of William Justice on the shoulder of an isolated section of Moody Road in Los Altos Hills.  Justice had been shot through the head and stabbed seven times in the back.

8.    Additional Sheriff's Deputies arrived at he scene and began a forensic investigation of the area.  While the Sheriffs were processing the crime scene, an Oldsmobile slowly approached on Moody Road.  As the car passed the scene,

Sheriff's Deputy Jennerjohn, was stopping traffic on Moody Road, noticed that the driver of the Oldsmobile appeared to have blood on the legs of his pants. Deputy Jennerjohn then ordered the driver out the vehicle and placed him in handcuffs. The driver of the Oldsmobile was Petitioner Felix A. Salcido.

9. Salcido made no attempt to avoid Deputy Jennerjohn or conceal the blood on his clothes. After he was removed from his car, Salcido told the officers at the scene, while indicating towards Justice's body, "That's my friend. That's my friend over there." Salcido also told the officers that earlier he had been with Mr. Justice in East Palo Alto in order to buy drugs, and that in the course of attempting to purchase crack cocaine, Mr. Justice was stabbed and shot by unidentified drug dealers. Salcido also informed the officers that after the shooting, he initially attempted to take Mr. Justice to Stanford hospital; although once he realized Justice was dead, he continued up Page Mill Road to Los Altos and left Justice's body on the side of the road.

10. The Sheriff's officers subsequently went with Petitioner to his home in Mountain View. Mr. Salcido consented to a search of the house and showed the officers some clothes he removed because they were soaked in blood. In addition to the clothing, the officers seized Salcido's cell phone and pager. The search of the house did not reveal any handguns or knives. The police also recovered a pair of gloves Mr. Salcido had worn while cleaning out the car to protect his hands from glass shards.

11. DNA test on Petitioner's clothing matched the blood of William Justice. Similar test on blood recovered from the inside of the Oldsmobile Salcido was driving revealed to be Mr. Justice's blood over various areas of the interior of the car. The police also found an expended 9mm shell casing on the floor under the back portion of the driver's side seat.

12.  Once the officers completed their search of Petitioner's house, Salcido led them to the Cozy 8 Motel, where Mr. Justice had been staying in the days before his death.  Several officers searched the motel room and located various indicia bearing the name William Justice.

## PETITIONER'S STATEMENTS TO THE POLICE

13.  After searching Petitioner's home, the officers took Mr. Salcido to the police station where he signed a Miranda waiver and engaged in a lengthy interview with homicide detectives.  During the interview, Mr. Salcido stated the following:

Petitioner met William Justice through a mutual friend in San Francisco. Frequently Mr. Justice would ask Salcido to drive him around on errands e.g. to the airport.  During this time Mr. Justice was spending thousands of dollars every week on hotels, prostitutes and drugs.  Justice was not working and was receiving money from former company credit cards and by borrowing money from friends overseas.

Eventually, Mr. Justice became homeless and Petitioner invited him to relocate to Mountain View, where Mr. Salcido lived.  Mr. Salcido told Mr. Justice that the temporary relocation could provide him a chance to get away from the drug culture of the San Francisco Tenderloin area.  Mr. Justice agreed that he needed to leave San Francisco, and asked Mr. Salcido to rent a room for him in Mountain View. On or about January 10, 1994, Mr. Salcido rented a room for Mr. Justice at the Cozy 8 Motel in Mountain View.  After Justice moved to Mountain View he continued to use drugs.

On the evening of January 17, 1994, Mr. Salcido met with Mr. Justice. Mr. Justice insisted that Mr. Salcido take him to East Palo Alto in order for Mr. Justice to purchase crack cocaine, which was readily available on the street in that area.

**(4)**

Driving a car he had borrowed from his friend, Dave Bergstrom, Salcido drove Justice to a side street off of University Avenue in East Palo Alto where they saw several people apparently selling drugs on the corner. Salcido stopped the car and Justice stepped out of the car and began negotiating a drug deal with several of the street sellers. A dispute ensued.

One of the drug dealers then attacked Mr. Justice and stabbed him several times. Justice fell down, landing with his head and torso inside the front passenger area of the car, with his legs remaining outside the opened car door. A second of the street dealers then produced a gun, pointed it at Mr. Salcido, and demanded that Salcido unlock the doors to the car. Salcido complied, and the man with the gun jumped in the back seat of the car and ordered Mr. Justice to give him his money. Several members of the crowd around the car began rifling through Justice's pockets. Justice, who was by then gagging on blood and convulsing, was unable to produce any money, so Salcido reached into Justice's pants' pocket, removed a wad of money, and tossed the money to the man with the gun in the back seat. After picking up the money, the man in back seat shot Justice once in the head. The gunshot broke the front passenger window of the car.

Upon the gunshot the crowd around the car ran. Mr. Salcido reached across the interior of the car and pulled Mr. Justice's legs into the car so that he could close the front passenger door and drive away. As Salcido began to drive, Justice slumped over in the car so that his he was lying on Salcido's lap. Salcido began driving toward Stanford Medical Center, the nearest hospital he knew of, but soon realized Justice was dead when Justice's panting breathing discontinued.

Panicked, Salcido drove past Stanford and proceeded straight (West) on Page Mill Road in Palo Alto. Justice continued to bleed onto Salcido's lap, Salcido removed his belt and used it to hold Justice upright in the passenger's seat.

He continued driving up Page Mill Road into the hills, where he turned back down (South) out of the hills on Moody Road.  Salcido then stopped at a roadside pullout, exited the car and pulled Justice out of the passenger's side of the car.  Salcido then left and drove to his house in Mountain View.

After showering and changing his clothes, Salcido attempted to clean the blood-drenched car.  He went to a carwash in Mountain View were he used the carwash and a vacuum to remove some of the glass and blood from the car.

While he was cleaning the car Mr. Salcido became afraid that he may have been mistaken and that Mr. Justice may have unconscious but still alive.  In order to check, Salcido drove from the car wash back to the area where he left Mr. Justice on Moody Road.  When he arrived at he scene he was stopped by the police.

Following Mr. Salcido's arrest, his interview with the police, and the search of his home, no charges were filed and Mr. Salcido was released.

## THE RENEWAL OF THE INVESTIGATION

12.  Four and one half years later, in July of 1998, Santa Clara County Sheriff's Deputy Medved reopened the investigation into the killing of William Justice.  Medved began the renewed investigation by interviewing several of Salcido's friends and associates, including Christian Smith, Ed Allison, Kojo Williams and Norman Jackson.  Officer Medved also retrieved copies of Mr. Salcido's phone records from the days prior to Mr. Justice's death.

13.  Medved discovered that Kojo Williams, a friend of Salcido, had purchased a 9mm Beretta handgun at a sporting goods store in 1994.  When Medved contacted Williams, Williams initially informed Medved that the 9mm Beretta was stolen in Seattle, Washington.

14.  Mr. Salcido was again arrested and charged with murder on December 22, 1998.

(6)

## SALCIDO'S RETENTION OF DEFENSE COUNSEL

15.  On December 28, 1998, just after Salcido was arrested, Salcido's father, Felix M. Salcido, retained attorneys Douglas Rappaport and Douglas Horngrad to represent Salcido in the murder case.  The retainer agreement called for both counsel to receive equal fees, and did not limit the representation to one trial. See Declaration of Felix M. Salcido, atttached hereto.

16.  When defense counsel were first retained they informed Salcido and his father that both counsels had potential conflicts of interest stemming from their prior representation of prosecution witnesses Christian Smith and Steve Margulies. However, both counsel indicated they did believe the potential conflicts would impede their representation of Salcido, so long as Salcido and the witnesses were willing to waive the conflicts.  Counsel further advised Mr. Salcido that the conflict issues should be raised at the preliminary hearing so that the District Attorney could not later "make an issue" of counsel's prior representation of the witnesses.  See Declaration of Felix M. Salcido, Declaration of Petitioner Felix A. Salcido III, attached hereto.

## INITIAL PROCEEDINGS CONCERNING
## DEFENSE COUNSELS' CONFLICT OF INTEREST

17.  At the preliminary, on September 22, 1999, defense counsel Douglas Horngrad informed the court that he had a conflict of interest that the court needed to address.  The conflict arose out of the fact that Mr. Horngrad had previously  represented prosecution witness Christian Smith and Steve Margulies. (See Exhibit A [independent counsel's report to the court].)  At the preliminary hearing Mr. Salcido was voire dired by the court concerning the potential conflict. (Defense counsel Rappaport had similary represented prosecution witness Smith.) Mr. Salcido and all witnesses signed written waivers.  The preliminary court

**(7)**

accepted the waivers and allowed both counsel to continue their representation
of Salcido.

## PRETRIAL DISCOVERY PROCEEDINGS

18.  Prior to trial Salcido filed several motions for discovery.  On April 11,
2000, Salcido filed a motion seeking discovery of information concerning various
prosecution witness.  On April 28, 2000, Salcido filed a motion seeking discovery
of various items of forensic evidence, including photographs.  These motions were
heard and granted on April 28, 2000.

19.  On June 26, 2000, the defense asserted its first motion for sanctions
for the prosecution's failure to comply with discovery orders and statutes.  The
trial court denied this first motion for sanctions.

20.  On June 27, 2000, the defense filed a motion seeking a hearing (pursuant
to Evidence Code Section 402) on chain of custody issues related to the forensic
evidence gathered in the case, including evidence gathered from the crime scene
and the interior and exterior of the car.

## DEFENSE TRIAL PREPARATION

21  Mr. Salcido's understanding of the roles played by his two attorneys
in preparing his case was that Mr. Horngrad, who was lead counsel, was responsible
for preparing lay witnesses, while Mr. Rappaport was responsible for the law
enforcement, forensic and experts portion of the case.

22.  During the course of preparing for the trial, Mr. Salcido and his counsel
spent many hours preparing for Salcido to testify.  Salcido always intended to
testify, and defense counsel continually assured him that they would call defense
witnesses, including defense experts who would testify regarding the prosecution's
crime-scene evidence and expert testimony.

23.  Both defense counsel participated in preparing Mr. Salcido for his

testimony.  The preparation sessions were conducted over a period of many weeks, and included mock cross-examination by counsel and by a consultant who was hired by defense counsel and paid by Mr. Salcido's father.

24.  The preparation sessions occurred during Salcido's trial.  The consultant and Mr. Salcido went over Salcido's entire testimony many times, and conducted several mock cross-examination sessions.  Both counsels and the consultant coached Mr. Salcido concerning his demeanor, the scope of his answers, and other such issues.

25.  Prior to trial counsel repeatedly informed Mr. Salcido that he would need to testify because he was indisputably linked to the shooting of Mr. Justice in the car and the depositing of Justice's body; and he therefor needed to explain to the jury how Mr. Justice was killed.  Based on discussions between counsels and Salcido, both attorneys and the Salcido family decided that Salcido would testify after the taped interviews of his statements to the police were excluded from evidence at trial.

26.  Mr. Salcido intended to testify in a manner consistent with the statement he gave to the police on the night of the shooting, as described briefly above.

27.  The defense hired and consultant with forensic experts Forensic Analytical (specifically Chuck Morton), a forensic consulting firm in Oakland, California; Dr. Peter Benson of San Mateo, California;  Dr. Paul Hermann, the former medical examiner for Alameda County, California; and, James Norris, a firearms expert. Forensic Analytical's  billing record indicate they billed the defense a total of nearly $16,000.  The billing shows that Chuck Morton spent 41 hours in court, during the trial, watching the testimony of the prosecution's expert witnesses, and approximately 17 hours preparing to testify and consulting with defense counsel immediately prior to trial.  A true copy of Forensic Analytical's invoices are attached to the Declaration of Felix M. Salcido filed herewith.

Forensic Analytical and Mr. Morton were hired in order to test the validity of the prosecution's theories concerning the crime scene evidence, including the meaning of the blood spatter patterns in the car, the blood smears on the outside of the car, the belt found in the victim's hand at the crime scene, and the gunshot residue found inside the car and on Mr. Salcido's clothing.

Dr. Hermann was asked to examine the autopsy materials, crime scene photos and reports by prosecution's expert Dr. Vameghi in order to discern, among other things, whether Vameghi's conclusion that Justice was alive when he was deposited on Moody Road was sound.

Dr. Benson was similarly asked to examine the autopsy materials, crime scene photos and reports by prosecution's expert Dr. Vermeghi in order to assess the validity of Dr. Vemaeghi's conclusion that Justice was alive when he was deposited on Moody Road, and was stabbed after he was shot.

James Norris was hired in order to examine the ballistics evidence and assess the validity of the prosecution's expert conclusion that the firing pin marking on the 9mm casing found in Salcido's car were consistent with the markings left by a 9mm Beretta handgun.  This issue was significant because the prosecution attempted to link Kojo Williams' 9mm Beretta to Mr. Salcido.

28.  Prior to and throughout the trial Mr. Salcido expected defense counsel to call Forensic Analytical's expert Chuck Morton.  Mr. Salcido believed that Chuck Morton would testify that the blood spatter patterns, the position of the shell casing and the gunshot residue did not indicate that Justice had been shot from the driver's side of the vehicle as Mr. Justice was seated in the passenger seat, as the prosecution's expert claimed.  Salcido was also informed by counsel that Morton would testify that the belt found grasped in the victim's hand did not, as the prosecution contented, indicate the victim had been garroted.

Also, Mr. Salcido expected defense counsel to call Theresa Chancellor, the maternal grandmother of Mr. Salcido's children, as a witness for the defense. Throughout the trial, the prosecution repeatedly referred to a power point presentation that an unknown number was called prior to the murder. The prosecution inferred that this phone call could have been to an "unknown" accomplice. Mr. Salcido understood that Mr. Chancellor would be called to explain that the number belong to her and her daughter, Ms. Elisha Padua. (See Declaration of Petitioner Felix A. Salcido III filed herewith.)

Mr. Salcido did not expect the defense to call Dr. Hermann or Dr. Benson. During a conversation, in a holding cell adjacent to the court room, moments after the prosecution rested its case in chief, defense counsel Rappaport told Mr. Salcido that all of the pathologist consulted by the defense had concluded that the forensic evidence showed that Mr. Justice was alive when he was removed from the car at Moody Road, and that there was no forensic evidence to support Mr. Salcido's version of the shooting, wherein Mr. Justice had been shot in East Palo Alto and his body was deposited on Moody Road fifteen or twenty minutes after the shooting. Specifically, Rappaport told Salcido that several doctors "do not buy your story" and he could not corroborate Mr. Salcido's testimony with an expert opinion in regards to the physical evidence. (See Declaration of Petitioner Felix A. Salcido III filed herewith.)

29. The defense never attempted to locate the drug dealer who Mr. Salcido indicated shot Mr. Justice in East Palo Alto. The defense similarly never attempted to reconstruct the events of the afternoon and evening of the day of the shooting. Nor did the defense attempt to refute phone calls reflected in Mr. Salcido's cell phone records.

30. Defense counsel Rappaport never spoke with Mr. Salcido about cross-

examination of the prosecution's lay witnesses, Norman Jackson, Dave Bergstrom, Ed Allison, Christian Smith and Steve Margulies, other than to discuss the potential conflict issues involving Smith and Margulies.

31.  The first discussion between Mr. Salcido and his counsel regarding possible jury instructions on lesser offenses and manslaughter took place after Ed Allison testified at the trial.  At that point defense counsel informed Salcido that Allison's testimony could support a manslaughter verdict.  (See Declaration of Petitioner Felix A. Salcido III, attached hereto.)

32.  Mr. Salcido always understood that the defense presented would be at least his own testimony; the testimony of Chuck Morton, who would corroborate Mr. Salcido's testimony that Mr. Justice was stabbed outside the car, and then shot inside the car in East Palo Alto; and, Mrs. Chancellor's testimony in regards to Mr. Salcido's cell phone records.

## THE DEFENSE EXPERTS' CONCLUSIONS AND THE TESTIMONY
## AVAILABLE TO DEFENSE COUNSEL

33.  Mr. Morton of Forensic Analytical, Drs. Hermann and Benson, and James Norris each provided their findings to defense counsel.  (See Declaration of Chuck Morton, Paul Hermann, Peter Benson and James Norris filed herewith.)

34.  Dr. Hermann reached several important conclusions concerning the coroner's opinions as to the time and place where the victim, Mr. Justice, was likely shot, stabbed and killed.  Dr. Hermann concluded that the coroner's findings were faulty. Dr. Hermann's Declaration concerning his findings is attached hereto.

Dr. Hermann concluded it was impossible to tell from the photos of the blood on the ground next to Mr. Justice's body how much blood was pooled next to the body.  Hermann therefor concluded that it was also impossible to tell from the photos how much Mr. Justice bled after he was faced down on the ground.

Dr. Hermann also determined, based on the forensic reports, that a large amount of Mr. Justice's blood had been found soaked into the driver's seat of Salcido's car and the lap area of the pants Salcido was wearing. According to Dr. Hermann, this was entirely consistent with Mr. Salcido's description of Mr. Justice lying on his lap for approximately twenty minutes in the driver's seat area of Salcido's car, following the shooting.

Dr. Hermann further resolved that the coroner's opinion that Mr. Justice had been garroted from behind with the belt found at the crime scene was baseless. According to Dr. Hermann, such garroting would leave abrasions on the neck of the victim, and such marks were not present on the victim's body. In addition, the victim's body did not show petechiae (small hemorrhages) in the eyes and eyelids, which would typically be found if the victim had been strangled in any manner.

Dr. Hermann concluded that the coroner's opinion that the victim was stabbed after he was face down on the ground was not supported by the physical evidence. He noted the primary basis for the coroner's opinion in this regard was the absence of significant blood stains on the victim's outer clothing (a sweater) in the area surrounding the stab wounds. However, according to Dr. Hermann, additional crime scene photos showed significant bleeding on the inside of the victim's clothing. More importantly, Dr. Hermann noted that the stab wounds suffered by the victim would not result in copious bleeding, and that what bleeding resulted would have been mostly internal. The absence of external bleeding therefor did not show that the victim was prone when he was stabbed.

Finally, Dr. Hermann concluded that the positioning and grouping of the victim's stab wounds, as well as the absence of defense wounds, were consistent with both the victim being stabbed while unconscious and with the victim being

stabbed from behind while standing.  In addition, Dr. Hermann noted that the slight upward angle of stab wounds was consistent with the victim being stabbed from behind while standing.

Had the defense called Dr. Hermann to testify at Salcido's trial, he would have testified to each of the above described opinions.  Moreover, Dr. Hermann would have testified that the forensic and physical evidence gathered by the police and the coroner was consistent with the chain of events Mr. Salcido described during his interview with the police in 1994.  Specifically, Dr. Hermann would have testified that the forensic evidence was consistent with the victim being stabbed while standing outside the car, then shot in the head while seated in the front passenger seat, then lying across Mr. Salcido's lap for some period of time while Mr. Salcido drove.  Dr. Hermann also would have testified that there was insufficient evidence to support the theory that the victim was stabbed and shot at the location where his body was found.

35.  Dr. Benson reached conclusions very similar to those of Dr. Hermann. Dr. Benson concluded that it was impossible to tell from the autopsy photos how much blood was located on the victim's shirt and sweater, and it appeared that the amount of blood located on the victim's clothes had not been measured.  In addition, Dr. Benson, like Dr. Hermann, noted that stab wounds of the type suffered by the victim in this case bled very little and tend to bleed inside, rather than outside of the body.  Therefore, Dr. Benson believed, it was not possible, based on the existing forensic evidence in this case, to discern how much Mr. Justice bled after he was lying on the ground, or whether he was stabbed on the ground. It was likewise impossible, based on the evidence, to reliably conclude that the victim was either shot or stabbed first.

Dr.  Benson also determined that Mr. Salcido's statements, in which he

**(14)**

indicated Justice was stabbed first, then shot within a minute, was consistent with forensic evidence concerning the blood stains on the victim's clothes. Dr. Benson based this conclusion on the fact that Justice would have gone into shock, and the bleeding would have stopped shortly after he was shot because there would have been no blood pressure after infliction of the gunshot wound, which severed the carotid artery. Dr. Benson therefor believed that any conclusion concerning how much Mr. Justice bled after his body was deposited at the crime scene would be based almost entirely on speculation.

Concerning the victim's position after he was shot, Dr. Benson noted that photographs of the inside of the car and Mr. Salcido's clothing indicated a large amount of Mr. Justice's blood soaked into the driver's seat of the car and the pants Mr. Salcido was wearing during the incident. Dr. Benson believed that the presence of so much blood on the driver's seat of the car was consistent with the victim lying with his head on Mr. Salcido's lap for some time after the gunshot, since the wound suffered by Mr. Justice would result in a great deal of bleeding from Justice's nose, mouth and the gunshot wound to his lower head.

Dr. Benson noted additional forensic evidence that could indicate the victim was alive and breathing after he was stabbed. According to Dr. Benson, the autopsy report noted that the victim suffered a massive hemorrhage into the parimcial on the lung, and given that there was only one gunshot wound (which was to the upper neck), the hemorrhage on the lung must have been caused by one or more of the stab wounds, which were to the mid-back of Mr. Justice's torso. The autopsy also noted the presence of blood in the victim's larynx and trachea. Dr. Benson concluded that the victim's aspiration of blood into the trachea would suggest that the victim's heart was still pumping blood and that the victim was still breathing after the stab wound to the lung.

Dr. Benson's review of postmortem x-rays of the victim revealed what appeared to be air in the pleural cavity (around the lungs), which the autopsy report failed to note. Dr. Benson determined that the presence of air in the pleural cavity would strongly suggest that the victim was alive when he was stabbed. In Dr. Benson's opinion, both of these factors (aspiration of blood and air in the pleural cavity) tend to show that the victim was alive and breathing when he was stabbed in the lung.

Like Dr. Hermann, Dr. Benson disagreed with the prosecution's theory that the evidence established that Mr. Justice was garroted with a belt before he was shot. Dr. Benson noted that the coroner claimed that garroting would leave no marks on Justice's neck if he was still alive when the garrote was removed, since blood circulation would eliminate any ligature marks on the skin. Dr. Benson, in contrast, concluded that the belt which was allegedly used as a garrote might or might not leave ligature marks on the neck, but it was likely that if the victim was garroted one would observe fingernail marks on the neck where the victim tried to remove the garrote. No ligature or fingernail marks were noted on the victim's neck.

Had Dr. Benson been called to testify, he would have testified that the forensic evidence gathered at the scene, during the autopsy, from the car and from Mr. Salcido's clothing, was consistent with Mr. Salcido's statements to the police. In other words, consistent with Mr. Justice having been stabbed first, then shot in the head a minute later, then lying across Salcido's lap for a period of time while he bled profusely from the gunshot wound (in the upper neck), his mouth and nose. Dr. Benson also would have testified that there was insufficient evidence to support a conclusion that Mr. Justice was still alive when his body was deposited at the crime scene. Dr. Benson also have testified that there was

insufficient evidence that the blood patterns on the victim's clothing established that the victim was prone when he was stabbed, or that the victim was stabbed after he was shot.

36.  Mr. Morton's opinions concerning the meaning of the forensic evidence would have directly contradicted the opinions offered by the prosecution's forensic experts.  Mr. Morton evaluated the physical evidence, in particular the blood spatter evidence and gunshot reside evidence.  Mr. Morton's Declaration concerning his evaluation and opinions is attached hereto.

Concerning the gunshot residue tests, Morton found that the amount of residue located on Mr. Salcido's glove was insufficient to discern whether Mr. Salcido had fired a gun, or had merely been nearby when someone else discharged a firearm. Mr. Morton further concluded that the amount of gunshot residue found on the gloves could easily have been deposited there by someone firing a gun inside Mr. Salcido's car while Salcido was also inside the car.  Mr. Morton therefor concluded that the prosecution's expert's opinion that the gunshot residue test that Salcido fired the weapon was insupportable.

As to the blood spatter evidence, Mr. Morton determined that the prosecution's expert, Mr. Ridolfi, did not take into account several key aspects of the forensic evidence, and Ridolfi's opinions were therefor unsound.  Mr. Morton noted that Ridolfi had not measured or taken into account the precise shape of the blood spatter marks, and did not consider the effect of the car having been driven for a considerable time with the window blown out, which would have imparted wind currents on the spatter blood.  As a result, Mr. Morton decided that the blood spatter patterns were altogether inconclusive as to the direction from which the victim was shot while seated in the car.

Mr. Morton similarly concluded that the blood spatter pattern did not establish

that the door of the car was closed or open when the fatal gunshot was fired. Morton based his conclusion on the absence of any photos or notations of the presence of blood spatter on the passenger door window frame near the roof of the car.

Mr. Morton, like Dr. Hermann, concluded the presence of the belt near the victim's body at the crime scene did not support the prosecution's experts' theories that the victim had been garroted with the belt. Finally, Mr. Morton concluded that the position of the bullet casing found under the back of the driver's seat did not indicate the gunshot had been fired by someone sitting in the driver's seat of the car.

37. James Norris' opinions concerning the ballistic and gunshot residue evidence would have impeached the prosecution's expert witnesses.

Mr. Norris characterized the amount of gunshot residue found on Mr. Salcido's gloves as "very small," which led him to conclude that it was no possible to discern whether Mr. Salcido had fired a gun or had merely been nearby when a gun was fired by someone else. Like Mr. Morton, Mr. Norris also determined that the small amount of residue on Salcido's gloves could have been deposited there when someone sitting in the back seat of Salcido's car shot Mr. Justice.

Regarding the bullet casing found in the car, Mr. Norris noted that the firing pin marking found on the expended casing could have been made by almost every type of handgun sold or commonly available in the United States. Furthermore, Mr.Norris would have testified that the markings left by 9mm Beretta handguns are quite commonplace.

Based on these findings, Mr. Norris would have testified that the prosecution's expert's opinion that the bullet casing found in the car "matched" or was "consistent with" a 9mm Beretta were overstated and misleading. Finally, Mr. Norris noted that

**(18)**

the prosecution's expert's examination of the casing was insufficient, since the expert did not note what the relevant markings were, or any description of the firing pin, ejector, extractor or breech face markings evident on a 9mm Beretta handgun.

## THE TRIAL BEGINS AND THE COURT REVISITS
## THE CONFLICT ISSUE

38.   In limine motions commenced on June 26, 2000.  After the first day of litigation of the in limine motions, both defense counsel visited Mr. Salcido at the jail.  During this meeting counsel Horngrad advised Salcido that he no longer could represent him because the court and the District Attorney had raised concerns about the conflict issue, and that counsel Rappaport might also be removed as defense counsel.  Mr. Salcido asked counsel why Horngrad could no longer represent him, and Horngrad informed him that if he continued as Salcido's attorney, the prosecution could call counsel as a witness, make it appear that Salcido, Smith, Bergstrom and Margulies were all conspirators, and that Salcido was "the puppeteer."  Counsel further informed Salcido that the appearance that Salcido controlled the prosecution witnesses would have a prejudicial impact on the jury. Horngrad assured Salcido that he wanted to continue as his counsel, but that the court would not allow it.  (See Declaration of Petitioner Felix A. Salcido III, attached hereto.)

39.   On June 28, 2000, defense counsel Horngrad moved to withdraw from his representation of Mr. Salcido due to a supposedly persisting conflict of interest. The June 28, 2000 hearing on in limine motions, at which Mr. Horngrad made his motion to withdraw, was the first Mr. Salcido was informed that counsel was moving to withdraw, as oppose to being removed by the court.  (See Declaration of Petitioner Felix A. Salcido III, attached hereto.)

39.  On June 28, 2000, defense counsel Horngrad moved to withdraw from his representation of Mr. Salcido due to a supposedly persisting conflict of interest. The June 28, 2000 hearing on in limine motions, at which Mr. Horngrad made his motion to withdraw, was the first Mr. Salcido was informed that the counsel was moving to withdraw, as opposed to being removed by the court.  (See Declaration of Petitioner Felix A. Salcido III, attached hereto.)

40.  In response to the motion to withdraw, the trial court appointed independent counsel Patrick Kelly to confer with Mr. Salcido and report to the court on the conflict issue.  That afternoon Mr. Kelly consulted with Mr. Salcido and Salcido informed Kelly that he wanted to keep both Horngrad and Rappaport as his attorneys, and that he would waive any conflicts as to both counsels, as he had at the preliminary hearing.  (See Declaration of Patrick Kelly filed herewith.)

41.  On July 10, 2000, the trial court held a hearing on the motion to withdraw. At the hearing, Mr. Horngrad indicated he was moving to withdraw "based on the conversations I've had with Mr. Kelly [the appointed independent counsel] and his analysis."  The court then asked Mr. Kelly to report his conclusions, and Kelly noted that he had looked into the matter, and "the primary focus...is on the rights of Mr. Salcido."  Kelly further informed the court that he had discussed the matter with Salcido, and Salcido "was prepared to waive and potential conflict of interest..."

The court then went through the history of Mr. Horngrad's representation of Christian Smith, and read into the record the portion of the preliminary hearing transcript wherein Mr. Smith was voire dired and entered his waiver of the conflict as to both Rappaport and Horngrad.  The court then asked Mr. Salcido, "do you have any comments that you wish to make regarding [Horngrad's motion to withdraw]?" Salcido, per the advise of both Rappaport and Horngrad answered, "no."

(20)

Following this discussion, the court allowed Horngrad to withdrawal and stated, "Mr. Horngrad, I am going to allow you to withdrawal as counsel of record in this matter based upon the apparent conflict that you have reported to the court.[1]"

After relieving Mr. Horngrad, the court questioned defense counsel Rappaport regarding his conflict concerning the same prosecution witness, Christian Smith. Mr. Rappaport informed the court that he had, like Horngrad, previously represented smith in criminal cases. Mr. Rappaport indicated he had a written waiver of the conflict in the record under seal. (See Exhibit B [Waiver of Potential Conflict of Interest].) The court then noted Mr. Salcido's waiver of the conflict and allowed Rappaport to continue representing Mr. Salcido. The court further noted that Rappaport would need additional time to prepare to handle matters that had previously been the province of Mr. Horngrad and continued the trial to July 26, 2000.

42. On July 26, 2000, the defense moved for continuance of the trial date based on late disclosures of discovery by the prosecution and the withdrawal of Mr. Horngrad. Mr. Rappaport informed the court "that Mr. Horngrad's withdrawal from this case was unanticipated,...both Mr. Horngrad and myself were aware of the potential conflict and had in our minds...that there would be not issue in this court." Rappaport then asserted that Horngrad's withdrawal, Rappaport noted,

---

[1] Mr. Salcido first learned that Horngrad's withdrawal was initiated by Horngrad himself during a Santa Clara County Superior Court habeas corpus petition's evidentiary hearing in 2006. During Mr. Rappaport's direct examination, Rappaport stated that the prosecution had a problem with Horngrad's representation of Mr. Salcido. The prosecution, in open court stated, that they never had a issue with either Rappaport or Horngrad representing Mr. Salcido. Prior to hearing this dialogue, Mr. Salcido had been under the impression, by both Horngrad and Rappaport, that it was the prosecution who would not permit Horngrad to represent Salcido.

placed Rappaport "in the position of having to pick up his part of the case. Approximately one-half of this homicide." Rappaport then admitted that he had underestimated how long it would take him to absorb the work done by Horngrad.

43. That same day Mr. Rappaport presented to Petitioner's father a second fee agreement which required Petitioner's father to pay Mr. Rappaport an additional $20,000 for counsel to perform "any and all legal work that was going to be handled by Douglas Horngrad..." (See Declaration of Felix M. Salcido, attached hereto.) The agreement also limited the representation to "one trial, excluding writs and appeals." (Id.) However, the agreement explicitly noted that the contract "does not replace the previous agreement dated December 28, 1998." (Id.)

## THE TRIAL

44. Following the July 26 continuance resulting from late discovery and Horngrad's withdrawal, trial started on August 16, 2000.

45. During opening statements defense counsel informed the jury that Mr. Salcido would testify in his own defense. Defense counsel informed the jury, "you'll hear from Mister Salcido himself. He's gonna take the witness stand, he has nothing to hide." Counsel went on to describe Mr. Salcido's expected testimony and defense, which corresponded to Salcido's statements to the police on the night of the shooting. Counsel told the jury that "Mr. Justice on the night of his death was driving Felix crazy to buy drugs. Take me to buy drugs. I don't have a car. I want to buy crack cocaine.'"

Defense counsel continued to tell the jury the defense's theory of how the shooting occurred. Counsel stated the jury would hear that Mr. Salcido took Mr. Justice to East Palo Alto. Counsel then told the jury, "That's there things went from bad to worse. Mr. Justice got out of the car. Felix told him to stay in the car and not to pull out a lot of money. Didn't listen." Counsel then

proceeded to tell the jury they would hear the entire story of how Mr. Justice was stabbed and shot by drug dealers.

Counsel further told the jury that they would hear testimony that Mr. Salcido panicked and could not identify the shooters.  Defense counsel said, "he'll [Mr. Salcido] testify that all he remember is the loud ringing in his ears..."

Counsel concluded his opening statement by telling the jury, "What Mr. Salcido said was this.  He had said when it happened in East Palo Alto -I was panicked. I could tell that Mr. Justice was still alive.  He had fallen over on to me. Transferring all the blood on Mr. Salcido and his side of the car.  That the body flopped over.  Mr. Salcido tried to get him up.  In fact, he used his belt to try to cinch him upright...He says he was taking him to the hospital and then realized within minutes that he was dead.  And that's where he made his mistake. Because instead of going to the hospital, he dumped the body...Later on, after he had gone home...he thought to himself maybe he's alive...And he went back.'" Counsel then again reiterated to the jury, "He'll get up there and tell you that."

46.  The prosecution called lay witness Ed Allison, Kojo Williams, Norman Jackson and Christian Smith.  Mr. Allison testified that Salciso had admitted to him, during one conversation "over drinks" in 1994, that Salcido had been involved in a drug deal, that "there was some problem with some deal that he had," and that he and a friend had been involved in "a drug deal that went bad."  According to Allison, Salcido also admitted that sometime after this "drug deal gone bad," Salcido and his friend had been shot at by an unidentified third party.  Salcido then told Allison that he third party, who was sitting in the back seat of Salcido's car, "shot the guy."  Finally, Salcido told Allison that after the person in the back seat shot the other participant in the drug deal, Salcido had been "pulled over and either they found the dead guy next to him...or they found blood on

(23)

him from this dead guy."

Norman Jackson testified at trial and a tape of his interview with the police for the jury. Jackson indicated he had been a friend of Salcido's since they were kids. Jackson informed the jury that sometime in 1993 or 1994, Salcido told Jackson that he "had a nice moeny thing going." Sometime later, Jackson claimed, Salcido told him this person was "lagging" and had "pissed him off." A third conversation between Jackson and Salcido, Salcido informed him that he got "rid of the guy." The prosecution inferred this testimony to correlate between Salcido and Justice. Later it was determined by defense counsel that Jackson's interview specifically referred to this "guy's" name to be "Scott." Mr. Justice first name was William. Defense counsel never recalled Jackson to clarify this to the jury.

Kojo Williams testified that he was a close friend of Salcido's and had once purchased a 9mm Beretta. Williams testified that Salcido was present during the purchase and Salcido loaned him $200.00 so that Williams could buy the gun. Williams further testified that he could not locate the 9mm gun because it had been stolen while he was visiting family in Tacoma, Seattle, but that he had never reported the theft.

47.    Prosecution forensics expert Doug Ridolfi testified about the blood spatter evidence and glass fragments found in the Oldsmobile Salcido was driving on the night of the shooting, and about a 9mm bullet casing found on the floorboard of the back seat of the car.

At trial Ridolfi testified that the marking on the 9mm bullet casing found in Salcido's car "matched" and were "consistent with" a shell casing fired from a 9mm Beretta handgun.

Concerning the blood spatter and glass evidence in the car, Ridolfi testified that the forensic evidence indicated that someone was seated in the back seat of

the car when Mr. Justice was shot inside the car, and that the person in the back seat had "contact" with the bloody head and clothing of Mr. Justice. Ridolfi further testified that the forensic evidence suggested that after being shot inside the car, Mr. Justice was dragged from the car and stabbed as he was lying face down on the ground.

Finally, Mr. Ridolfi testified that a belt that was found clutched in Mr. Justice's right hand at the crime scene "suggested" that Mr. Justice was garroted from behind, with the belt, during the shooting.

48. The prosecution also called Sheriff's investigator Medved. During the prosecution's direct exam of Medved, Medved was asked why he retrieved Salcido's phone records. In response, Medved informed the jury that in his opinion there had been a "conspiracy" to kill William Justice, and that Salcido's phone records would likely reflect phone calls between Salcido and a unknown conspirator[2]. Medved then proceeded to testify about Mr. Salcido's phone records, including numerous phone calls during the day of the murder to numbers Medved characterized as "unknown" phone numbers.

During argument, the prosecution utilized large projection charts of Salcido's phone records from the day of the killing. Numerous of calls on the chart were labeled as having been made to "unknown" phone subscribers, and the prosecution argued that these calls were to Salcido's unidentified "accomplices."

49. Prosecution experts witness Dr. Vermeghi, the Santa Clara County coroner, testified regarding various forensic pathology and crime scene issues, including his opinions as to whether Mr. Justice was killed at or near the scene where his body was found. According to Dr. Vermeghi, the amount of blood pooled on the ground

---

[2]. Defense counsel did not object to the elicitation of Medved's opinion about the supposed "murder conspiracy." Nor did the defense counsel bring it to the attention of the court that the "unknown number called before the killing belong to Salcido's sons' maternal grandmother.

around  Mr. Justice's corps, the amount of blood around the stab wounds, and the
nature of the bullet wound to Justice's head and upper neck all indicated Mr.Justice
was shot and stabbed very near where his body was found, and that he was still alive
when he was deposited on the ground at the roadside turnout on Moody Road.  This
testimony contradicted Mr. Salcido's statement to the police in which Salcido
indicated Mr. Justice was shot in East Palo Alto, some 15 miles away, and that
Mr. Justice was already dead when Salcido deposited his body out of the car on
Moody Road.

## THE DISCOVERY DISPUTE DURING TRIAL AND THE
## RESULTING MOTION FOR A MISTRIAL

50.  During the course of Ridolfi's testimony it became apparent that Ridolfi
was referring to crime-scene photographs that had never been disclosed to defense
counsel.

51.  The discovery included 64 photos of the critical blood spatter evidence
and 750 pages of transcripts of taped statements by witnesses who testified in the
prosecution's case-in-chief. (RT 1230, 1250-1252, 1284-1285.)  By the time the
defense received the late discovery defense counsel had already consulted with
the defense expert and begun examination of the prosecution's expert, criminalist
Doug Ridolfi.  In addition, Christian Smith, John Berstrom, and Kojo Williams,
whose were among those produced at the last moment, had already testified.

52.  upon learning of the undisclosed photos and witness statements, defense
counsel moved for sanctions.  However, when queried by the court as to whether
the defense requested a mistrial, defense counsel, stated, "quite honestly, my
fee agreement clearly states that I'm retained for one trial regardless of the
outcome...so [a mistrial] prejudices Mr. Salcido, quite frankly.  It may jeopardize
or prejudice his ability to have counsel of his choice."  Counsel then requested

(26)

exclusion of the crime-scene photos and resulting expert testimony, rather than a mistrial. The court then took a short recess.

53. Following the recess, defense counsel informed the court that he had spoken with Mr. Salcido regarding a possible mistrial, and that Salcido agreed that a mistrial would cause financial prejudice to him and his family. The court then advised Mr. Salcido, "I would never, ever consider a mistrial motion without the active participation and consent of the defendant...And if what your attorney says, Mr. Salcido, is correct,...namely, that he has some type of retainer agreement that is only for one trial,...if you consented to a mistrial motion, you would have to understand that he would probably no longer be your attorney, and you would be subject to a court appointed attorney..." The court then recessed for the day.

54. The following morning defense counsel met with Mr. Salcido and informed him that his parents did not have enough money to pay for another trial, and if the court declared a mistrial he (defense counsel) would no longer be Mr. Salcido's attorney. Defense counsel then advised that Mr. Salcido agree to withdraw the motion. Mr. Salcido confronted with the choice of losing his counsel or withdrawing the motion, chose to maintain his counsel. (See Declaration of Petitioner Felix A. Salcido III, Declaration of Felix M. Salcido, attached hereto.)

55. After consulting with Mr. Salcido, defense counsel informed the court that Mr. Salcido had decided to withdraw the motion for a mistrial. The court then indicated, "any request for a mistrial has been withdrawn..."

56. The original retainer agreement between defense counsel and Mr. Salcido in fact did not provide that counsel was retained for only one trial, regardless of whether a first trial ended in a mistrial. The original agreement actually indicated counsel was retained through trial, with no qualifications. A second

fee agreement, which purportedly "augmented" but did not "replace" the original agreement, and which was executed four days after counsel Horngrad withdrew, indicated defense counsel would be paid an extra $20,000 to complete trial work that was initially assigned to Horngrad, and further specified that the $20,000 fee was "for one trial only." True copies of both original and "supplemental" retainer agreements are attached to the Declaration of Felix M. Salcido filed herewith.

## PETITIONER'S FAILURE TO TESTIFY OR PRESENT A DEFENSE

57.  After initially informing the jury during opening statements that a defense would be presented and that "you'll hear from Mister Salcido himself. He's gonna take the witness stand, he has nothing to hide," the defense rested without calling a single witness.

58.  At the close of the prosecution's case-in-chief the court granted a short recess.  At this moment Mr. Salcido fully intended to testify and expected his counsel to put on a defense that would include the expert witnesses hired by his father and prepared by the defense.  Also, Salcido expected defense counsel to call his sons' maternal grandmother to refute "unknown" phone calls presented by the prosecution.  However, during the recess Mr. Salcido was taken to a holding cell adjacent to the courtroom where he was joined by defense counsel.  At that point defense counsel told Mr. Salcido that he did not intend to put on any defense. Defense counsel told Mr. Salcido that he had already spoken to Salcido's father, and that his father agreed.

Mr. Salcido was confused by this sudden change of strategy and questioned defense counsel about how they were going to explain the saturated blood found in Mr. Salcido's car seat, Salcido's bloody clothes and belt and identifying the "unknown" phone numbers.  Defense counsel assured Salcido that he had seriously

damaged the prosecution's expert witness on gunshot residue and that there was
insufficient evidence to show that Salcido had shot Mr. Justice.   Mr. Salcido
then again indicated that he wanted to tesify so he can explain his presence at
the crime scene.   Mr. Salcido specifically remembers defense counsel stating,
my dad always told me that the real trial doesn't start until closing arguments."
Mr. Salcido still wanted to testify, to which defense counsel responded that
Salcido was being arrogant, and that he had a "50-50" chance of winning if he
did not testify and "10%" chance if he did testify.   Defense counsel further
informed Salcido that he had consulted with several experts and that none of them
"buy your story."   Mr. Salcido was angry with defense counsel's revelation and
questioned him on how he could be so far into his trial only to learn that "no
one bought his story."   Finally, defense counsel assured Salcido that anything
Salcido wanted to say on the stand, defense counsel could say in his closing
argument.   Mr. Salcido was still upset with the idea that defense counsel would
provide the jury with an explanation of the shooting during his closing statements.
(See Declaration of Petitioner Felix A. Salcido III and Declaration of Felix M.
Salcido, attached hereto."

The entire conversation, in the holding cell, lasted less than five minutes.
This was the first conversation  in which any Mr. Salcido's counsels told Salcido
he should not testify.   Mr. Salcido had always been under the impression that
after his statements to the police were thrown out in limine motions; Salcido
would have to testify to explain his presence at the crime scene.

59.   When Salcido and his counsel returned to the courtroom, Salcido expected
to be voire dired by the court on his decision not to testify.   Mr. Salcido was
expecting the court to inquire on his right to testify the same way the court
directly asked him regarding his plea at his arraignment and his previous conflict

of attorney issues. When the court did not inquire as to whether Salcido wanted to testify, Salcido did not know what to do. He was afraid to confront his attorney in front of the jury and thereby lowering the jury's estimation of both him and his counsel. As a result, Mr. Salcido remained silent. (See Declaration of Petitioner Felix A. Salcido III and Declaration of Felix M. Salcido, attached hereto.)

## PETITIONER'S ALLEGATIONS REGARDING
## INEFFECTIVE ASSISTANCE OF COUNSEL

60. Petitioner did not receive the effective assistance of counsel at his trial to which he is constitutionally entitled under the Sixth and Fourteenth Amendments to the United States Constitution. Trial counsel rendered ineffective assistance by denying Petitioner his right to testify in his own defense, by failing to present defense evidence that was exculpatory and material, by improperly agreeing to the withdrawal of Petitioner's co-counsel just prior to trial, and by improperly convincing Petitioner to forego a mistrial motion concerning late discovery disclosures by prosecution.

61. Petitioner always believed that he would testify in his own defense, until Petitioner's counsel prevented Petitioner form testifying. At the close of Petitioner's case, Petitioner's counsel spoke with him in the holding cell and coerced Petitioner into foregoing his right to testify. Petitioner had less than five minutes to consider this issue, in a holding cell adjacent to the court, before his counsel informed the court that the defense would rest on the state's evidence. By coercing Petitioner into not testifying, Petitioner's counsel rendered ineffective assistance in violation of Petitioner's Sixth Amendment and California constitutional rights.

62. Had Petitioner testified, he would have provided a plausible explanation

as to how Mr. Justice was shot in Petitioner's car, then driven by Petitioner to the Moody Road area where Mr. Justice's body was later found. Petitioner's testimony, which would have reflected his statements to the police in the days following the shooting, would have exculpated Petitioner. Given that it could not be disputed at trial that Mr. Justice was shot and killed in Petitioner's car, while Petitioner was present, there was no justification tactical reason for Petitioner's counsel to prevent Petitioner from testifying in his own defense.

63. Petitioner's counsel was further ineffective by failing to present a defense case. The defense had available numerous forensic expert witnesses who would have both impeached the prosecution's forensic experts, and who would have substantially supported the version of the events described by Petitioner during his statements to the police (and to which Petitioner would have would have testified at trial). These experts witnesses would have testified that the forensic evidence supported the contention that Mr. Justice was stabbed before he was shot, that Justice was shot in the car and then lay prone for some time on Mr. Salcido's lap, that there is no evidence to indicate Mr. Justice was garroted, and that there is insufficient evidence to indicate Mr. Justice was stabbed as he was laying prone on the ground at Moody Road. The forensic experts also would have testified that there is insufficient evidence to support the prosecution's contention that Mr. Justice was alive when his body was deposited at the site where he was eventually found.

Additional expert witnesses were available to testify that the gunshot residue found on Petitioner's gloves and hand was minute and that such residue deposits were consistent with Petitioner's version of events that he put the gloves on to clean the car and protect his hands from glass shards. Hereby the expert witness available to the defense would have testified that the amount of residue

found on the gloves is consistent of a transfer while cleaning as oppose to a
result of firing a weapon. Finally, the expert witness would have testified that
the markings on the expended bullet casing found in the Petitioner's car could
not be linked , with any degree of certainty, to a 9mm Beretta handgun or any
other type of 9mm handgun.

64. By failing to present available, credible defense expert witnesses on
Petitioner's behalf, defense counsel rendered ineffective assistance under both
the state and federal constitutions. The defense experts would have substantially
and materially corroborated Petitioner's statements and potential testimony wherein
Petitioner would have established that third parties stabbed, then shot Mr.Justice,
and that Petitioner drove Mr. Justice to Moody Road from East Palo Alto after
the shooting.

65. Petitioner's counsel also failed to present available defense witnesses
to rebut the prosecution's contention that Petitioner's phone records reflected
calls to an unidentified "accomplice" in the hours before the shooting. Though
defense counsel was well aware that the prosecution would assert that several
phone calls reflected in the records were to an "unknown" number, counsel failed
to call Petitioner's sons' maternal grandmother to testify that she is the true
subscriber of this number listed in the records. By failing to do so, counsel
allowed the prosecution to present to the jury a false picture of the meaning
of the phone records, and failed to rebut significant, though misleading,
prosecution evidence that the person in the back seat, when Justice was shot,
was the "unknown subscriber," an unknown accomplice.

66. Petitioner's counsel was further ineffective when he and his co-counsel
moved to allow co-counsel to withdrawal just before trial. Though both defense
counsels represented to the court and Petitioner before the preliminary hearing

**(32)**

of a conflict of interest regarding the state's material witnesses, Rappaport compromised his allegiance to Petitioner by allowing Horngrad to mislead Petitioner to the facts relating to his withdrawal. Moreover, Rappaport gained financially from Horngrad's withdrawal despite knowing from Petitioner that he was willing to reiterate waivers asserted at the preliminary hearing to maintain both counsels.

Despite Petitioner's willingness to waive the conflict and despite a third court appointed counsel's conclusion that Petitioner wished to waive the potential conflicts and continue with both of his counsels representing him, both defense counsels informed the court that one counsel must withdraw. As a result of both defense counsels' representations to the court, and false advisement to Petitioner, the court allowed one of Petitioner's counsel to withdraw.

67.  Petitioner was prejudiced by the last-minute withdrawal of one of his counsel. As a result of the withdrawal of one counsel, Petitioner's remaining counsel was not adequately prepare for trial. Specifically defense counsel was not able to prepare the portion of the defense case of direct and cross examination of lay witnesses. Moreover, the defense received late discovery related to lay witnesses statements.

68.  Petitioner's counsel was further ineffective when he convinced Petitioner to withdrawal his motion for a mistrial based on the prosecution's improperly late, mid-trial disclosure of important forensic evidence and witness statements. During argument on the mistrial motion, Petitioner's counsel falsely informed both petitioner and the court that his fee agreement with Petitioner would allow him to withdraw as Petitioner's counsel, should the court declare a mistrial. Based on this representation by counsel, Petitioner was under the impression that if the court granted his motion for a mistrial, he would lose his attorney and be subjected to court appointed counsel for a new trial. In response, Petitioner

consented to the withdrawal of the mistrial motion. As a result, Petitioner was prejudiced by continuing his trial with late disclosures of forensic evidence and witnesses' statements.

69. Once the motion was withdrawn, the court attempted to remedy the discovery violation by giving the defense a brief continuance. However, defense counsel and defense expert had already spent hours preparing the defense case concerning the forensic evidence. The brief continuance provided by the court was insufficient to allow defense counsel and the defense experts to review the evidence, re-formulate the defense case and rebut the conclusions of the prosecution's experts.

Petitioner was prejudiced when defense counsel limited the new dicovery  to one expert, Mr. Morgan and not allowing Dr. Benson, Dr. Hermann and James Norris to re-formulate their opinions. As a result, defense counsel was not adequately prepared to cross examine the prosecution's expert witnesses on the forensic issues, and failed to present all potential testimony available to the defense.

In addition, defense counsel neglected to address lay witness Jackson's statement to the police that the Petitioner "got rid of him." It was later discovered by the defense that Jackson's transcripts specifically referred to this person to be "Scott." The victim's name is this matter is William Justice. Defense counsel was ineffective by knowingly allowing the jury to deliberate without clarifying this statement.

70. This Petition has been filed as soon as practicable after all of the facts alleged as grounds herein became known to the undersigned.

71. Under Article 6, Section 10 of the California Constitution, this Court has original jurisdiction over this petition for writ of habeas corpus.

72. Petitioner has no other adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner request that this court:

1. Take judicial notice of all court records in People v. Salcido, Santa Clara Superior Court case number Superior Court No. B9842667, and People v. Salcido, California Court of Appeals for the Sixth District No. H023965;

2. Issue an order to show cause, returnable before this Court, Why Petitioner's conviction should be set aside, and order an evidentiary hearing;

3. Upon final review, order that Petitioner's conviction be set aside;

4. Provide such other and further relief as may be deemed appropriate in the interest of justice.

Respectfully submitted,

_Wednesday, August 26 2008_
Dated.

Felix A. Salcido III, In Pro Se

(35)

<u>**DECLARATIONS**</u>

Felix A. Salcido III, In Pro Se

## DECLARATION OF FELIX M. SALCIDO

I, Felix M. Salcido, state as follows:

1.      In am the father of Felix Salcido III, the Petitioner in this matter.

2.      In or about the last week of December of 1998, shortly after my son was arrested for a second time, I hired attorneys Doug Rappaport and Doug Horngrad to represent him in the murder case.  Attached to this declaration is a true copy of the retainer agreement I entered with Mr. Horngrad and Mr. Rappaport.

3.      Over the course of the next two years I had many conversations with both attorneys.  I also paid the attorneys additional sums of money for investigators, expert witnesses, and other attorneys who represented some of the witnesses.  These people included, among others, investigator Steve Schwartz, experts Chuck Morton, Dr. Paul Herman, Dr. Peter Benson, a firearms expert named Jim Norris, an attorney by the name of Rebecca Young, Dr. Diane McEwan, Dr. David Lawrence and the National Jury Project.

4.      It was my understanding that attorney Rebecca Young was hired to represent a witness in the case.  My recollection was that I paid Ms. Young over $3,000 for representing the witness.

5.      At the time I first hired Mr. Rappaport and Mr. Horngrad they informed me that they had potential conflicts of interest involving their prior representation of Christian Smith and Steve Margulies.  They also told me that the conflicts would not be a problem if Felix III and the witnesses signed waivers.

6.      Based on conversations between the two lawyers, my son and myself, my understanding was that Mr. Rappaport was responsible for the forensics and expert witness portion of the case, while Horngrad was responsible for preparing for the police officers and other witnesses.

7.      During the time period when Mr. Horngrad and Mr. Rappaport were preparing my son to testify, they told me they needed additional funds to hire the National Jury Project consultants to help prepare Felix III's testimony.  I paid the National Jury Project about $5,000.

8.      Prior to trial both of the attorneys told me that Felix III would be testifying

*In re Salcido: Declaration of*
*Felix M. Salcido.*                                                                      Page 1

in his own defense because it was clear that he was present when Mr. Justice was shot, and he needed to explain how it happened.

9.      At the trial I expected Mr. Rappaport to call Chuck Morton, an expert we hired. I thought that based on my conversations with Mr. Rappaport and the large amounts of money I paid Mr. Morton for what I understood was his preparation to testify at the trial. True copies of the Mr. Morton's invoices, which I paid, are attached to this declaration.

10.     Near the beginning of the trial, Mr. Rappaport and Mr. Horngrad told me that Mr. Horngrad could no longer represent Felix III because the court and the District Attorney had raised concerns about the conflict issue, and that Mr. Rappaport could also be removed as defense counsel.

11.     I attended the hearing where the judge, Mr. Rappaport, Mr. Horngrad and the D.A. discussed the conflict and Mr. Horngrad moved to withdraw from the case. After the hearing Mr. Rappaport presented me with another fee agreement which he told me I needed to agree to in order for him to stay on the case. I signed the agreement because I was afraid of my son losing both his attorneys just before trial. A true copy of the second fee agreement is attached to this declaration.

12.     I remember during the trial when a dispute arose about the prosecution's failure to give the defense a large number of photos and other reports. Mr. Rappaport made a motion for a mistrial as a result.

13.     After court Mr. Rappaport and I talked about a possible mistrial, and Mr. Rappaport told me that he was not obligated under his contract to do a second trial, and asked if I could afford to pay for another trial. I told him I could not afford to pay more.

14.     I also spoke with my son about the mistrial. He said he wanted to keep Mr. Rappaport and that he thought that it would hurt his defense to lose his lawyer. We both agreed that the only way for my son to keep his attorney was for him to agree to withdraw the mistrial motion.

15.     I was in court the day Mr. Rappaport announced that he would not be putting on a case. I was shocked. Until that moment I had fully expected that Mr. Rappaport would call my son to the stand, would call Chuck Morton, and would use some of the other expert witnesses. Mr. Rappaport had, up until that point, told me that he was putting on a defense. He also told me that the additional money I had paid was for

*In re Salcido: Declaration of*
*Felix M. Salcido.*                                                    Page 2

preparing the defense case, as well as his preparing to present the part of the case Mr. Horngrad was supposed to present.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this 20th day of July, 2005, in San Francisco, California.

FELIX M. SALCIDO

# Invoice 9844045

## Invoice Date 10/05/00

**Remit To: Forensic Analytical**
3777 Depot Road
Suite 409
Hayward, CA 94545
Telephone: 510/887-8828

Fed Tax ID: 94-3018588

**Report To:**

**Bill To:** Law Ofc/Douglas L. Rappaport

530 Jackson Street, 4th Flr
San Francisco, CA 94133
USA

Law Ofc/Douglas L. Rappaport
530 Jackson Street, 4th Flr
San Francisco, CA 94133
Phone: 415/989-7900- USA

| Customer # 10523 | PO/Contract B9842667 | Job ID 20000100 | | Terms Net 30 Days | | | |
|---|---|---|---|---|---|---|---|
| Item Number | Item Description / Date - Activity | Report | Qty | Unit | Unit Price | Extended Price |
| 030 | CM | | 1.40 | Hours | 180.00 | 252.00 |
| | 06/15/00 Consultation Time-Senior | | | | | |
| 020 | CM | | 0.80 | Hour | 180.00 | 144.00 |
| | 06/15/00 Case Review-Senior | | | | | |
| 090 | CM | | 1.00 | Hour | 180.00 | 180.00 |
| | 06/16/00 Evidence Examination-Senior | | | | | |
| 50 | CM | | 0.40 | Hour | 180.00 | 72.00 |
| | 06/16/00 Miscellaneous-Senior | | | | | |
| 80 | CM | | 0.10 | Hour | 180.00 | 18.00 |
| | 06/20/00 Phone Consultation-Senior | | | | | |
| 80 | CM | | 0.10 | Hour | 180.00 | 18.00 |
| | 06/21/00 Phone Consultation-Senior | | | | | |
| 090 | CM | | 1.00 | Hour | 180.00 | 180.00 |
| | 06/22/00 Evidence Examination-Senior | | | | | |
| 81 | NS | | 0.30 | Hour | 180.00 | 54.00 |
| | 06/22/00 Phone Consultation(DNA)-Senior | | | | | |
| 031 | NS | | 2.00 | Hours | 180.00 | 360.00 |
| | 06/23/00 Consultation Time(DNA)-Senior | | | | | |
| HOTO | Photography | | 9.00 | Each | 2.00 | 18.00 |
| | 06/27/00 | | | | | |

Ite Address: People vs Felix Salcido

# Invoice 9844045

### Invoice Date 10/05/00

**Remit To:** **Forensic Analytical**
3777 Depot Road
Suite 409
Hayward, CA 94545
Telephone: 510/887-8828

Fed Tax ID: 94-3018588

**Bill To:** Law Ofc/Douglas L. Rappaport

530 Jackson Street, 4th Flr
San Francisco, CA 94133
USA

**Report To:**

Law Ofc/Douglas L. Rappaport
530 Jackson Street, 4th Flr
San Francisco, CA 94133
Phone: 415/989-7900- USA

| Customer # 10523 | PO/Contract 59842667 | | Job ID 20000100 | | | Terms Net 30 Days | |
|---|---|---|---|---|---|---|---|
| Item Number | Item Description / Date - Activity | Report | Qty | Unit | Unit Price | | Extended Price |
| PHOTO | Photography 07/05/00 | | 7.00 | Each | 2.00 | | 14.00 |
| 180 | CM 07/05/00 Phone Consultation-Senior | | 0.10 | Hour | 180.00 | | 18.00 |
| 00 | JJ 07/07/00 Evidence Handling-Technician | | 0.30 | Hour | 75.00 | | 22.50 |
| 00 | CM 07/07/00 Evidence Handling-Senior | | 0.50 | Hour | 180.00 | | 90.00 |
| 00 | CM 07/07/00 Evidence Handling-Senior | | 0.40 | Hour | 180.00 | | 72.00 |
| 020 | CM 07/09/00 Case Review-Senior | | 2.00 | Hours | 180.00 | | 360.00 |
| 020 | CM 07/14/00 Case Review-Senior | | 0.60 | Hour | 180.00 | | 108.00 |
| 020 | CM 08/29/00 Case Review-Senior | | 1.10 | Hours | 180.00 | | 198.00 |
| 040 | CM Court Appearance-Senior | | 5.10 | Hours | 180.00 | | 918.00 |
| 090 | CM 09/02/00 Evidence Examination-Senior | | 2.00 | Hours | 180.00 | | 360.00 |

**Site Address:** People vs Felix Salcido

Customer Original

Page 2

10/18/2000  09:59    4159897950                    LAW OFC D RAPPAPORT                    PAGE  08

# Invoice 9844045
### Invoice Date 10/05/00

Bill To: **Forensic Analytical**
3777 Depot Road
Suite 409
Hayward, CA 94545
Telephone: 510/887-8828

Fed Tax ID: 94-3016588 

To:    Law Ofc/Douglas L. Rappaport

530 Jackson Street, 4th Flr
San Francisco, CA 94133
USA

Report To:

Law Ofc/Douglas L. Rappaport
530 Jackson Street, 4th Flr
San Francisco, CA 94133
Phone: 415/989-7900  USA

| Customer # 10523 | PO/Contract B9842667 | Job ID 120000100 | | | Terms Net 30 Days | |
|---|---|---|---|---|---|---|
| Item Number | Item Description / Date - Activity | Report | Qty | Unit | Unit Price | Extended Price |
| | CM | | 3.00 | Hours | 180.00 | 540.00 |
| | 09/03/00 Evidence Examination-Senior | | | | | |
| | CM | | 2.20 | Hours | 180.00 | 396.00 |
| | 09/04/00 Case Review-Senior | | | | | |
| | CM | | 0.50 | Hour | 180.00 | 90.00 |
| | 09/04/00 Phone Consultation-Senior | | | | | |
| COURIER | Delivery/Courier | | 1.00 | Each | 60.20 | 60.20 |
| | 09/05/00 | | | | | |
| | JJ | | 0.50 | Hour | 75.00 | 37.50 |
| | 09/06/00 Miscellaneous-Technician | | | | | |
| | CM | | 1.70 | Hours | 180.00 | 306.00 |
| | 09/06/00 Case Review-Senior | | | | | |
| | CM | | 4.00 | Hours | 180.00 | 720.00 |
| | 09/07/00 Court Appearance-Senior | | | | | |
| | TG | | 0.40 | Hour | 75.00 | 30.00 |
| | 09/08/00 Miscellaneous-Technician | | | | | |
| | CM | | 6.90 | Hours | 180.00 | 1242.00 |
| | 09/08/00 Evidence Examination-Senior | | | | | |
| | CM | | 6.20 | Hours | 180.00 | 1116.00 |
| | 09/10/00 Evidence Examination-Senior | | | | | |

Address:  People vs Felix Salcido

# Invoice 9844045

## Invoice Date 10/05/00

**Remit To: Forensic Analytical**
3777 Depot Road
Suite 409
Hayward, CA 94545
Telephone: 510/887-8828

Fed Tax ID: 94-3018588

**Bill To:** Law Ofc/Douglas L. Rappaport

530 Jackson Street, 4th Flr
San Francisco, CA 94133
USA

**Report To:**

Law Ofc/Douglas L. Rappaport
530 Jackson Street, 4th Flr
San Francisco, CA 94133
Phone: 415/989-7900- USA

| Customer # | 10523 | PO/Contract | B9842667 | | Job ID | 20000100 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Item Number | | Item Description / Date - Activity | | | Report | Qty | Unit | | Unit Price | Extended Price |
| 70 | CM | | | | | 5.00 | Hours | | 180.00 | 900.00 |
|  | | 09/11/00 Off-site Consultation Time-Senior | | | | | | | | |
| 40 | CM | | | | | 9.50 | Hours | | 180.00 | 1710.00 |
|  | | 09/12/00 Court Appearance-Senior | | | | | | | | |
| 20 | CM | | | | | 4.70 | Hours | | 180.00 | 846.00 |
|  | | 09/13/00 Case Review-Senior | | | | | | | | |
| 10 | CM | | | | | 8.00 | Hours | | 180.00 | 1440.00 |
|  | | 09/14/00 Court Appearance-Senior | | | | | | | | |
| 0 | CM | | | | | 5.00 | Hours | | 180.00 | 900.00 |
|  | | 09/18/00 Court Appearance-Senior | | | | | | | | |
|  | | 09/19/00 Court Appearance-Senior | | | | 9.00 | Hours | | 180.00 | 1620.00 |
|  | | | | | | 1.00 | Each | | 43.12 | 43.12 |
| TO | Photography | | | | | 229.00 | Each | | 0.35 | 80.15 |
|  | | 09/20/00 | | | | | | | | |
| TOCOPY | Photocopy | | | | | 1.00 | Each | | 11.50 | 11.50 |
|  | | 09/20/00 | | | | 1.00 | Each | | 17.37 | 17.37 |

**Address:** People vs Felix Salcido

| Terms | Net 30 Days |
|---|---|

PAGE 10

# Invoice 9844045

### Invoice Date 10/05/00

Remit To: Forensic Analytical
3777 ...
Suite 403
Hayward, CA 94545
Telephone: 510/887-8926

Fed Tax ID: 94-3018588

Bill To: Law Ofc/Douglas L. Rappaport

530 Jackson Street, 4th Flr
San Francisco, CA 94133
USA

Report To:

Law Ofc/Douglas L. Rappaport
530 Jackson Street, 4th Flr
San Francisco, CA 94133
Phone: 415/989-7900- USA

| Customer # 10523 | PO/Contract B9842887 | | | Job ID 20000100 | | | Terms Net 30 Days | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Item Number | Item Description / Date - Activity | | | Report | Qty | Unit | Unit Price | Extended Price |
| TRAVEL | Tolls | | | | | | | |
| | 09/20/00 | | | | 1.00 | Each | 2.00 | 2.00 |
| PHOTO | Photography | | | | | | | |
| | 09/29/00 | | | | 7.00 | Each | 2.00 | 14.00 |

Site Address: People vs Felix Salcido

| | |
| --- | --- |
| Nontaxable Subtotal | 15578.34 |
| Taxable Subtotal | 0.00 |
| Tax | 0.00 |
| Total Invoice | 15578.34 |

**Douglas I. Horngrad**

ATTORNEY AT LAW
MAYBECK BUILDING FOUR
1736 STOCKTON STREET
SAN FRANCISCO, CA 94133-2926
(415)397-9509

FAX (415) 397-9519
AFTER HOURS (415) 397-9522

December 28, 1998

Felix Salcido, Sr.
191 Evelyn Avenue
Mountain View, CA 94041

Re:    People v. Salcido, *Santa Clara Murder Prosecution*
       Penal Code section 187

Dear Mr. Salcido:

In the event you had any questions regarding our fee agreement, please allow us to set it forth in writing for your approval. Douglas I. Horngrad and Douglas Rappaport will undertake joint representation of Felix Salcido, Jr. in the pending Santa Clara County murder prosecution. The fee for proceedings in Municipal Court for Felix Salcido's pending murder case in Santa Clara County is $75,000. If the case is certified to Superior Court there will be an additional fee of $50,000. We would also ask for $15,000 to be placed in trust to fund the costs in this case which include investigation, forensic work, messengering, transcription and copying. At the end of the case an accounting will be provided to you along with the refund of any unused balance. It is understood that the legal fee will be divided 50%-50% by Messrs. Horngrad and Rappaport. We acknowledge receipt of $5,000 and understand that an additional $15,000 - $20,000 will be paid on or before January 4, with the balance to be paid on or before January 30, 1999.

We do ask that you keep our office advised of any change in your domicile or any travel plans which would take you away from your home for any substantial period of time. As you know, you can contact us either day or night, including weekends, at either of the numbers

/ / /

/ / /

/ / /

December 28, 1998
Page 2

above. We would also caution you not to discuss the facts of this case with any third party and would advise you to similarly caution your family members.

Finally, we would ask you to review this agreement carefully and date and sign where indicated. A copy is provided for your reference. Please call if you have any questions.

Very truly yours,

DOUGLAS I. HORNGRAD

DOUGLAS L. RAPPAPORT

I have read this letter and understand that by my signature below, I have contracted for your legal services in return for payment of fees as stated above.

Date: _____

_____
FELIX SALCIDO, SR.

Douglas I. Horngrad



Felix Salcido, Sr.
191 Evelyn Avenue
Mountain View, CA 94041

     Re:    People v. Salcido, *Santa Clara Murder Prosecution*
            Penal Code section 187

Dear Mr. Salcido:

     In the event you had any questions regarding our fee agreement, please allow us to set it forth in writing for your approval. Douglas I. Horngrad and Douglas Rappaport will undertake joint representation of Felix Salcido, Jr. in the pending Santa Clara County murder prosecution. The fee for proceedings in Municipal Court for Felix Salcido's pending murder case in Santa Clara County is $75,000. If the case is certified to Superior Court there will be an additional fee of $50,000. We would also ask for $15,000 to be placed in trust to fund the costs in this case which include investigation, forensic work, messengering, transcription and copying. At the end of the case an accounting will be provided to you along with the refund of any unused balance. It is understood that the legal fee will be divided 50%-50% by Messrs. Horngrad and Rappaport. We acknowledge receipt of $5,000 and understand that an additional $15,000 - $20,000 will be paid on or before January 4, with the balance to be paid on or before January 30, 1999.

     We do ask that you keep our office advised of any change in your domicile or any travel plans which would take you away from your home for any substantial period of time. As you know, you can contact us either day or night, including weekends, at either of the numbers

/ / /

/ / /

/ / /

# Douglas L. Rappaport

ATTORNEY AT LAW
530 JACKSON STREET
FOURTH FLOOR
SAN FRANCISCO, CA 94133-5115
(415) 989-7900
FAX (415) 989-7950

July 14, 2000

Supplemental Fee Agreement

Felix Salcido Sr.
191 W. Evelyn Avenue
Mountain View, CA 94041

**Re:** *People v. Salcido*
*Case No. B9842667*

Dear Mr. Salcido:

In the event you had any questions regarding our supplemental fee Agreement, please allow me to set it forth in writing for your approval. The legal fee for additional representation of your son, Felix Salcido Jr. on the above-referenced matter is $20,000. This Agreement augments and supplements, but does not replace the previous Agreement dated December 28, 1998. This fee includes any and all legal work that was going to be handled by Douglas Horngrad and is for one trial, excluding writs and appeals. This fee also excludes any retrial of this matter irrespective of whether the case concludes via verdict or mistrial. To reiterate, this fee as well as the fee stated in the original Agreement, is for one trial only.

In addition, I will maintain control of the trust account which will be transferred to my office from Douglas Horngrad for extraordinary costs (such as investigation, fax, subpoena fees, filing fees and expert witnesses).

Legal appearance will be made on your son's behalf in Santa Clara County. We do ask that you keep our office advised of any change in Felix Jr.'s custody or in your residence or any travel plans which would take you away from your home for any substantial period of time. We also caution you to refrain from discussing any factual detail of your son's case with any third party.

Finally, I would ask you to review this Agreement carefully, and date and sign it where indicated. A copy is provided for your records.

Very truly yours,

DOUGLAS L. RAPPAPORT

I have read this letter and understand that by my signature below, I have contracted for your legal services on behalf of Felix Salcido Jr. in return for payment of fees as stated above.

Date: 7-26-2000

FELIX SALCIDO SR.

## DECLARATION OF PETITIONER FELIX ANDREW SALCIDO III

I, Felix Andrew Salcido III, state as follows:

1.      I was first arrested on this case on January 17, 1994, by Santa Clara County Sheriff's Deputies when I returned by car to the body of William Justice on the shoulder of an isolated section of Moody Road in Los Altos Hills

2.      As I drove up to the area where Mr. Justice's body was, a Sheriff's Deputy was stopping traffic on Moody Rd.  As the Sheriff approached my car he asked me what I was doing.  I motioned toward the area where Mr. Justice's body was and said, "That's my friend.  That's my friend over there."

3.      I proceeded to tell various Sheriff's officers that I had been with Mr. Justice in East Palo Alto earlier in the evening, and that Mr. Justice had been trying to buy drugs. I also told the officers that in the course of attempting to purchase crack cocaine, Mr. Justice was stabbed and shot by drug dealers I did not know.  I also told the officers that after the shooting, once I realized Mr. Justice was dead, I drove to Los Altos in a panic and left Mr. Justice's body on the side of the road.

4.      The Sheriff's officers then asked me to take them to my home and consent to a search, which I did.   I also told the officers that I had gone to a car wash to clean up the car after the shooting, and I directed them to the carwash.

5.      I also took the officers to the Cozy 8 Motel where Mr. Justice had been staying in the days before his death.

6.      After searching my home, the officers took me to the police station where I signed a *Miranda* waiver and was interviewed, over several hours, by two homicide detectives.

7.      I told the homicide detectives that I met William Justice through a mutual friend in San Francisco. At this time I became aware that Mr. Justice was spending thousands of dollars every week on hotels, prostitutes and drugs in San Francisco.  I was living down on the Peninsula.  I became friends with Mr. Justice and would sometimes do small "odd-jobs" for him.  As far as I knew, Mr. Justice was not working and was borrowing money from friends overseas who would wire transfer the funds to him.

8.      I finally invited Mr. Justice to relocate to Mountain View, where I lived and where I told Mr. Justice he could get away from the drugs he was using in the San

*In re Salcido: Declaration of*
*Petitioner Felix Andrew Salcido III*                                            Page 1

Francisco Tenderloin area, where Mr. Justice had been living in a motel. Mr. Justice agreed that he needed to leave San Francisco, and asked me to rent a motel room for him in Mountain View. On or about January 10, 1994 I rented a motel room for Mr. Justice in Mountain View, and Justice began living at the motel. However, after Mr. Justice moved to Mountain View he continued to use drugs, though not as much as when he was living in San Francisco.

9.    On the evening of January 17, 1994 I met up with Mr. Justice at the Cozy 8 Motel. Mr. Justice asked me to take him to East Palo Alto so that he could buy some crack cocaine, which was easy to do in that area at that time. I had grown up in the area and was generally familiar with Palo Alto. I did not want to take Mr. Justice to purchase drugs. Mr. Justice was not familiar with the area and did not have a car, but insisted that he would go without me if I would not drive him, so I agreed.

10.    I then drove Mr. Justice to a side street off University Avenue in East Palo Alto where we saw several people who looked like they were selling drugs on the corner. I stopped the car and Mr. Justice stepped out and began negotiating a drug deal with several of them. At this point, Mr. Justice began arguing with some of the drug dealers over the price they wanted for drugs.

11.    Several of the drug dealers were standing around Mr. Justice. They appeared to strike him several times, after which he was pushed, landing with his head and torso inside the front passenger seat area of the car, with his legs remaining outside the opened car door. One of the drug dealers, who was standing at the rear drivers side of the car pulled out a gun, pointed it at me, and ordered me to unlock the doors to the car. I unlocked the doors and the man with the gun jumped into the back seat of the car and ordered Mr. Justice to give him his money. Several members of the crowd around the car began rifling through Justice's pockets. Mr. Justice, who was by then gagging on blood and looked like he was having a convulsion, couldn't get any money out of his pocket, so I reached into Justice's pant pocket, removed a wad of $20 bills, and tossed the money to the man with the gun in the back seat. After picking up the money, the man in the back seat shot Justice once in the head. The gunshot broke the front passenger window of the car.

12.    As soon as the man fired the gun the crowd around the car scattered and I leaned over and pulled Mr. Justice's legs into the car so that I could close the passenger door and drive away. As I began to drive off, Mr. Justice slumped over in the car so that his head was lying on my lap. I began driving toward Stanford Medical Center, the nearest hospital I knew of, but soon realized that Mr. Justice was dead.

13.      At this point I panicked and drove past Stanford and turned right up Page Mill Road in Palo Alto. Mr. Justice had bled heavily, and was dead weight on my lap, so I removed my belt and attempted to use it to pull him upright in the passenger's seat. I then continued driving up Page Mill into the Los Altos hills, where I eventually turned onto Moody Road. I didn't have any particular destination in mind. Eventually I stopped at a roadside pullout, got out of the car, and pulled Mr. Justice's body out of the passenger's side of the car. I then left and drove to my house in Mountain View.

14.      After showering and changing my clothes, I tried to clean the blood out of the car. I went to a carwash in Mountain View were I used the carwash and a vacuum to remove some of the glass and blood from the car.

15.      While I was cleaning the car I started to fear that Mr. Justice may have been unconscious but still alive. I decide to go back to check. I then drove from the car wash back to the area where I left Mr. Justice on Moody Road. When I arrived the police were there. After making the previously mentioned lengthy tape recorded statement to the police I was released and was not at that time charged with a crime.

16.      I was arrested again in 1998 and charged with murder. At that time my family hired two lawyers to represent me, Doug Horngrad as lead counsel and Doug Rappaport to assist him.

17.      Soon after they were hired my attorneys told me about potential conflicts of interest involving their prior representation of witnesses Christian Smith and Steve Margulies. They told me that the conflicts would not be a problem so long as I and the witnesses signed waivers. My attorneys also told me that the conflict issue should be raised at the preliminary hearing so that the District Attorney could not later "make an issue" of their prior representation of the witnesses.

18.      Based on numerous conversations between the three of us, my understanding was that Mr. Rappaport was responsible for the forensics and expert witness portion of the case, while Horngrad was responsible for preparing for the police officers and other witnesses.

19.      Mr. Horngrad, Mr. Rappaport and I spent many hours preparing for me to testify at trial. I always intended to testify. My attorneys also repeatedly assured me that they would call defense witnesses, including defense experts who would testify regarding the prosecution's crime-scene evidence and expert testimony.

20.      Both Mr. Horngrad and Mr. Rappaport helped prepare me to testify. The

*In re Salcido: Declaration of*
*Petitioner Felix Andrew Salcido III*                                        Page 3

preparation sessions were conducted over a period of weeks, and included a jury
consultant they hired to assist with practice cross-examination. The consultant was paid
by my father.

21.  During these preparation sessions, my attorneys, the consultant and I went
over my entire testimony many times, and conducted several practice cross-examination
sessions. My attorneys coached me about how be patient on the stand, to not answer
more than was asked of me, and many similar things.

22.  Prior to trial both of my attorneys repeatedly told me that I would probably
need to testify because I had already said I was present when Mr. Justice was shot in the
car and I admitted leaving Mr. Justice's body alongside the road. Both of my attorneys
told me that they thought I needed to explain to the jury how Mr. Justice was killed.
Based on these discussions, I decided with the advice of my attorneys and my family that
I would testify at trial, especially after the full tape recordings of my statements to the
police were excluded as evidence at the trial.

23.  Had I testified, I would have reiterated the same facts that I related to the
police in my statement on the night of the shooting, which I have also briefly described
above in this declaration.

24.  Prior to and throughout my trial I expected my attorney to call Chuck
Morton, an expert we hired, and Theresa Chancellor, the mother of my girlfriend Alisha
Padua, as witnesses on my behalf. I thought, based on my conversations with my
attorney, that Mr. Morton would testify that the blood spatter patterns and gunshot reside
did not, as the prosecution contended, necessarily show Mr. Justice had been shot from
the driver's seat of the vehicle while he was seated in the front passenger seat. My
attorney also told me that Morton would testify that the belt found grasped in the victim's
hand did not, as the prosecution claimed, show that Mr. Justice had been choked from
behind. I also was told by my attorney and believed that Ms. Chancellor would be called
to explain that certain telephone numbers that appeared in my phone records from the
hours prior to the shooting actually belonged to her and her daughter, Ms. Padua, my
girlfriend.

25.  I did not expect the defense to call a forensic pathologist. Just before the
defense rested, in a holding cell next to the courtroom, Mr. Rappaport told me for the first
time that the forensic pathologists consulted by the defense had concluded that the
evidence showed Mr. Justice was alive when he was removed from the car at Moody
Road, and there was no forensic evidence available to support my version of the shooting.
I remember specifically that Mr. Rappaport told me that the pathologist "does not buy

*In re Salcido: Declaration of
Petitioner Felix Andrew Salcido III*                                                    Page 4

your story" and could not corroborate my testimony with expert opinions concerning the physical evidence. This was the first time he said anything like this to me.

26.     Mr. Rappaport never spoke with me about cross-examination of the prosecution's lay witnesses, Norman Jackson, Dave Bergstrom, Ed Allison and Christian Smith, other than to discuss the potential conflict issues involving Smith.

27.     Prior to trial I was told by Doug Horngrad that my testimony could result in a conviction as an accessory after the fact. During trial, after Ed Allison testified, I discussed with Doug Rappaport for the first time the possibility of instructions on lesser included offenses, specifically involuntary manslaughter. I always understood that the core of the defense that would be presented would be my own testimony and the testimony of Chuck Morton, who would corroborate my testimony that Mr. Justice was stabbed outside the car in East Palo Alto, and then shot by an assailant who was in the rear seat of the car, also in East Palo Alto. Mr. Rappaport told me that Morton would testify that blood spatter patterns and other physical evidence did not establish that the shooter was seated in the driver's seat of the car, or that Mr. Justice was stabbed after being removed from the car at the Moody Road site, contradicting the prosecution's theory of the case.

28.     After the first day of trial motions, both of my attorneys visited me at the jail. Mr. Horngrad told me that he no longer could represent me because the court and the District Attorney had raised concerns about the conflict issue, and that Mr. Rappaport could also be removed as defense counsel. I asked them why Horngrad could no longer represent me, and Horngrad told me that if he continued as my attorney the prosecution could call him as a witness and make it appear that I, Smith, Bergstrom and Margulies were all conspirators, and that I was "the puppeteer." Mr. Horngrad also told me that if it looked like I controlled the prosecution witnesses it would look very bad in front of the jury. Horngrad assured me that he wanted to continue as my lawyer, but that the court would not allow it.

29.     The next day Mr. Horngrad moved to withdraw from my case due to the conflict of interest. This hearing, at which Mr. Horngrad made his motion to withdraw, was the first time I was told that my attorney was moving to withdraw, as opposed to being removed by the court.

30.     Following the motion to withdraw, I met with a court appointed lawyer named Patrick Kelly and discussed the conflict issue. I told Mr. Kelly that I wanted to keep both Horngrad and Rappaport as my attorneys, and that I would waive any conflicts as to both counsel, as I had done at the preliminary hearing. A few days later I signed a

*In re Salcido: Declaration of*
*Petitioner Felix Andrew Salcido III*                                                    Page 5

conflict waiver form Mr. Rappaport gave to me.

31.    About a week later the court held another hearing on the conflict, and Mr. Kelley read his report to the court.   The court then asked me if I wanted to comment and I answered, "no."  I said no because both Mr. Horngrad and Mr. Rappaport told me that I could lose both of them if there was a fight with the D.A. about the conflict issue.

32.    On July 26, 2000, the defense moved for a continuance of the trial date based on late disclosures of discovery by the prosecution and the withdrawal of Mr. Horngrad.  Mr. Rappaport informed the court "that Mr. Horngrad's withdrawal from the case was unanticipated, ...both Mr. Horngrad and myself were aware of the potential conflict and had in our minds ... that there would be no issue in this court."  Rappaport then asserted that Horngrad had been forced to withdraw due to an issue raised by the prosecution concerning Mr. Horngrad's prior representation of prosecution witness Christian Smith and Steve Margulies.  Horngrad's withdrawal, Rappaport noted, placed Rappaport "in the position of having to pick up his part of the case.  Approximately one-half of this homicide."  Rappaport then admitted that he had  underestimated how long it would take him to absorb the work done by Horngrad.

33.    I remember during the trial when a dispute arose about the prosecution's failure to give the defense a large number of photos and other reports.  Mr. Rappaport made a motion for a mistrial as a result.  The court then took a short recess.

34.    During the recess Mr. Rappaport and I talked about a possible mistrial, and Mr. Rappaport told me that he was not obligated under his contract to do a second trial, and that he did not think my family could afford to pay for another trial.  I agreed that a mistrial would cause financial problems for my family.

35.    We then went back into court and the judge told me that he would not consider a mistrial motion without my participation and consent.  The court then recessed for the day.

36.    The following morning Mr. Rappaport met with me and told me that my parents did not have enough money to pay for another trial, and if the court declared a mistrial he would no longer be my attorney.   He then advised me to agree to withdraw the motion.  I felt I had to choose between losing my second lawyer or withdrawing the motion, so I chose to keep my attorney.

37.    When the prosecution closed its case-in-chief the court granted a short

*In re Salcido: Declaration of*
*Petitioner Felix Andrew Salcido III*                                                    Page 6

recess. At this point I fully intended to testify and expected Mr. Rappaport to put on a defense including the expert witnesses hired by my father. However, during the recess I was taken to a holding cell next to the courtroom where Mr. Rappaport and I had a very brief conversation. Mr. Rappaport told me that he did not intend to put on any defense, that he had already spoken to my father, and that my father agreed. I specifically remember Mr. Rappaport telling me that his Dad always told him that the real trial doesn't start until closing arguments, and that there's nothing I could say on the stand that he couldn't say during his closing argument.

38. I was confused by this sudden change of strategy and asked my attorney how we were going to explain the dead body in my car, as we had discussed many times before. Mr. Rappaport told me that we had seriously damaged the prosecution's expert witnesses on the gunshot reside issue, and that there was insufficient evidence to show that I had shot Mr. Justice. I then again told Mr. Rappaport that I wanted to testify. Mr. Rappaport told me I was being "arrogant," and that he had a "50-50" chance of winning if I did not testify, but only a "ten percent" chance if I did testify. I was angry about these statements and told him I still wanted to testify. He then told me that if I did, I would lose. He then assured me that he would provide the jury with an explanation of the shooting during his closing argument.

39. The entire conversation in the holding cell lasted less than five minutes. This was the first conversation in which any of my attorneys told me that I should not testify.

40. When I returned to the courtroom I expected that the court would ask me whether I wanted to testify. When Mr. Rappaport stood and told the court that the defense rested, and the court did not ask me what I wanted to do, I did not know what to do. I was afraid to confront my attorney in front of the jury and have it look like we did not know what we were doing.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this 22nd day of July, 2005, in Coalinga, California.

_FELIX ANDREW SALCIDO III_

_In re Salcido: Declaration of_
_Petitioner Felix Andrew Salcido III_

PATRICK H. KELLY    SBN: 71462
Attorney at Law
1550 The Alameda, #308
San Jose, CA 95126
Telephone: (408) 294-9733

Court Appointed Attorney for Defendant
For Limited Purpose

# F I L E D

JUL 1 0 2000

STEPHEN V. LOVE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY ᴍ Fᴏʀʜɪnᴀ___ DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, )<br><br>　　　　　　　　　　Plaintiff, )<br><br>vs. )<br><br>FELIX ANDREW SALCIDO, JR. , )<br><br>　　　　　　　　　　Defendant. )<br>_____ ) | NO. B9842667<br><br>MEMORANDUM ON<br>CONFLICT OF INTEREST |

## FACTS

This case was assigned out for trial with the Defendant represented by two retained counsel, Douglas L. Rappaport and Douglas I. Horngrad.  Mr. Horngrad had previously represented two prosecution witnesses, Mr. Margulies and Mr. Smith.  Mr. Rappaport had briefly represented Mr. Smith on unrelated matters subsequent to the underlying events that form the basis of this prosecution.  Patrick H. Kelly has been appointed to advise the Defendant concerning his rights to a "conflict-free" attorney to represent him in this prosecution for an alleged violation of Penal Code §187.

For purposes of this memorandum, it will be assumed that Mr. Horngrad  will be

993

voluntarily withdrawing as trial attorney, with Mr. Rappaport continuing to represent the Defendant in this trial.

ISSUES

1. Can the Defendant waive his right to a "conflict-free" attorney?

2. Does the witness have any rights?

LAW

There appear to be two appellate cases that deal with the relevant facts and law presented in this case:

In <u>Vangsness v Superior Court</u> (1984) 159 Cal.App.3d 1087, the court was faced with a murder trial where the prosecution witness had been previously represented by the public defender's office concerning misdemeanor charges. The court appointed an attorney to advise the prosecution witness. The Defendant agreed to waive any conflict of interest; however, the witness would not waive "any conflict of interest that might arise." No actual conflict existed in that there was no exchange of confidential information. The witness merely objected to being cross-examined by his former attorney, claiming an "appearance of a conflict." The deputy public defender stated he did not intend to use any information his office acquired in its previous relationship with the witness; did not believe it could be relevant or even admissible since only misdemeanors were involved; and, in any event, had ample evidence from independent sources to refute the witness's proposed testimony. The appellate court held that the trial court's removal of the public defender was improper since the prior representation was minimal and dealt with matters unrelated to and inadmissible in the current proceeding. Thus there was no suggestioon that the deputy public defender proposed to violate his professional obligations. The appellate court noted that to deny the defendant his right to an attorney, under these circumstances, would be a possible violation of his Sixth Amendment rights.

In <u>Alcocer v Superior Court</u> (1988) 206 Cal.App.3d 951, the appellate court was faced

994

with the situation of defense counsel (Funke-Bilu) was currently representing a possible

prosecution witness (Jackson). The court summarized the cases that set forth the right of the

defendant to be represented by an attorney free of conflicting interests. However, the court

concluded that a trial judge "abridges a defendant's right to counsel when it removes retained

defense counsel in the face of a defendant's willingness to make an informed and intelligent

waiver of his right to be represented by conflict-free counsel." The court cited <u>People v Bonin</u>

(1989) 47 Cal.3d 808 and <u>People v Easley</u> (1988) 46 Cal.3d 712 as Supreme Court approval for

the right of the defendant to waiver his right to "conflict-free" counsel. The court then set forth

the procedure for a trial judge to follow when confronted with potential conflict:

> Once the trial court determines that a conflict may exist, the court should then briefly set forth the basis for its conclusion. The court must advise the defendant that his lawyer may not be able to effectively and adequately represent him. The court must inform him that this means he may not receive a fair trial if the attorney should continue to represent him.

> The court should appoint independent counsel as the court did here to confer with the defendant regarding the conflict. If after conferring with independent counsel the defendant should still wish to continue with his attorney despite the conflict, the court should ask the defendant if he understands that the conflict, or potential conflict, facing his lawyer could prevent his lawyer from representing him effectively or adequately.

> If he answers "yes," the court should then ask defendant if the only reason he is keeping his present lawyer is because of financial reasons concerning fees already paid the attorney, or fees owed the attorney. If the defendant answers "yes" to that question, the trial court should inform defendant that if he is financially unable to retain more than one attorney, separate counsel will be appointed by the court and paid for by the government. (See People v. White, supra, 201 Cal.App.3d at p. 1339; People v. Sanford, supra, 174 Cal.App.3d at p. 18.)

> If the answer to the question is "no," the court should then ask defendant if he understands that, by proceeding with his current counsel, his chances of being convicted are greater than would be the case if he were represented by a conflict-free attorney. The court should also advise defendant that by waiving his right to conflict-free counsel he also waives his right to appeal the issue of incompetence of counsel insofar as it involves the conflict.

> The court should then say: "Having been advised of the right to be represented by an

995

attorney free from conflict, and having understood the disadvantages and dangers in being represented by an attorney with a conflict, do you specifically give up the right to be represented by an attorney who has no conflict of interest?" If the defendant answers "yes," the court should then ask: "Do you specifically give up the right to appeal the issue of incompetence of counsel insofar as it involves the conflict?"

The extent to which Funke-Bilu is hindered in his representation of Alcocer is also dependent upon whether Jackson waives the conflict. The court must apprise Jackson of the ramifications of conflict, and then afford him the opportunity to object to the representation of Alcocer by Funke-Bilu. (United States v. James (2d Cir. 1983) 708 F.2d 40, 46.)

If such objection is made, and there appears to be a potential conflict, as there is in this case, the court must consider other options. One option might be for the court to employ backup counsel for Alcocer for the limited purpose of cross-examining Jackson. (United States v. Agosto, supra, 675 F.2d at p. 974.) Such an arrangement would require that Alcocer waive any claim that he had been denied effective counsel insofar as that right was affected by the need to employ backup counsel to conduct cross-examination. (Ibid.)

## CONCLUSION

It appears that the Alcocer procedure is the recommended procedure, i.e., the defendant has had independent counsel appointed to represent him concerning the issue of waiver. Assuming that the defendant is willing to waive his right to conflict-free counsel, then the second stage would be to determine if any testifying witness is willing to waive any privilege he may have with the trial attorney (if in fact the trial attorney represented the witness) unless the situation is closer to the Vangsness facts where there was no real conflict based on the factual representations of counsel and the witness.

Respectfully submitted,

Dated: July 8, 2000

_Patrick H. Kelly_
Patrick H. Kelly
Attorney for Defendant

996

Mark Rosenbush
Ca. State Bar No. 72436
214 Duboce Avenue
San Francisco, CA 94103
(415) 861-3555

Attorney for Petitioner
FELIX SALCIDO

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

# IN AND FOR THE COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| In re FELIX SALCIDO , | ) | No. |
| | ) | |
| **On Habeas Corpus** | ) | **Santa Clara County Superior** |
| | ) | **Court No. B9842667** |
| | ) | **Sixth District Court of Appeal** |
| | ) | **No. H023965** |

## <u>DECLARATION OF JAMES L. NORRIS</u>

I, James Norris, state the following:

1.    I am forensic scientist and criminalist.  Since 1970 I have been so employed

by the San Mateo County Sheriff's Office, the Santa Clara County District Attorney

Criminalistics Lab, the San Francisco Police Department Forensic Services Division

(appointed Director in 1995), and in private practice.  I have qualified as an expert in

hundreds of cases in both the federal and California courts.  I have also been appointed by

*In Re Felix Salcido: Dec. Of James L. Norris*                                                   Παγε 1

the California courts as an expert witness in numerous cases. A true copy of my curriculum vitae is attached to this declaration.

2.     In March of 2000 I was retained by attorneys Doug Rappaport and Doug Horngrad to consult with the defense in the case *People v. Felix Salcido*, Santa Clara County case number No. B9842667.

3.     Two issues I was asked to address in the *Salcido* case were the gunshot residue tests performed on the defendant's gloves and hands, and the markings found on a spent cartridge casing retrieved from the defendant's car. I reviewed the law enforcement reports, notes, diagrams, photo's and other such materials relating to these issues, examined some physical evidence, and consulted with defense counsel, but I was never asked to testify at the *Salcido* trial.

4.     More recently, in 2005, I was contacted by attorney Mark Rosenbush in regard to the *Salcido* case. In the course of this consultation I again reviewed the forensic reports and underlying documents, as well as my notes, concerning the evidence I was asked to examine regarding this 1994 homicide. I have also reviewed the testimony of prosecution experts Dough Ridolfi and Eric Barloewen.

5.     Concerning the gunshot residue on the defendant's glove and hand, I concluded the following. Based on the very small amount of material on Mr. Salcido's left glove that could be identified as gunshot residue, I concluded that it was not possible to discern whether Mr. Salcido had recently fired a gun, or had recently been nearby when

someone else fired a gun, or had recently touched a surface that had previously been contaminated with gunshot reside.  I also concluded that had Mr. Salcido been inside a car when another person fired a gun, Mr. Salcido's proximity to that gunshot may have been sufficient to deposit on his gloves or hands the small amount of residue located during the forensic tests.

6.    Had I been called to testify at the *Salcido* trial I would have testified to the conclusions described above.  My review of the evidence and reports indicated that a very small amount of unique GSR (one particle) was found on Salcido's left glove, and a similarly small amount was also found on Salcido's left hand.  Gunshot reside does not penetrate leather, so if Mr. Salcido was wearing gloves at the time of the shooting, you would not expect GSR on his hand.  This raises the possibility that the gunshot residue on Mr. Salcido's hand may have been deposited there through contamination (later contact with a surface bearing GSR) rather than from firing a weapon during the incident in question.

7.    Based on my review of the 9mm casing located in Mr. Salcido's vehicle and my research and experience on the subject, I concluded that the markings on the casing, which included ejector scrape marks and a firing pin indentation, could have been left by almost any type of 9mm handgun sold or commonly available in the United States.  I would also have testified that while it is true expended cartridge casings possess class characteristics that sometimes allow the make and model of the firearm used to discharge

*In Re Felix Salcido: Dec. Of James L. Norris*                                        Παγε 3

the cartridge casings to be determined, in practice the class characteristics seen on

cartridge casings are usually so common that little information may be gleaned from

them. In this case I determined that the class characteristics for 9mm Beretta pistols are

very common, in fact most 9mm pistols have these class characteristics. The

prosecution's lab report of April 15, 1994 stated that, "These features are also seen in

some Beretta pistol test fires in the laboratory reference collection". Left unsaid is that

these features are also seen in most 9mm Luger caliber test firings in the laboratory

reference collection. In late April, 2000, I personally examined the cartridge casing at

issue and I found that it had no markings that could identify it as having been fired from a

9mm Beretta pistol, in fact it could have been fired from most any commonly available

9mm pistol.

     8.     Had I been called to testify at the *Salcido* trial I would have testified to the

conclusions described above. I also would have testified that the prosecution's experts

had overstated the degree to which the marks on the 9mm shell casing "matched" or were

"consistent with" a 9mm Beretta handgun, or at least that it was misleading not to explain

that such marks matched or were consistent with most any 9mm pistol. Finally, I would

have noted that the criminalist Ridolfi's notes concerning his examination of the

expended casing lack any indication what the relevant markings were, or any description

of the firing pin, extractor, ejector or breech face markings. Without such descriptions of

the markings, it is impossible to make any comparison to known characteristics left by

various types of handguns.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this ___7th___ day of July, 2005, in Portola Valley, California.

JAMES L. NORRIS

Mark Rosenbush
Ca. State Bar No. 72436
214 Duboce Avenue
San Francisco, CA 94103
(415) 861-3555



(ENDORSED)
**FILED**

AUG 2 6 2005

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ S. Chua _____ DEPUTY

Attorney for Petitioner
FELIX SALCIDO

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| In re FELIX SALCIDO , | ) ) | No. B9842667 |
| **On Habeas Corpus** | ) ) ) ) ) | **Santa Clara County Superior Court No. B9842667 Sixth District Court of Appeal No. H023965** |

## DECLARATION OF PETER BENSON, M.D.

I, Dr. Peter Benson, state the following:

1.      I am medical doctor who specializes in forensic pathology.  I was formerly

a staff pathologist at San Mateo County Hospital and the Medical Director of Cytopath

Laboratory in Burlingame.  I have qualified as an expert in 650 cases in both the federal

and California courts.  I have testified on many occasions for the prosecution, as well as

the defense in criminal cases.  A true copy of my curriculum vitae is attached to this

*In Re Felix Salcido: Dec. Of Dr. Benson*                                    Page 1

declaration.

2.      In April of 2000 I was retained by attorneys Doug Rappaport and Doug Horngrad to consult with the defense in the case *People v. Felix Salcido*, Santa Clara County case number No. B9842667.

3.      My primary focus in the *Salcido* case was the autopsy report authored by Santa Clara County Forensic Pathologist Massoud Vameghi, and crime scene photos, x-rays, notes and other materials underlying the autopsy report, as well as statements made by Mr. Salcido following his arrest. I reviewed those materials and consulted with counsel, but I was never asked to testify at the *Salcido* trial.

4.      More recently, in 2005, I was contacted by attorney Mark Rosenbush in regard to the defense in the *Salcido* case. In the course of this consultation I again reviewed the autopsy reports and underlying documents from the 1994 homicide as well as crime scene and autopsy photographs, and the trial testimony of Dr. Vameghi.

5.      Two of the issues I was asked to address in the *Salcido* case involved the time and location of death of the homicide victim, Mr. Justice. More specifically, I was asked to address whether the forensic evidence and autopsy records showed Mr. Justice must have been shot and stabbed at the location where his corpse was found on Moody Road as contended by the prosecution, or whether the killing could have occurred earlier in the evening in East Palo Alto, as Mr. Salcido stated to police.

6.      In support of the prosecution's theory that Mr. Justice was first shot inside

the car on Moody Road, and then stabbed as he lay prone on the ground, Dr. Vameghi relied upon the lack of extensive blood on the sweater and t-shirt that Justice was wearing at the time, and the copious blood near the left side of the head. Looking at the crime scene photographs, I saw some blood on the back of Justice's sweater, and blood soaked into his green t-shirt. It was impossible to tell from the autopsy photos how much blood was located on the victim's shirt and sweater. In addition, stab wounds of the type suffered by the victim in this case may bleed externally very little (there are not many blood vessels in the back), and tend to bleed inside, rather than outside the body. It was not possible, based on the existing forensic evidence in this case, to discern how much Mr. Justice bled after he was lying face-down on the ground, or how much leaked out after the body was moved to a supine position. It is impossible, based on this evidence, to reliably conclude that the victim was either shot or stabbed first.

According to Mr. Salcido's statements, Justice was stabbed first, then shot within a minute or two. This is consistent with the forensic evidence to the extent that Justice would have gone into shock after the gunshot wound, and bleeding from the lung stab wounds would have stopped after he was shot because there would have been no blood pressure after infliction of the gunshot wound, which severed a carotid artery. In sum, any conclusion concerning how much Mr. Justice bled after his body was deposited at the crime scene would be based partly on speculation. Estimation of the quantity of blood on the ground is largely speculative.

7.      I also noted that the crime scene photographs of the inside of the car and Mr. Salcido's clothing indicated a large amount of Mr. Justice's blood soaked into the driver's seat of the car and the seat of the pants Mr. Salcido was wearing during the incident. In my opinion, the presence of so much blood on the driver's seat of the car is consistent with the victim lying with his head on the car seat for some time after the gunshot, since the wound suffered by Mr. Justice would result in a great deal of bleeding from Justice's nose and mouth, as well as the gunshot wound in his lower head.

8.      Some of the forensic evidence indicated to me that the victim was alive and breathing after he was stabbed. The autopsy report noted that the victim suffered a massive hemorrhage into the parenchymal tissue of the lung (at page 6 of the report), which Dr. Vameghi ascribes to the bullet wound and aspiration of blood, but some bleeding must have also been caused by the four penetrating lung stab wounds, as confirmed by the presence of pleural blood. The autopsy report then noted the presence blood in the victim's larynx and trachea. This would suggest that the victim's heart was still pumping blood and that the victim was still breathing after the gun shot wound.

My review along with Mr. Rosenbush of notes taken by Mr. Rappaport indicate that I looked at x-rays of the victim during May of 2000. Although the x-rays were head shots only, the upper chest area was visible according to Rappaport's notes of our conversation. I noted that there appeared to be air in the apex of the pleural cavity (around the lungs). The autopsy report does not allude to this. If this is confirmed by a

radiologist this may well indicate conclusively that the victim was alive when he was stabbed. I recommended a consultation with a forensic radiologist to confirm this possibility. Air of a significant amount in the pleural cavity would strongly suggest the idea that the victim was alive and breathing when he was stabbed in lung.

9.      In support of the prosecution's theory that Mr. Justice was garroted with a belt before he was shot, in spite of there being no ligature marks on the neck, Dr. Vameghi testified that garroting would leave no marks on Justice's neck if he was still alive when the garrote was removed, since blood circulation would eliminate any ligature marks on the skin. In fact, the belt which was allegedly used as a garrote might or might not leave ligature marks on the neck, and it is likely that if the victim was garroted one might observe fingernail marks on the neck where the victim tried to remove the garrote. Neither ligature nor fingernail marks were noted on the victim's neck.

10.      Dr. Vameghi testified that the cuts in the t-shirt and sweater corresponding to the stab wounds were lower on the shirt and sweater than the wounds on the victim's back and more to the left. To Vameghi this indicated significant movement of the shirt and sweater on Mr. Justice's body at the time he was stabbed. This testimony was apparently offered in support of the prosecution's theory that Justice was stabbed by a person kneeling above his head while he lay prone on the ground with the back of his shirt and sweater pulled up towards his head. However, The location of the holes in the shirt and sweater and the stab wounds on Mr. Justice's back are equally consistent with Mr.

Salcido's statements that Justice was stabbed from behind while standing outside the car in East Palo Alto, if Mr. Justice's assailant grabbed him by the clothing and pulled it upward while stabbing him from behind.

11.    Had I been called to testify at the *Salcido* trial I would have testified to the conclusions described above. I also would have testified that the forensic evidence gathered at the scene, during the autopsy, from the car, and from Mr. Salcido's clothing, partly supported Mr. Salcido's statements to the police. That is, some elements are consistent with Mr. Justice having been stabbed outside the car in East Palo Alto, then shot in the head inside the car a minute or two later, and then driven to and deposited at the location where his body was found. The well-formed blood clots on the road leading to the body suggest that some time had passed since the gunshot wound. I would have further testified that there was questionable evidence to support a conclusion that Mr. Justice was still alive when his body was deposited at the crime scene.

12.    I also would have testified that the blood stains depicted in the pictures of the victim's t-shirt, as well the presence of 500 ml of blood in the right pleural cavity and the possible presence of air in the pleural cavity, were consistent with the findings one would expect if these stab wounds were inflicted on a person who is alive, breathing, and upright for some time after the wounds were inflicted.

Because the gunshot wound inflicted upon Mr. Justice would result in heavy bleeding from Mr. Justice's mouth, nose and gunshot wounds, one would expect to find

the largest amount of Justice's blood in the area where Mr. Justice's head was positioned shortly after the shooting.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this 21st day of August, 2005, in Burlingame, California.

PETER BENSON, M.D.

# Peter Alfred Benson, M.D.
## Forensic Pathologist

San Mateo Medical Center
Coroner's Pathology
222 West 39th Avenue
San Mateo, CA 94403-4398
Phone and voice mail (650) 573-2250, (650) 573-3555
Fax (650) 573-2606

342 Chapin Lane
Burlingame, CA 94410-5104
Phone (650) 342-8868
Fax (650) 343-2774

**Academic Background & Professional Training:**

Graduated, Clark University, 1952

Graduated, Yale University School of Medicine, 1958

Internship in Pathology:  Grace-New Haven Community Hospital, in affiliation with Yale University, 1958-1959

Residency in Pathology:  Grace- New Haven Community Hospital, in affiliation with Yale University, 1959-1960

Residency in Pathology: Moffitt Hospital in affiliation with The University of California, San Francisco, 1960-1961

Residency in Pathology:  San Francisco General Hospital, in affiliation with The University of California, San Francisco, 1961-1962

**Licensed Physician & Surgeon:**

In California since 1960

**Specialty Certifications:**

Diplomate of American Board of Pathology:
* Anatomic and Clinical Pathology, 1963
* Forensic Pathology, 1977
* Voluntary Recertification in Pathology, Jan. 1, 1997

**Medical Practice:**

* Staff Pathologist, San Mateo County General Hospital, 1962-1968
* Proprietor and Medical Director, Cytopath Laboratory, Burlingame, CA 1964-1997
* Forensic Pathologist under contract with San Mateo County, since 1968

**Pathology Experience:** Approximately 17,200 forensic, private and academic autopsies
Consulting Expert for the District Attorney of Orange County, CA, circa 1991-2001

**Court Experience:**

* Qualified as Expert Witness in court 650 times (San Mateo, San Francisco, Santa Clara, Alameda, Monterey, Santa Cruz, and Contra Costa Counties, CA)

(Cont'd).

Mark Rosenbush
Ca. State Bar No. 72436
214 Duboce Avenue
San Francisco, CA 94103
(415) 861-3555

Attorney for Petitioner
FELIX SALCIDO

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| In re FELIX SALCIDO ,      ) | No. |
|                ) | |
| **On Habeas Corpus**     ) | **Santa Clara County Superior** |
|                ) | **Court No. B9842667** |
|                ) | **Sixth District Court of Appeal** |
|                ) | **No. H023965** |

## DECLARATION OF PAUL HERRMANN, M.D.

I, Dr. Paul Herrmann, state the following:

1.     I am medical doctor who specializes in forensic pathology. I was formerly the senior forensic pathologist for the Coroner ofAlameda County, and I have qualified as an expert in over 1,000 cases in both the federal and California courts. I have also been appointed by the California courts as an expert witness in more than 1,000 cases. A true copy of my curriculum vitae is attached to this declaration.

*In Re Felix Salcido: Dec. Of Dr. Herrmann*

Page 1

2.     In April of 2000 I was retained by attorneys Doug Rappaport and Doug Horngrad to consult with the defense in the case *People v. Felix Salcido*, Santa Clara County case number No. B9842667.

3.     My primary focus in the *Salcido* case was the 1994 autopsy report of one William Justice, authored by Santa Clara County coroner Massoud Vameghi, as well as autopsy and crime scene photos, notes and other materials relevant to the autopsy report, and statements to the police by Felix Salcido following his arrest.  I reviewed those materials and consulted with counsel, but I was never asked to testify at the *Salcido* trial.

4.     More recently, in 2003, I was again retained, by attorney Mark Rosenbush, to consult with the defense in the *Salcido* case.  In the course of this consultation I again reviewed the autopsy reports and underlying documents from the 1994 homicide, as well as transcripts of Dr. Vameghi's testimony at the trial and the exhibits submitted at the trial in relation to Dr. Vameghi's testimony.  I have also reviewed a lengthy transcript of an interview of Mr. Salcido by the police, in which Mr. Salcido describes the shooting and stabbing of Mr. Justice at an unknown location in east Palo Alto.

5.     Principal issues raised by the case included the time and place of death of the homicide victim, Mr. Justice.  More specifically, I was asked to address whether the forensic evidence and autopsy records validated the prosecution theory that Justice was stabbed while he was unconscious or dead, that Justice was shot before he was stabbed, that the forensic evidence showed Mr. Justice was shot and stabbed at the location where

*In Re Felix Salcido: Dec. Of Dr. Herrmann*                                    Page 2

his corpse was found, and that the killing could not have occurred at some other location, at some point before Mr. Justice's body was left at the location where it was found (as indicated by Mr. Salcido's statements to the police).

6.    At the *Salcido* trial Dr. Vameghi testified that the crime scene photos showed a large amount of blood (Dr. Vameghi estimated "500 ccs", or about a pint) pooled on the ground near Mr. Justice's head, and various blood stains on Mr. Justice's clothing. Dr. Vameghi also indicated that the autopsy and crime scene photos showed dried blood on Mr. Justice's face that was deposited as a result of his body lying face-down in a pool of blood at the crime scene.

Based on these photos of blood at the crime scene and the nature of Mr. Justice's wounds, Dr. Vameghi concluded that Mr. Justice was still alive when he was deposited at the scene where his corpse was eventually found. Given that severe nature of the gunshot wound to Mr. Justice's upper neck (which severed Mr. Justice's carotid artery), and what Dr. Vameghi characterized as the relatively short amount of time it would take a person with such wounds to "bleed out," Dr. Vameghi concluded that Mr. Justice was shot and stabbed within a couple of minutes of when he was left on the ground at the crime scene. According to Dr. Vameghi, the forensic evidence indicated Mr. Justice's heart was still pumping when he was left face-down at the crime scene. (Dr. Vameghi's testimony in this regard appears at pages 2085 though 2092 of the trial transcript).

Dr. Vameghi further testified that what he characterized as the absence of blood on

Mr. Justice's sweater in the area of his stab wounds, and the pattern of the stab wounds themselves, indicated Justice was laying face down, not moving, and likely unconscious when he was stabbed by a person standing above Justice's head as he lay prone on the ground. (Dr. Vameghi's testimony in this regard appears at pages 2114 though 2118 of the trial transcript). On cross-examination Dr. Vameghi admitted that there were significant blood stains on the t-shirt Mr. Justice was wearing under the sweater. (Dr. Vameghi's testimony in this regard appears at pages 2125 though 2127 of the trial transcript). Dr. Vameghi also indicated he did not go to the crime scene and that his testimony about the amount of blood found at the various locations, including Mr. Justice's clothing and the area on the ground where Mr. Justice was found, was based on his viewing of crime scene photos.

Finally, Dr. Vameghi concluded that the presence of a belt in Mr. Justice's hand, as depicted in various crime scene photos, and the absence of any ligature Marks on Mr. Justice's neck, were consistent with a theory that Mr. Justice was garroted from behind with the belt before he was shot. According to Dr. Vameghi, the absence of ligature marks showed that Mr. Justice struggled, by pulling the belt away from his neck with his hand, since the removal of a garrote while a person is alive restores blood flow to the area where the garrote was applied and therefor results in no markings on the skin. (Dr. Vameghi's testimony in this regard appears at pages 2093 though 2095 of the trial transcript).

*In Re Felix Salcido: Dec. Of Dr. Herrmann*                                     Page 4

7.    I reached different conclusions concerning the meaning of the crime scene blood evidence, the stains on Mr. Justice's clothing, the meaning of the absence of ligature or scratch marks on Mr. Justice's neck, and several other aspects of Dr. Vameghi's testimony.

8.    I do not believe the forensic evidence supports Dr. Vameghi's conclusion that Mr. Justice's heart must have been beating when Justice was deposited at the scene where his corpse was found. As an initial matter, it is impossible to tell from only the crime scene photos how much blood was pooled at the crime scene, as Dr. Vameghi admitted at one point during his testimony (at page 2131). Thus, it is impossible to discern how much Mr. Justice bled after he was lying face-down on the ground at the crime scene. In sum, Dr. Vameghi's conclusion concerning how much Mr. Justice bled after his body was deposited at the crime scene is based almost entirely on speculation.

In addition, the evidence gathered from the inside of the car and from Mr. Salcido's clothing indicated a large amount of Mr. Justice's blood was found soaked into the driver's seat of the car and the pants Mr. Salcido was wearing. The presence of such copious amounts of blood in the driver's area of the car and on Salcido's pants is consistent with the victim's head lying in Mr. Salcido's lap for some time after the gunshot, since the wound suffered by Mr. Justice would result in a great deal of bleeding from Justice's nose, mouth and gunshot wounds.

9.    There is also little or no evidence to support Dr. Vameghi's conclusion that

*In Re Felix Salcido: Dec. Of Dr. Herrmann*                                                          Page 5

Mr. Justice was garroted from behind with the belt found near his hand at the crime scene, prior to being shot. In fact, and in contradiction to Dr. Vameghi's testimony, when a person is garroted around the neck while they are still conscious and struggle against the garotte, the neck area will typically show abrasions. Such abrasions of the skin occur due to the friction between the skin and the garrote, as well the person clawing at the neck area with their fingers to remove the garrote. Moreover, strangulation by ligature blocks the jugular vein causing blood to back up into the head and causing petechiae on the eyelids and eyeball (pin point hemorrhages) which were not noted at Justice's autopsy Thus, the absence of any markings on Mr. Justice's neck, and the lack of petechiae, indicate he was not garroted with the belt while he was conscious prior to being shot.

The fact that the belt was lying between two of Mr. Justice's fingers when Justice was found does not necessarily indicate Mr. Justice grabbed the belt away from his neck as he struggled against a garrote. The evidence is equally consistent with Mr. Salcido's statements that he took off his belt and used it to lift Mr. Justice after Justice had died in his lap.

10.    Dr. Vameghi's conclusions that Mr. Justice was stabbed as he lay face-down and unconscious at the crime scene, after being shot, is similarly not supported by the forensic evidence.

The primary basis for Dr. Vameghi's conclusion that Justice was stabbed after he was shot and while he was lying prone on the ground was what Vameghi described as an

*In Re Felix Salcido: Dec. Of Dr. Herrmann*                                        Page 6

absence of blood stains on Mr. Justice's sweater in the area surrounding the stab wounds, and the absence of defensive wounds. However, Dr. Vameghi indicated his testimony concerning the absence of blood on the sweater was based on review of crime scene photographs. In fact the crime scene photographs which I reviewed show a significant amount of blood on the inside of Mr. Justice's sweater and t-shirt in the area that you would expect to see bleeding from these stab wounds.

Equally important is the fact that the absence of copious blood stains on Justice's sweater would not necessarily indicate Justice was stabbed after he was shot. The stab wounds suffered by Mr. Justice, which involved punctures of the chest, often do not involve a great deal of external bleeding. Typically such wounds bleed into the chest cavity, rather than outside the body. The muscle and tissue surrounding such penetrating wounds tend to act like a seal once the stabbing object is removed, limiting external bleeding.

In addition, the type of gunshot wound Mr. Justice suffered causes a sudden drop in blood pressure. This drop in pressure, combined with the amount blood flowing from the victim's mouth and nose, would mean that very little blood would seep from the stab wounds if, as Salcido indicates in his statements, Justice was shot shortly after he was stabbed.

Finally, Dr. Vameghi was incorrect when he indicated that the grouping and consistent angles of the stab wounds, and the lack of defensive wounds, necessarily

*In Re Felix Salcido: Dec. Of Dr. Herrmann*                                                    Page 7

indicate that Mr. Justice was lying face down and unconscious when he was stabbed. It is true that the uniform angle and grouping of the wounds, as well as the absence of any apparent defense wounds, are consistent with the victim being stabbed while he was relatively motionless. However, the circumstances are also consistent with a victim being stabbed from behind by surprise, and the minimal upward angle (5 degrees) of the stab wounds is consistent with the victim standing when he was stabbed from behind. The lack of defensive wounds is also consistent with Mr. Salcido's statement that Justice was stabbed by surprise from behind and incapacitated before he could defend himself.

In addition, the position of the knife holes in the sweater as compared to the location of the stab wounds on Mr. Justice's body showed that the sweater was pulled up toward the victim's shoulders when he was stabbed. This tends to show that the victim's clothes and body were manipulated at the time he was stabbed. This is inconsistent with the victim being stabbed as he lay motionless, unconscious, and face-down in the same position as his body was found. However it is entirely consistent with Mr. Salcido's statement that Justice was stabbed from behind while standing, if the assailant grabbed his shirt as he stabbed Justice with a knife held in his other hand.

11.     Had I been called to testify at the *Salcido* trial I would have testified to the conclusions described above. I also would have testified that the forensic evidence gathered at the scene, during the autopsy, from the car, and from Mr. Salcido's clothing, is entirely consistent with Mr. Justice having been stabbed outside the car in East Palo

Alto, then shot in the head by a person in the back seat, and then driven to and deposited at the location on Moody Road where his body was found. I would have further testified that there was insufficient evidence to support a conclusion that Mr. Justice was still alive when his body was deposited at the crime scene.

12.    I would have testified that the angle and grouping of the stab wounds and the lack of defensive wounds were consistent with the victim being stabbed by surprise, from behind, while he was standing. I also would have testified that the blood stains depicted in the crime scene photographs of the victim's t-shirt and sweater were consistent with the type of bleeding one would expect from such stab wounds by a person who is alive and upright for some time after the wounds were inflicted.

I would have further testified that the amount of blood found on the driver's side of the car, as well as Mr. Salcido's pants, was entirely consistent with Mr. Salcido's description of Mr. Justice lying for some time after the shooting with his head on Mr. Salcido's lap. Because the gunshot wound inflicted upon Mr. Justice would result in heavy bleeding from Mr. Justice's mouth, nose and gunshot wounds, one would expect to find the largest amount of Justice's blood in the area where Mr. Justice's head was positioned immediately after the shooting.

I also would have testified that the presence of dried blood on the victim's face, and on the ground in the area surrounding the victim's head at the crime scene, does not show that the victim's heart was still beating when his body was deposited at the crime

scene. It is not possible to discern from the crime scene photos how much blood was on the ground, and the presence of some blood on the ground and the victim's face is consistent with the body being deposited at the scene well after the shooting, as described by Mr. Salcido.

Finally, I would have testified that the presence of the belt at the crime scene was consistent with Mr. Salcido's description of his trying to lift Mr. Justice's body with the belt after Mr. Justice was dead. Had Mr. Justice been garroted with the belt while he was still alive, and struggled violently against the garrote, there likely would have been visible abrasions on Mr. Justice's neck and petechiae on his eyelids and eyeballs. The absence of such abrasions and petechiae tend to show that Mr. Justice was not garroted with the belt while he was conscious.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this 27th day of April, 2005, in San Rafael, California.

PAUL HERRMANN, M.D.

*In Re Felix Salcido: Dec. Of Dr. Herrmann*                              Page 10

**PAUL W. HERRMANN, M.D.**
FORENSIC PATHOLOGIST AND MEDICAL-LEGAL CONSULTANT
140 OAK VIEW DRIVE
SAN RAFAEL, CA 94903

TELEPHONE : 415-492-0928
CELL PHONE : 415-971-9098
FAX : 415-492-1610

DIPLOMATE: AMERICAN BOARD OF PATHOLOGY
ANATOMIC/CLINICAL/FORENSIC PATHOLOGY

## CURRICULUM VITAE

## PAUL W. HERRMANN, M. D.

## EDUCATION

| | | |
|---|---|---|
| UNIVERSITY | 1953-1957 | Washington University<br>St. Louis, Missouri, B. A.<br>(German) |
| MEDICAL SCHOOL | 1957-1961 | Washington University<br>St. Louis, Missouri, M. D. |
| INTERNSHIP - ROTATING | 1961-1962 | Hennepin County General Hospital,<br>University of Minnesota<br>Minneapolis, MN |
| RESIDENCY - INTERNAL MEDICINE | 1964-1965 | Hennepin County General Hospital<br>Minneapolis, MN |
| RESIDENCY - PATHOLOGY | 1965-1967 | Department of Pathology<br>Washington University School of Medicine,<br>Barnes Hospital, St. Louis, MO<br>Paul Lacy, M. D., Director |
| | 1967-1968 | Office of the Chief Medical Examiner,<br>New York, NY  (Forensic Pathology)<br>Milton Helpern, M. D., Chief Medical Examiner |
| | 1968-1969 | Department of Surgical Pathology, Washington<br>University School of Medicine,<br>Barnes Hospital, St. Louis, MO<br>Lauren V. Ackerman, M. D., Director |
| | 1969-1970 | Department of Clinical Pathology<br>Lenox Hill Hospital, New York, N.Y.<br>Sheldon Sommers, M. D., Director |

## CERTIFICATION

| | | |
|---|---|---|
| | 1970 | Anatomic and Clinical Pathology<br>American  Board of Pathology |
| | 1971 | Forensic Pathology<br>American Board of Pathology |

## MILITARY SERVICE

| | | |
|---|---|---|
| U.S. Army | 1962-1963 | First Cavalry Division, Korea<br>General Medical Officer |
| | 1963-1964 | U. S. Army Dispensary<br>Fort Hamilton, New York<br>Officer in Charge |

## EMPLOYMENT

| | |
|---|---|
| 1970-2004 | WESTERN LABORATORIES MEDICAL GROUP<br>Staff Pathologist (1970 – 2004)<br>Managing Partner (1975-2002) |
| 1975-1982 | WESTERN PATHOLOGY LABORATORIES,INC.<br>Director<br>(Laboratory sold 1982) |
| 1970-2001 | INSTITUTE OF FORENSIC SCIENCES<br>Director, 1982-2001 (Toxicology Laboratory sold<br>March 2001) |
| 1982-1985 | INTERNATIONAL CLINICAL LABORATORIES<br>Medical Director |
| 1970-Present | ALAMEDA HOSPITAL, DEPTARTMENT OF PATHOLOGY<br>Staff Pathologist |
| 1970-2004 | OFFICE OF THE CORONER, ALAMEDA CO.<br>Forensic Pathologist |
| 1968-Present | FORENSIC PATHOLOGIST AND MEDICAL- LEGAL CONSULTANT |

## MEDICAL APPOINTMENTS

| | |
|---|---|
| 1982-1995 | ADVISORY COMMITTEE ON ALCOHOL DETERMINATION,<br>State of California<br>Member  (Committee inactive since 1995) |
| 1987-2004 | TRAUMA AUDIT COMMITTEE, EMERGENCY MEDICAL SERVICES.<br>HEALTH SERVICE DEPARTMENTS ALAMEDA-CONTRA COSTA<br>COUNTIES<br>Member |
| 1987-2004 | CHILDHOOD DEATH COMMITTEE, ALAMEDA<br>COUNTY, Member |

## TEACHING APPOINTMENT

| | |
|---|---|
| 1976-1994 | Lecturer, Department of Pathology<br>University of California Medical School<br>Berkeley, CA |
| 1976-1996 | Lecturer, Department of Life Sciences<br>University of California, Berkeley, CA<br>(Criminalistics curriculum inactivated 1996) |
| 1976-1994 | Lecturer, Department of Pathology<br>University of California Medical School, Davis, CA |
| 1976-1994 | Veterans Administration Hospital, Martinez, CA |
| 1981-1983 | Lecturer, Department of Pathology<br>Stanford University, School of Medicine |
| 1983-1987 | Assistant Clinical Professor<br>Department of Pathology<br>Stanford University School of Medicine |
| 1987-1994 | Associate Clinical Professor<br>Department of Pathology<br>Stanford University, School of Medicine |
| 1994-2004 | Clinical Professor<br>Department of Pathology<br>Stanford University, School of Medicine |
| 2004-Present | Emeritus Clinical Professor<br>Department of Pathology<br>Stanford University, School of Medicine |

## SOCIETY MEMBERSHIPS

| | |
|---|---|
| 1970-Present | Alameda/Contra Costa Medical Association |
| 1970-Present | California Medical Association |
| 1970-Present | American Medical Association |
| 1970-Present | California Society of Pathologists |

## HONORARY SOCIETY MEMBERSHIP
Phi Beta Kappa

## PUBLICATIONS

Reynolds, P. C., Som, C. W. and Herrmann, P. W., Loxapin Fatalities, Clinical Toxicology 14, 181, 1979.

Grant Gauger, M. D. and Paul W. Herrmann, M. D., Cranial Arteriovenous Malformation: Suicide by Exsanguination. Journal of Forensic Sciences 33, Vol.1, 283, 1988.

Meeker, J. E. and Herrmann, P. W., Clozapine Tissue    Concentrations Following an Apparent Suicidal Overdose of Clozaril, Journal of Analytical Toxicology, Vol. 16, 54, 1982.

## ORIGINAL PRESENTATIONS

Institute of Forensic Sciences Medical-Legal Seminars, Oakland, CA

| | |
|---|---|
| 1971 | The New York Medical Examiner System, A Model for the United States |
| 1971 | The Surgical Treatment of Barbiturate Poisoning |
| 1972 | Current Status of Forensic Pathology Training in the United States |
| 1973 | A Case of Historical Interest: The Ruxton Case |
| 1973 | Cardiovascular Injuries Sustained by Drivers in Single Auto Crashes |
| 1973 | Physical Activity Following Fatal Gun Shot Wounds |
| 1974 | Post Ictal Respiratory Failure |
| 1976 | The Sexual Asphyxias |
| 1977 | The Pathology of Acetaminophen Poisoning |
| 1978 | Laetrile, Discussion and Presentation of a Case of Lethal Laetrile Intoxication |
| 1978 | Childhood Asphyxial Deaths Caused by Toys |
| 1980 | Amniotic Fluid Embolism, A Review |
| 1980 | Hypoplasia of the Coronary Arteries, Fact or Fiction? |
| 1981 | A Review of Hereditary Diseases |
| 1982 | Fetal Death Following Maternal Trauma |
| 1983 | Bomb Blast Injuries and Death |
| 1983 | Fatal Alcohol Intoxication in Children |
| 1985 | The Shaken Infant Syndrome |
| 1986 | Three Case Presentations |
| 1986 | The Occurrence and Development of Intracerebral Hematomas in Head Trauma |
| 1987 | Three Case Presentations |
| 1992 | The Pathologic Findings in the Oakland Fire of October 1991 |

1992   Eosinophilic Myocarditis Associated with Clozapine Therapy

1995   Death During Police Restraint


## INSTRUCTIONAL PRESENTATIONS

College of American Pathologists: Advanced Course on Forensic Pathology

    1976   Gunshot Wounds
          Oakland, CA

    1981   Blunt Head Trauma
          Sexual Asphyxias
          San Francisco, CA

California Homicide Investigators Association:

    1977   Death by Asphyxiation, Reno, NV

Western Federation of Neurological Sciences:

    1981   Gunshot Wounds of the Head, San Francisco, CA

    1984   Neuropathology of Penetrating Head Trauma,
          Pebble Beach, CA

Office of the District Attorney:

    1986   An Overview of Forensic Pathology, Oakland, CA

Alameda Hospital Medical Staff:

    1993   The Battered Child Syndrome, Alameda, CA

Northwest Association Of Forensic Scientists:

    1994   Forensic Evidence Collection and Use in the Oakland Fire of 1991

International Homicide Investigators' Association:

    1994   Forensic Pathology in Mass Disasters

Alameda County Arson Investigators' Training Course:

    1997   Forensic Pathology Examination in Cases of Arson

California Association of Criminalists:

    2004   New developments in the practice of Forensic Pathology



(ENDORSED)
FILED

AUG 2 2005

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ CHUA
_____ DEPUTY

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

|  |  |
|---|---|
| FELIX SALCIDO ,<br>      Petitioner,<br><br>      v.<br><br>JAMES A. YATES, Warden of Pleasant<br>Valley State Prison,<br>      Respondent. | No. B9842667<br><br>**Santa Clara Co. Superior<br>Court No. B9842667<br>Sixth District Ct. Appeal<br>No. H023965** |

## <u>DECLARATION OF CHARLES MORTON IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS</u>

Mark Rosenbush
State Bar No. 72436
214 Duboce Avenue
San Francisco, CA 94103
(415) 861-3555

Attorney for Petitioner
FELIX SALCIDO

Mark Rosenbush
Ca. State Bar No. 72436
214 Duboce Avenue
San Francisco, CA 94103
(415) 861-3555

Attorney for Petitioner
FELIX SALCIDO



(ENDORSED)
FILED

AUG   2 2005

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ S. CHUA _____ DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

In re FELIX SALCIDO ,

**On Habeas Corpus**

)
)
)
)
)
)
)
)
)

No.

**Santa Clara County Superior
Court No. B9842667
Sixth District Court of Appeal
No. H023965**

## DECLARATION OF CHARLES V. MORTON

I, Charles V. Morton, state the following:

1.    I am Chief Forensic Scientist, Forensic Science Division, Forensic

Analytical, Inc.  I have been retained as an expert in hundreds of cases in both the federal

and California courts.  I have also been qualified to testify as an expert forensic

criminalist in hundreds of cases.  A true copy of my curriculum vitae is attached to this

declaration.

//

//

1

2.      In March of 2000 I was retained by attorneys Doug Rappaport and Doug Horngrad to consult with the defense in the case *People v. Felix Salcido*, Santa Clara County case number No. B9842667.

3.      I spent considerable time preparing for the Salcido trial, consulting with defense counsel Doug Rappaport, and reviewing the prosecution's forensic evidence. I also went to court and watched the testimony of key prosecution forensic experts regarding the significance of physical evidence, including Mr. Ridolphi and Mr. Barlowen. I was not called to testify at the *Salcido* trial.

4.      Recently, attorney Mark Rosenbush contacted me, informed me that he was representing Mr. Salcido in a habeas corpus proceeding, and asked me to discuss the *Salcido* case with him. As a result, I again reviewed my case file on the *Salcido* matter, including my notes, police and crime scene reports, crime scene photos and forensic reports from the 1994 homicide.

5.      Among the issues I was asked to address when I was retained to confer with the defense of Mr. Salcido's case prior to trial were: (1) the meaning of the blood splatter and other forensic evidence gathered from inside Mr. Salcido's car, and specifically, whether the evidence indicated someone was in the back seat of the car at the time of the shooting, whether the fatal shot more likely was fired by a person in the back seat or the driver's seat of the car, and whether the front passenger door of the car was open or closed at the time the shot was fired; and (2) the meaning of the available gunshot residue evidence, and whether that evidence showed that Mr. Salcido fired the shot, or was merely present in the vicinity from which the shot was fired; in addition to (3) a general examination and interpretation of the crime scene evidence gathered in the Salcido case. In addition, Forensic Analytical analyzed DNA evidence gathered in the case, but I did not directly participate in the DNA analysis.

6.    At the *Salcido* trial criminalist Doug Ridolfi testified as an expert for the prosecution. I sat through Mr. Ridolfi's testimony and was prepared to testify in a manner that would have rebutted several of Mr. Ridolfi's conclusions.

7.    My conclusions concerning the Salcido forensic evidence included the following, all of which I would have testified to, had I been asked to do so.

8.    Based on the very small amount of material on Mr. Salcido's gloves that could be identified as gunshot residue, I concluded that it was not possible to discern whether Mr. Salcido had recently fired a gun, had recently been in the vicinity when someone else fired a gun, or had recently touched a surface that had previously been contaminated with gunshot reside. I also concluded that had Mr. Salcido been inside the car when another person fired a gun (for example a person in the back seat area who was, as some evidence suggests, reaching over into the front seat area when he fired a handgun), then Mr. Salcido was in an atmosphere of gunshot residue that would have been more than sufficient to deposit on his gloves the amount of residue located during the forensic tests. This conclusion was contrary to Mr. Ridolfi's opinion that the gunshot residue evidence tended to prove that Mr. Salcido fired the shot that killed Mr. Justice while he (Salcido) was seated in the driver's seat of the car. Mr. Ridolphi's conclusion in this regard also failed to account for the fact that the hand that held the weapon could have belonged to either the driver of the car, or the person who (Mr. Ridolphi opined) was seated in the back seat area.

9.    Mr. Ridolphi also concluded that the fatal gunshot was fired from the direction of the driver's seat based on his analysis of the high and medium speed blood spatter patterns inside the car. In fact, in my opinion, the blood spatter pattern was inconclusive as to the direction of the shot. Mr. Ridolphi did not document the precise shape of the blood spots underlying his conclusions, and he did not take into account the effect of wind on these spatters (this was important because the car was driven

extensively without a right front passenger window in place, just after the shooting). Both of these omissions call his conclusions into question.

10.    I also disagree with Mr. Ridolphi's opinion that the belt found clutched in Mr. Justice's hand was used to hold the victim in place while he was shot. The presence of the belt between two fingers of Mr. Justice as he lay out on Moody Road after being shot is not enough to support this conclusion. The belt could have gotten tangled with the body in any number of ways. Also, the belt was bloody from end to end, so if it had been used to hold Mr. Justice then I would expect to see staining of the outline of the belt on his person or clothing where he was being restrained by it.

11.    I also concluded, contrary to Mr. Ridolphi's testimony, that the blood spatter evidence gathered from inside Mr. Salcido's car was not sufficient to establish whether the passenger side front car door was closed or open when the shooting occurred inside the car. I based this conclusion on the fact that there was blood spatter on the upper right side interior of the car above the front door, very close to the right front passenger window frame. If there was similar blood spatter on the window frame near that same spot, that would be evidence that the door was closed at the time of the shot. If there was no blood spatter on the window frame near that spot, then the door was probably open. Contrary to Mr. Ridolphi's opinion, no conclusion can be reliably drawn because there are no photographs of this area of the right front passenger door/window frame, and there are no notes by Mr. Ridolphi regarding the presence or absence of blood spatter in this area.

12.    Mr. Ridolphi testified that one of the reasons that he believed the shooter was seated in the drivers seat of the car was because an expended shell casing was found under the front seat. The location of an expended casing under the front seat does not, in my opinion, support that conclusion. The significance of the location of the casing under the front seat is inconclusive. The final location of an expended cartridge case is determined by a number of factors. These include the ejection characteristics of the

Declaration of Charles Morton, Page 4

firearm and ammunition, the orientation of the firearm at the time the cartridge case was ejected, the nature of the surfaces it strikes and the angles at which it strikes these surfaces. In addition, subsequent movement due to activity within the vehicle and even the act of towing the vehicle can change the final location of an expended cartridge case.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this 25th day of July, 2005, in Hayward, California.

CHARLES V. MORTON
Chief Forensic Scientist
Forensic Analytical, Inc.

Mark Rosenbush
Ca. State Bar No. 72436
214 Duboce Avenue
San Francisco, CA 94103
(415) 861-3555

Attorney for Petitioner
FELIX SALCIDO

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| In re FELIX SALCIDO , | ) | No. |
| | ) | |
| **On Habeas Corpus** | ) | **Santa Clara County Superior** |
| | ) | **Court No. B9842667** |
| | ) | **Sixth District Court of Appeal** |
| | ) | **No. H023965** |

### DECLARATION OF ATTORNEY PATRICK KELLEY

I, Patrick Kelley, state the following:

1.      I am an attorney duly licensed to practice in the California courts.  On or

about June 28, 2000, I was appointed by the Santa Clara County Superior Court to

represent and advise Felix Salcido, in case number B9842667, concerning the limited

*In Re Felix Salcido: Dec. of Patrick Kelley*                                           Page 1

issue of conflicts of interest on behalf of Mr. Salcido's counsel of record in that case, Douglas Horngrad and Douglas Rappaport.

2.    Upon my appointment I discussed the case and the potential conflict with defense counsel Rappaport and Horngrad, as well as the prosecutor in the case, Daniel Carr. The potential conflict at issue stemmed from both defense counsel having previously represented an important prosecution witness in the *Salcido* case, Christian Smith.

3.    I was informed that the issue of defense counsel's prior representation of Mr. Smith, as well as two other potential prosecution witnesses, had been raised at Mr. Salcido's preliminary hearing and that Mr. Salcido and the witnesses had all waived the conflict. It was my understanding that the conflict issue was before the court pursuant to Mr. Horngrad's motion to withdraw.

4.    Upon my appointment I conferred with Mr. Salcido in detail about the conflict, his right to conflict-free counsel, his right to waive the conflict, and the various ways in which his counsel's potential conflict could prejudice him in his case.

5.    After discussing the matter with Mr. Salcido, he informed me that he was certain that he wanted to keep both of his attorneys, and certain that he wanted to waive the conflict as to both Rappaport and Horngrad. Mr. Salcido held both of his attorneys in very high regard and was quite concerned over the prospect of losing the representation either or both counsel. I believe that Mr. Salcido's decision to waive the potential

*In Re Felix Salcido: Dec. of Patrick Kelley*                                    Page 2

conflicts as to both counsel was made with full knowledge of the consequences of his choice.

6.    After consulting with Mr. Salcido, on July 10, 2000 I attended a hearing in Judge Ahearn's court on Mr. Horngrad's motion to withdraw. Prior to the hearing I met with the court, both defense counsel, and the prosecutor in chambers. A lengthy discussion of the conflict issue ensued, and I informed defense counsel and the court that Mr. Salcido's desire was to waive the conflict, and that his decision to do so was, in my estimation, knowing and well informed.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this *13th* day of April, 2005, in San Jose, California.

PATRICK KELLY
Attorney at Law

*In Re Felix Salcido: Dec. of Patrick Kelley*                                    Page 3

**F I L E D**

**WAIVER OF POTENTIAL CONFLICT OF INTEREST**      JUL 1 0 2000

STEPHEN V. LOVE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY M, Fortuna    DEPUTY

I, FELIX SALCIDO, do hereby state and declare as follows under penalty of perjury:

That, prior to retaining DOUGLAS L. RAPPAPORT to represent me in this action, I was advised that he had previously represented Mr. CHRISTIAN SMITH on two separate occasions:

A.    That on or about the last Quarter of 1995 or the first Quarter of 1996, Mr. RAPPAPORT had made a single special appearance for Mr. DOUGLAS I. HORNGRAD who was representing Mr. SMITH in a Santa Clara felony matter involving the discharge of a firearm which was ultimately reduced to a misdemeanor; and,

B.    That in approximately 1997 or 1998, Mr. RAPPAPORT had represented Mr. SMITH in a San Francisco County domestic violence matter;

Further, I was made aware in my first meeting with Mr. RAPPAPORT that CHRISTIAN SMITH was a probable prosecution witness in this action and that I was advised of the potential drawbacks of having Mr. RAPPAPORT represent me;

Specifically, I was advised that Mr. RAPPAPORT would not be able to use certain information undermining Mr. SMITH's credibility during his cross-examination since such information was acquired during the representation of Mr. SMITH; Further, said information could potentially be readily used by a attorney who had never represented Mr. SMITH;

I was further advised that Mr. RAPPAPORT may not provide as effective representation as an attorney without a potential conflict of interest and that it may be more likely that I will be convicted should Mr. RAPPAPORT continue to represent me in this action;

I was further advised that I had a right to conflict-free representation and could consult with an independent attorney to advise me about the consequences of the potential conflict and the wisdom of waiving the potential conflict;

Further, that on or about the first two weeks of JULY, 2000, that the HONORABLE ROBERT AHERN appointed Mr. PATRICK KELLY, an attorney licensed to practice law in the State of California, to

FELIX SALCIDO
WAIVER OF POTENTIAL CONFLICT OF INTEREST
Page 2

advise me about the consequences, potential dangers and wisdom of having Mr. RAPPAPORT continue to represent me in the jury trial in this matter;

Further, Mr. KELLY also advised me of the following:

A.   That I have a right to have a conflict-free attorney represent me;

B.   That should I not be able to retain alternative counsel, that the county would appoint a conflict-free attorney to represent me; and,

C.   That should I waive the conflict of interest, that I would be waiving the right to appeal the issue of incompetence of counsel insofar as it involves this potential conflict of interest;

I Further declare that my decision is completely unrelated to any financial considerations related to representation and that I have had sufficient opportunity to discuss the potential conflict of interest with my counsel as well as contemplate the consequences of my decision; and,

THEREFORE, based upon the above, I knowingly, intelligently and voluntarily waive any potential conflict of interest involving Mr. RAPPAPORT's prior representation of Mr. CHRISTIAN SMITH.

I declare under penalty of perjury that the above is true and correct.

DATE: 7-10-2000        SIGNED: _____
                                **FELIX ANDREW SALCIDO**

DATE: 7/10/00          WITNESSED: _____
                                **PATRICK KELLY, ESQ.**

NON-CALJIC DEFENSES                                    F 4.020

## Third-Party Culpability

You have heard evidence that another person [_____] [or name of suspect if available] _____ [basis of suspicion]. It is not required that the defendant prove this fact beyond a reasonable doubt. Defendant is entitled to an acquittal if the evidence raises a reasonable doubt in your minds as to the defendant's guilt. Such evidence may by itself raise a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after consideration of this and all of the other evidence, you have a reasonable doubt that the defendant committed this offense, you must give the defendant the benefit of the doubt and find [him] [her] not guilty.

### Points and Authorities

It is well established that the defendant may rely upon the theory that a third party committed the charged offense. (People v. Edelbacher (89) 47 C3d 983, 1017 [254 CR 586]; People v. Hall (86) 41 C3d 826, 833 [226 CR 112].) It is also well settled that the defense has a right to pinpoint instructions upon the theory of the defense and upon the applicability of the burden of proof to that theory. (People v. Saille (91) 54 C3d 1103, 1120 [2 CR2d 364]; People v. Wright (88) 45 C3d 1126, 1136-37 [248 CR 600]; People v. Adrian (82) 135 CA3d 335, 342 [185 CR 506]; Evid. Code § 502; 1 FORECITE Practice Guide § III (A) and (D).) Further, the prosecution's burden logically permits the jury to rely entirely upon a single defense theory to find a reasonable doubt as to guilt. (See CJ 2.40.)

Therefore, when evidence of third-party culpability has been presented, the defense has a right to an instruction upon third-party culpability such as the one set forth above. The failure to provide such an instruction would implicate the defendant's federal constitutional rights to compulsory process, trial by jury and due process (6th and 14th Amendments).

___ Given as Requested    ___ Given as Modified    ___ Refused/Reasons:

(Continued)

⊕ FORECITE Legal Publications        Non-CALJIC Defenses, Pg. 30

1228 CT



PATRICK H. KELLY     SBN: 71462
Attorney at Law
1550 The Alameda, #308
San Jose, CA 95126
Telephone: (408) 294-9733

Court Appointed Attorney for Defendant
For Limited Purpose

# FILED

JUL 1 0 2000

STEPHEN V. LOVE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY m Fortino DEPUTY

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

### IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) NO. B9842667 |
| Plaintiff, | ) |
| vs. | ) MEMORANDUM ON |
| | ) CONFLICT OF INTEREST |
| FELIX ANDREW SALCIDO, JR. , | ) |
| Defendant. | ) |

## FACTS

This case was assigned out for trial with the Defendant represented by two retained

counsel, Douglas L. Rappaport and Douglas I. Horngrad.  Mr. Horngrad had previously

represented two prosecution witnesses, Mr. Margulies and Mr. Smith.  Mr. Rappaport had

briefly represented Mr. Smith on unrelated matters subsequent to the underlying events that

form the basis of this prosecution.  Patrick H. Kelly has been appointed to advise the

Defendant concerning his rights to a "conflict-free" attorney to represent him in this

prosecution for an alleged violation of Penal Code §187.

For purposes of this memorandum, it will be assumed that Mr. Horngrad  will be

993 CT

voluntarily withdrawing as trial attorney, with Mr. Rappaport continuing to represent the Defendant in this trial.

ISSUES

    1. Can the Defendant waive his right to a "conflict-free" attorney?

    2. Does the witness have any rights?

LAW

There appear to be two appellate cases that deal with the relevant facts and law presented in this case:

In <u>Vangsness v Superior Court</u> (1984) 159 Cal.App.3d 1087, the court was faced with a murder trial where the prosecution witness had been previously represented by the public defender's office concerning misdemeanor charges. The court appointed an attorney to advise the prosecution witness. The Defendant agreed to waive any conflict of interest; however, the witness would not waive "any conflict of interest that might arise." No actual conflict existed in that there was no exchange of confidential information. The witness merely objected to being cross-examined by his former attorney, claiming an "appearance of a conflict." The deputy public defender stated he did not intend to use any information his office acquired in its previous relationship with the witness; did not believe it could be relevant or even admissible since only misdemeanors were involved; and, in any event, had ample evidence from independent sources to refute the witness's proposed testimony. The appellate court held that the trial court's removal of the public defender was improper since the prior representation was minimal and dealt with matters unrelated to and inadmissible in the current proceeding. Thus there was no suggestioon that the deputy public defender proposed to violate his professional obligations. The appellate court noted that to deny the defendant his right to an attorney, under these circumstances, would be a possible violation of his Sixth Amendment rights.

In <u>Alcocer v Superior Court</u> (1988) 206 Cal.App.3d 951, the appellate court was faced

994

with the situation of defense counsel (Funke-Bilu) was currently representing a possible

prosecution witness (Jackson). The court summarized the cases that set forth the right of the

defendant to be represented by an attorney free of conflicting interests. However, the court

concluded that a trial judge "abridges a defendant's right to counsel when it removes retained

defense counsel in the face of a defendant's willingness to make an informed and intelligent

waiver of his right to be represented by conflict-free counsel." The court cited People v Bonin

(1989) 47 Cal.3d 808 and People v Easley (1988) 46 Cal.3d 712 as Supreme Court approval for

the right of the defendant to waiver his right to "conflict-free" counsel. The court then set forth

the procedure for a trial judge to follow when confronted with potential conflict:

> Once the trial court determines that a conflict may exist, the court should then briefly set
> forth the basis for its conclusion. The court must advise the defendant that his lawyer
> may not be able to effectively and adequately represent him. The court must inform him
> that this means he may not receive a fair trial if the attorney should continue to represent
> him.
>
> The court should appoint independent counsel as the court did here to confer with the
> defendant regarding the conflict. If after conferring with independent counsel the
> defendant should still wish to continue with his attorney despite the conflict, the court
> should ask the defendant if he understands that the conflict, or potential conflict, facing
> his lawyer could prevent his lawyer from representing him effectively or adequately.
>
> If he answers "yes," the court should then ask defendant if the only reason he is keeping
> his present lawyer is because of financial reasons concerning fees already paid the
> attorney, or fees owed the attorney. If the defendant answers "yes" to that question, the
> trial court should inform defendant that if he is financially unable to retain more than one
> attorney, separate counsel will be appointed by the court and paid for by the government.
> (See People v. White, supra, 201 Cal.App.3d at p. 1339; People v. Sanford, supra, 174
> Cal.App.3d at p. 18.)
>
> If the answer to the question is "no," the court should then ask defendant if he
> understands that, by proceeding with his current counsel, his chances of being convicted
> are greater than would be the case if he were represented by a conflict-free attorney. The
> court should also advise defendant that by waiving his right to conflict-free counsel he
> also waives his right to appeal the issue of incompetence of counsel insofar as it involves
> the conflict.
>
> The court should then say: "Having been advised of the right to be represented by an

**995**

attorney free from conflict, and having understood the disadvantages and dangers in being
represented by an attorney with a conflict, do you specifically give up the right to be
represented by an attorney who has no conflict of interest?" If the defendant answers
"yes," the court should then ask: "Do you specifically give up the right to appeal the
issue of incompetence of counsel insofar as it involves the conflict?"

The extent to which Funke-Bilu is hindered in his representation of Alcocer is also
dependent upon whether Jackson waives the conflict. The court must apprise Jackson of
the ramifications of conflict, and then afford him the opportunity to object to the
representation of Alcocer by Funke-Bilu. (United States v. James (2d Cir. 1983) 708 F.2d
40, 46.)

If such objection is made, and there appears to be a potential conflict, as there is in this
case, the court must consider other options. One option might be for the court to employ
backup counsel for Alcocer for the limited purpose of cross-examining Jackson. (United
States v. Agosto, supra, 675 F.2d at p. 974.) Such an arrangement would require that
Alcocer waive any claim that he had been denied effective counsel insofar as that right was
affected by the need to employ backup counsel to conduct cross-examination. (Ibid.)

## CONCLUSION

It appears that the Alcocer procedure is the recommended procedure, i.e., the defendant
has had independent counsel appointed to represent him concerning the issue of waiver.
Assuming that the defendant is willing to waive his right to conflict-free counsel, then the second
stage would be to determine if any testifying witness is willing to waive any privilege he may
have with the trial attorney (if in fact the trial attorney represented the witness) unless the
situation is closer to the Vangsness facts where there was no real conflict based on the factual
representations of counsel and the witness.

Respectfully submitted,

Dated: July 8, 2000

Patrick H. Kelly
Attorney for Defendant

996

11/29

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA   F I L E D

2      COUNTY OF SANTA CLARA

                   NOV 2 1999

3   BEFORE THE HONORABLE DIANE NORTHWAY, JUDGE

                STEPHEN V. LOVE

4      PALO ALTO FACILITY

5       DEPARTMENT 89           DEPU

6        ---oOo---

            ORIGINAL

7

8  THE PEOPLE OF THE   )

  STATE OF CALIFORNIA, )

9           )

      PLAINTIFF, )  CASE NO.: B9842667

10          )  CHARGES: F(001)187

     VS.       )

11          )

  FELIX ANDREW SALCIDO, )

12          )

     DEFENDANT. )

13 _____)

14        ---oOo---

15     PRELIMINARY EXAMINATION

16   WEDNESDAY, SEPTEMBER 22, 1999

17       VOLUME I

18    PAGES 1 THROUGH 28

19

20 A P P E A R A N C E S :

21 FOR THE PEOPLE:   DANIEL H. CARR

             DEPUTY DISTRICT ATTORNEY

22

  FOR THE DEFENDANT:  DOUGLAS L. RAPPAPORT

23           ATTORNEY AT LAW

24           DOUGLAS I. HORNGRAD

             ATTORNEY AT LAW

25

  ALSO PRESENT:    CINDY DIAMOND, ESQ.

26           ATTORNEY FOR KOJO WILLIAMS

27 OFFICIAL COURT REPORTER: VIVIAN PELLA BALBONI

             C.S.R. NO. 4806

28

2

1    PALO ALTO, CALIFORNIA                SEPTEMBER 22, 1999

2                    P R O C E E D I N G S

3          THE COURT:  WE'RE ON THE RECORD IN THE MATTER OF

4    THE PEOPLE VERSUS FELIX SALCIDO, CASE NUMBER B9842667.

5          CAN I HAVE APPEARANCES FOR THE RECORD, PLEASE.

6          MR. CARR:  GOOD MORNING, YOUR HONOR.  DANIEL CARR

7    ON BEHALF OF THE PEOPLE.

8          MR. HORNGRAD:  GOOD MORNING, YOUR HONOR.  DOUGLAS

9    HORNGRAD WITH FELIX SALCIDO, JUNIOR, WHO IS PRESENT IN

10   CUSTODY.

11         MR. RAPPAPORT:  GOOD MORNING, YOUR HONOR.  DOUGLAS

12   RAPPAPORT ALSO APPEARING ON BEHALF OF MR. SALCIDO.

13         THE COURT:  ALL RIGHT.  MR. HORNGRAD, I DON'T KNOW

14   WHETHER YOU OR MR. RAPPAPORT WISH TO GO FIRST.  THERE IS AN

15   ISSUE ABOUT CONFLICT OF INTEREST, AS I UNDERSTAND IT, THAT

16   YOU MAY OR MAY NOT HAVE.

17         MR. RAPPAPORT:  YES.  GOOD MORNING, YOUR HONOR.

18         THE COURT:  YOU BOTH HAVE; IS THAT CORRECT?

19         MR. RAPPAPORT:  THAT IS CORRECT.

20         THE COURT:  POTENTIALLY.

21         MR. RAPPAPORT:  I'M SORRY?

22         THE COURT:  POTENTIALLY.  I DON'T WANT TO PREJUDGE

23   IT.  I'M JUST SAYING YOU'VE RAISED A CONFLICT OF INTEREST

24   ISSUE WITH ME, SO I WANT TO HEAR IT.

25         MR. RAPPAPORT:  THAT'S RIGHT.  I SPOKE WITH

26   MR. CARR PREVIOUSLY, AND IT WAS OUR UNDERSTANDING AND IT WAS

27   ANNOUNCED IN COURT THAT THIS WAS GOING TO BE A HEARING

28   PURSUANT TO PROPOSITION 115.  HOWEVER, MR. CARR INDICATED TO

3

1    ME YESTERDAY THAT ONE OF THE POTENTIAL WITNESSES THAT HE WAS

2    GOING TO CALL WAS CHRISTIAN SMITH.

3            THE COURT:  I'M SORRY, WHAT WAS THE WITNESS'S

4    NAME?

5            MR. RAPPAPORT:  CHRISTIAN, A MALE.  HE WAS GOING

6    TO BE POTENTIALLY CALLED AS A WITNESS.  MR. CARR DIDN'T KNOW

7    WHETHER HIS TESTIMONY WOULD BE REQUIRED IN THE COURTROOM.

8            I SPOKE WITH MR. HORNGRAD.  I LEFT A MESSAGE FOR

9    MR. CARR IF, IN FACT, HE WAS GOING TO CALL MR. SMITH TO,

10   PLEASE, CONTACT ME IMMEDIATELY SO I CAN LET HIM KNOW OF THE

11   POTENTIAL ISSUE HERE.

12           APPARENTLY, HE IS GOING TO CALL MR. SMITH SO,

13   CONSEQUENTLY, IT'S TIME TO ADDRESS THE ISSUE OF PRIOR

14   REPRESENTATION.  IT'S MY UNDERSTANDING THAT THERE SHOULD NOT

15   BE A CONFLICT PROBLEM IN THIS MATTER AND THAT THIS SHOULD BE

16   EASILY RESOLVED.  BUT, NEVERTHELESS NOW IS THE TIME TO RAISE

17   THIS ISSUE.

18           THE COURT:  OKAY.  COULD YOU DESCRIBE THE NATURE

19   OF THE PRIOR REPRESENTATION, YOU KNOW, HOW LONG AGO IT WAS,

20   YOU KNOW, ALL OF THOSE FACTORS.

21           MR. HORNGRAD:  YOUR HONOR, I REPRESENTED MR. SMITH

22   ON TWO OCCASIONS, ONCE IN THE CITY AND COUNTY OF SAN

23   FRANCISCO ABOUT FOUR YEARS AGO.  NO, PERHAPS MORE, FIVE

24   YEARS AGO.  AND THEN I REPRESENTED HIM, MR. SMITH, IN SAN

25   JOSE ABOUT A YEAR AFTER THAT.  SO I'VE DEFENDED HIM ON TWO

26   OCCASIONS.

27           MR. RAPPAPORT:  AND I'VE REPRESENTED MR. SMITH IN

28   THE CITY AND COUNTY OF SAN FRANCISCO APPROXIMATELY A YEAR TO

4

1    A YEAR AND A HALF AGO.

2          THE COURT:  OKAY.  CAN YOU TELL ME IF THESE WERE

3    ALL CRIMINAL CASES.

4          MR. RAPPAPORT:  CRIMINAL MATTERS, YOUR HONOR.

5          MR. HORNGRAD:  YES, YOUR HONOR.

6          THE COURT:  WHAT WAS THE LENGTH OF THE

7    REPRESENTATION, MEANING, HOW LONG?

8          MR. HORNGRAD:  YOUR HONOR, IN MY CASE --

9          THE COURT:  EXCUSE ME.  WHOEVER HAS THAT, TURN IT

10   OFF.  PUT IT ON SILENT.

11         GO AHEAD.

12         MR. HORNGRAD:  THANK YOU, YOUR HONOR.

13         THE SAN FRANCISCO CASE I REPRESENTED MR. SMITH

14   FROM ARRAIGNMENT TO DISPOSITION.  HE, MR. SMITH, HAD BEEN

15   CHARGED WITH A FELONY 211 AND ULTIMATELY PLED GUILTY, AS I

16   RECALL.  WE DO NOT HAVE MR. SMITH'S RAP SHEET.  WE COULD

17   PROBABLY USE THAT BEFORE HE TESTIFIES.

18         MY RECOLLECTION IS MR. SMITH PLED GUILTY TO A

19   FELONY 487 AND WAS GRANTED PROBATION.

20         THE SECOND CASE I DEFENDED HIM IN WAS SOMETHING

21   LIKE, AND I BELIEVE IT WAS A PENAL CODE SECTION 246.3,

22   DISCHARGING A FIREARM IN PUBLIC, INITIALLY CHARGED AS A

23   FELONY.  MY RECOLLECTION IS THAT ON THE MORNING OF -- TRIAL

24   MORNING OR JUST BEFORE TRIAL MORNING THE CASE SETTLED FOR A

25   TIME SERVED MISDEMEANOR.  AND THOSE WERE THE TWO CASES WHERE

26   I HAD CONTACT WITH MR. SMITH.

27         THE COURT:  OKAY.

28         MR. RAPPAPORT:  TO THE EXTENT OF MY REPRESENTATION

5

1    OF MR. SMITH, YOUR HONOR, THAT WAS AN INCIDENT --

2         THE COURT:  WAS THAT IN SAN FRANCISCO?

3         MR. RAPPAPORT:  IN SAN FRANCISCO, THAT BEGAN AS A

4    DOMESTIC VIOLENCE ASSAULT, ULTIMATELY NOT CHARGED.  HOWEVER,

5    IT WAS USED AS A BASIS TO REVOKE FELONY PROBATION IN SAN

6    FRANCISCO TO THE BEST OF MY RECOLLECTION AT THIS POINT.

7         THE COURT:  OKAY.  WERE ALL OF THESE

8    COURT-APPOINTED REPRESENTATIONS?

9         MR. RAPPAPORT:  ON BEHALF OF MYSELF IT WAS

10    RETAINED.

11         MR. HORNGRAD:  AND THE SAME IS TRUE FOR ME, YOUR

12    HONOR.  I WAS RETAINED IN BOTH MATTERS.

13         THE COURT:  OKAY.  IS THERE ANYTHING THAT WE

14    SHOULD EXPLORE ABOUT THESE?

15         MR. HORNGRAD:  YOUR HONOR, I CAN GIVE THE COURT A

16    LITTLE MORE INFORMATION, WHICH IS, THAT WHEN WE SAW THAT

17    MR. SMITH'S NAME WAS FEATURED IN THE ORIGINAL REPORTS,

18    MR. RAPPAPORT SAW MR. SMITH AND I THINK THAT WAS IN

19    CONNECTION WITH THE CASE THAT I HAD BEEN DEFENDING HIM ON.

20    MR. SMITH INDICATED THAT HE WAS PREPARED TO WAIVE ANY

21    CONFLICT.  WE DID DISCUSS THIS WITH MR. SALCIDO AND TOLD

22    MR. SALCIDO WHAT THE POSTURE OF OUR SITUATION WAS AND THAT

23    MR. SALCIDO HAD INDICATED TO US THAT HE TOO WOULD WAIVE ANY

24    POTENTIAL CONFLICT.

25         THE COURT:  ALL RIGHT.  PERHAPS, THEN WE CAN --

26    DID YOU WANT TO SAY SOMETHING, MR. CARR?

27         MR. CARR:  WELL, YOUR HONOR, I THINK THAT THE

28    IMPORTANT THING THAT DEFENSE COUNSEL MUST LOOK TO IS THE

6

1    REPRESENTATION OF THE DEFENDANT AT OR ABOUT THE TIME THAT

2    THE HOMICIDE OCCURRED.  APPARENTLY, MR. SALCIDO WAS

3    REPRESENTED BY MR. HORNGRAD AT THAT PARTICULAR TIME OR

4    SOMETHING OF THAT NATURE.  THE PROBLEM THAT EVOLVES IS THAT

5    MR. SMITH GAVE PARTICULAR STATEMENTS TO THE POLICE

6    IMPLICATING THE DEFENDANT AS BEING IN POSSESSION OF A 9MM

7    BARETTA WHICH IS CONSISTENT WITH THE WEAPON THAT WAS USED TO

8    KILL THE VICTIM IN THIS CASE.  I'M NOT SURE IF THEY WERE

9    ALSO REPRESENTING MR. SMITH AT THE TIME THAT HE GAVE

10   SUBSEQUENT STATEMENTS --

11            THE COURT:  MR. HORNGRAD WAS NOT.

12            MR. CARR:  I DO NOT KNOW IF MR. HORNGRAD --

13            THE COURT:  MR. HORNGRAD'S REPRESENTATION, HE

14   SAID, WAS FOUR OR FIVE YEARS AGO AND THOSE WERE BOTH DISPOS;

15   IS THAT CORRECT?

16            MR. HORNGRAD:  THAT IS CORRECT.  NOW, IF I MAY,

17   YOUR HONOR, I'M QUITE CERTAIN THAT THE SAN FRANCISCO CASE

18   WAS PRIOR TO THIS HOMICIDE.

19            THE COURT:  WELL, NOW, THIS HOMICIDE, WHEN DID

20   THIS OCCUR?

21            MR. CARR:  1994, YOUR HONOR, JANUARY 17TH OR 18TH.

22            THE COURT:  I SAW THE DATE ON THE -- I SAW '98 AND

23   I ASSUMED THAT IT WAS --

24            MR. HORNGRAD:  '94 WAS MY FIRST REPRESENTATION OF

25   SMITH.  MR. SMITH WAS PRIOR TO MY -- PRIOR TO THE ALLEGED

26   HOMICIDE.  THE SECOND CASE THAT I DEFENDED MR. SMITH FOR --

27   PARDON ME A MOMENT.

28            (DEFENSE COUNSEL CONFERRING.)

7

1          THE COURT:  SO THAT WOULD HAVE BEEN EARLY '94?

2          MR. HORNGRAD:  RIGHT.  THAT WAS PRIOR TO '94, AND

3    MR. RAPPAPORT'S REMINDING ME, MY BELIEF IS THAT THE SAN JOSE

4    CASE WAS DISPOED IN APPROXIMATELY AUGUST 1995.  AND WITH

5    RESPECT TO MR. CARR'S COMMENT, I DID PREVIOUSLY DEFEND

6    MR. SALCIDO HERE IN PALO ALTO ON A MISDEMEANOR CHARGE NOT --

7    I HAD SEEN TWO CASES IN DISCOVERY, ONE IS A DISCHARGE OF A

8    FIREARM.  ONE IS A SIMPLE BATTERY.  I DEFENDED MR. SALCIDO

9    ON THE SIMPLE BATTERY NOT THE DISCHARGE OF THE FIREARM.  I

10   BELIEVE IT WAS A PUBLIC DEFENDER CASE.

11         MR. CARR:  YOUR HONOR, I DON'T HONESTLY KNOW.

12   IT'S DEFINITELY THE VIEW OF DEFENSE COUNSEL AND, I BELIEVE

13   THE DATES WOULD BE MORE SPECIFIC.

14         THE COURT:  I'M REALLY CONCERNED ABOUT THAT,

15   COUNSEL.  IS THERE SOME WAY TO MAKE A CALL BACK TO YOUR

16   OFFICE AND HAVE SOMEBODY LOOK UP THE FILES AND TELL ME WHEN

17   THAT OCCURRED?

18         MR. HORNGRAD:  MR. SMITH'S RAP SHEET WOULD TELL

19   US.  I DON'T BELIEVE THE TIMING OF THE REPRESENTATION

20   CONTROLS IT IN ANY WAY, BUT IT HAS TO DO WITH THE WAIVERS.

21   IF MR. SMITH IS GOING TO TESTIFY, WE WOULD LIKE HIS RAP

22   SHEET AND I SUSPECT THAT WOULD TELL US --

23         THE COURT:  DO WE HAVE HIS RAP SHEET?

24         MR. CARR:  NO, YOUR HONOR, WE DO NOT HAVE THE

25   WITNESS'S RAP SHEET.

26         MR. HORNGRAD:  FOR WHAT IT'S WORTH --

27         THE COURT:  THE RAP SHEET WILL ONLY TELL WHEN HE

28   WAS ARRESTED ON THE CHARGES.

8

1          MR. HORNGRAD:  SOMETIMES DISPOS.

2          THE COURT:  IN BOTH CASES IN WHICH YOU REPRESENTED

3    HIM, MR. SMITH --

4          MR. HORNGRAD:  YES, MA'AM.

5          THE COURT:  -- WERE FIVE AND FOUR YEARS AGO?

6          MR. HORNGRAD:  MORE OR LESS, YES, YOUR HONOR.  AS

7    I SAY, THE FELONY IN SAN FRANCISCO PREDATES THE CHARGED

8    HOMICIDE.  I'M RATHER CERTAIN.  THE DISCHARGE OF A FIREARM

9    DISPOSITION OCCURRED AFTER THIS HOMICIDE, I BELIEVE.  BUT,

10   AGAIN, I DO NOT THINK THAT THE DATES CONTROL OR ARE

11   DISPOSITIVE IN ANY WAY.

12         MR. RAPPAPORT:  I BELIEVE LEGALLY THE DATES AS TO

13   WHEN THE REPRESENTATION OCCURRED ARE IMMATERIAL.  THE

14   IMPORTANT ISSUE IS THE WAIVER AT THIS POINT.

15         MR. CARR:  WELL, IT MAY OR MAY NOT BE IMMATERIAL

16   GIVEN THE FACT THAT THE DEFENDANT WAS REPRESENTED AT THE

17   TIME THAT THE OTHER WITNESS WAS ALSO REPRESENTED.  THERE

18   COULD BE ISSUES THAT ARISE.  MR. RAPPAPORT INDICATED THAT HE

19   HAD CONVERSATIONS WITH MR. SMITH IN REGARDS TO, I BELIEVE,

20   THE REPRESENTATION ITSELF.  IF, IN FACT, HE WAS REPRESENTED

21   AT THE -- IF THEY WERE BOTH REPRESENTED AT THE SAME TIME,

22   CERTAIN ISSUES CAN ARISE BETWEEN THE STATEMENTS GIVEN BY THE

23   WITNESSES.  THERE COULD BE A POTENTIAL PROBLEM, NAMELY,

24   MR. SALCIDO AT OR ABOUT THE TIME OF THE HOMICIDE WAS AWARE

25   THAT MR. SMITH GAVE HIM OR GAVE THE POLICE INFORMATION

26   REGARDING THE GUN THAT WAS IN HIS POSSESSION.  SUBSEQUENTLY,

27   MR. SMITH RECANTED AFTER MR. SALCIDO CONTACTED POLICE SAYING

28   THAT MR. SMITH WAS INCORRECT.  THERE IS COMMUNICATION

9

1    BETWEEN THE DEFENDANT AND MR. SMITH.  I'M NOT SURE IF ANY OF

2    THAT COMMUNICATION WENT THROUGH THE MATERIALS OR NOT.

3    CERTAINLY, IF REPRESENTATION EXISTS AT THAT PARTICULAR TIME

4    THERE MAY BE INFORMATION THAT DEFENSE COUNSEL HAS THAT THEY

5    MAY WISH TO USE AGAINST MR. SMITH IN REGARDS TO THIS

6    PARTICULAR CASE.  I CERTAINLY DON'T KNOW THAT.  I WOULD HAVE

7    HOPED THAT GIVEN THE FACT THAT THIS CASE WAS FILED BACK IN

8    THE BEGINNING OF THIS YEAR MR. SMITH WAS NOTIFIED OR DEFENSE

9    COUNSEL WAS NOTIFIED VIA THE POLICE REPORTS THAT HE WAS A

10   KEY WITNESS.  THAT CERTAINLY THIS ISSUE WOULD HAVE BEEN

11   RESOLVED BEFORE WE GET TO THE DAY OF PRELIMINARY HEARING IN

12   THIS PARTICULAR MATTER.  I DON'T FIND IT TO BE A SITUATION

13   THAT IS SIMPLE TO RESOLVE, ESPECIALLY WHEN DEFENSE COUNSEL

14   IS UNABLE TO GIVE US THE NECESSARY INFORMATION OF DATES,

15   TIMES THAT ARE NECESSARY TO EVALUATE IF THE POTENTIAL

16   CONFLICT EXISTS.

17           MR. HORNGRAD:  IF WE HAD HIS RAP SHEET AS WE

18   REQUESTED UNDER 1054 WE WOULD HAVE THE ANSWER FOR THE COURT,

19   YOUR HONOR.

20           THE COURT:  WOULD THAT GIVE THE PARTICULARS

21   THOUGH?

22           MR. HORNGRAD:  SURE.

23           THE COURT:  IT WOULD?

24           MR. HORNGRAD:  SURE.

25           MR. CARR:  OF SAN FRANCISCO?

26           MR. HORNGRAD:  IF I COULD JUST FINISH, COUNSEL.

27           MOREOVER, THE DEFENSE IS ENTITLED TO MR. SMITH'S

28   PRIORS.  THAT'S WHY WE ASKED FOR ALL WITNESS'S PRIORS UNDER

10

1   1054.  IF THE PROSECUTOR INTENDS TO CALL HIM WE GET HIS

2   PRIORS.  THAT WOULD TELL US THE ANSWERS TO THE DATES.

3         I WOULD TELL THE COURT UNDER ALCOCER THE

4   CONTROLLING CASE IS ON CONFLICT.  THE WITNESS AND DEFENSE

5   CAN WAIVE THE CONFLICT.  HE'S PREPARED TO ENTER INTO THE

6   WAIVER TODAY, THE DEFENDANT.  AND, FINALLY, AS AN OFFICER TO

7   THE COURT I CAN MAKE A REPRESENTATION ON BOTH MYSELF OR

8   MR. RAPPAPORT OR THE COURT MAY WISH TO MAKE AN INQUIRY, NONE

9   OF US GOT INFORMATION FROM MR. SMITH ON THIS HOMICIDE CASE

10  DURING ANY OF OUR REPRESENTATION OF HIM.  AND AS I SAY, IF

11  THE COURT WANTS TO MAKE AN INQUIRY OF MR. RAPPAPORT --

12        MR. RAPPAPORT:  I CONCUR IN THAT STATEMENT.  I

13  HAVE RECEIVED NO INFORMATION ON THIS CASE AS IT PERTAINS TO

14  MR. SMITH.

15        THE COURT:  A COUPLE OF THINGS HERE.  I DO WANT TO

16  TAKE THE WAIVERS, AND UNLESS ANYBODY HAS SOME STRONG

17  FEELINGS I'M GOING TO DO THAT.  AND THEN WE'RE GOING TO

18  ATTEMPT TO PROCEED.  IF THE PEOPLE FEEL THAT THERE IS SOME

19  PIECE THAT NEEDS TO BE RESOLVED, THEN I CAN TAKE A RECESS

20  AND LOOK AT SOME OF THESE CASES MORE CAREFULLY AND MAKE THAT

21  DETERMINATION.  BUT IT SEEMS TO ME THAT THE CRUCIAL ISSUE

22  WOULD BE THE WAIVER AND THE KNOWLEDGEABLE WAIVER BY THE

23  DEFENSE OF ALL THE POSSIBLE POTENTIAL CONFLICTS HERE.  BUT

24  IF THERE IS MORE THAT THE PEOPLE FEEL NEEDS TO BE DONE, AND

25  IF THEY COULD DIRECT ME TO SOME CASE THAT THEY FEEL IS

26  PERTINENT, I'D BE HAPPY TO READ THAT.

27        MR. CARR:  WELL, YOUR HONOR, JUST TO ADDRESS THE

28  COURT, I APPRECIATE THE OPPORTUNITY TO DO THAT.  HOWEVER, AT

11

1   APPROXIMATELY TWENTY TO NINE WAS THE FIRST TIME I BECAME

2   EVEN AWARE THAT THERE WAS A POTENTIAL CONFLICT.

3            THE COURT:  I THINK WE'RE BEYOND -- I UNDERSTAND.

4       MR. CARR:  OKAY.

5            THE COURT:  EVERYBODY'S GOT A GRIPE AGAINST THE

6   OTHER PARTY BECAUSE ONE SAYS HE TOLD ME IT WAS A 115, THE

7   OTHER SAYS, WELL, NOW, YOU SHOULD HAVE KNOWN HE WAS A

8   WITNESS.  I DON'T WANT TO DO THAT.

9            MR. RAPPAPORT:  THAT WAS THE POINT OF --

10           THE COURT:  I DON'T WANT TO DO THAT.  THAT'S A

11  WASTE OF TIME AT THIS POINT.  NOW, I'M FACED WITH A

12  PARTICULAR SITUATION, AND EVERYBODY CONTRIBUTED TO IT OR

13  DIDN'T.  IT DOESN'T EVEN MATTER.  WHAT I NEED TO DECIDE IS

14  IF THERE IS A CONFLICT, AND THERE MAY BE, IT CAN BE WAIVED.

15  SO THAT'S THE ISSUE THAT I NEED TO ADDRESS RIGHT NOW, NOT

16  WHOSE FAULT IT IS.  I HAVE TO DECIDE THIS AT THIS MOMENT IN

17  TIME.  SO I'D LIKE YOUR HELP IN FOCUSING ON THAT PARTICULAR

18  ISSUE AND NOT HOW WE GOT THERE BECAUSE REHASHING THAT IS NOT

19  OF ANY VALUE TO ANYBODY.

20           MR. HORNGRAD:  UNDER WOOD VERSUS GEORGIA I HAVE

21  POINTS AND AUTHORITIES I PRINTED IN CONNECTION WITH ANOTHER

22  CASE I HAD EARLIER.

23           THE COURT:  GIVE IT TO THE CLERK AND SHE'LL GIVE

24  IT TO EVERYBODY AND EVERYONE CAN HAVE IT.

25           MR. HORNGRAD:  I'D BE HAPPY TO.  WHAT I'D SAY TO

26  THE COURT IS UNDER WOOD, "TO FIND A VALID WAIVER, A TRIAL

27  COURT MUST BE ASSURED THAT:  1) THE DEFENDANT HAS DISCUSSED

28  THE POTENTIAL DRAWBACKS OF POTENTIALLY CONFLICTED

12

1   REPRESENTATION WITH HIS ATTORNEY, OR IF HE WISHES, OUTSIDE

2   COUNSEL; 2) THAT HE HAS BEEN MADE AWARE OF THE DANGERS AND

3   POSSIBLE CONSEQUENCES OF SUCH REPRESENTATION IN HIS CASE;

4   (3) THAT HE KNOWS OF HIS RIGHT TO CONFLICT-FREE

5   REPRESENTATION; AND 4) THAT HE VOLUNTARILY WISHES TO WAIVE

6   THAT RIGHT." AND THAT IS THE STANDARD.  AND, IN FACT, THE

7   STANDARD'S A LITTLE DIFFERENT FOR RETAINED COUNSEL.

8   DEFENDANT IS ALWAYS FREE TO WAIVE THAT CONFLICT.

9           IN ANY EVENT, THESE ARE POINTS AND AUTHORITIES

10  THAT I PREPARED IN A MARIN HOMICIDE.  I'M HAPPY TO SHARE

11  THEM WITH THE COURT.

12          THE COURT:  SHE CAN MAKE A COPY FOR MR. CARR AND

13  FOR ME.

14          I THINK IF THERE'S A WITNESS WAITING TO TESTIFY

15  YOU MIGHT TAKE HIM DOWNSTAIRS FOR A FEW MINUTES WHILE WE TRY

16  TO RESOLVE THIS.  MR. CARR, WOULD YOU LIKE TO TAKE A FEW

17  MINUTES AND GET SOME AUTHORITY FOR ME TO LOOK AT?  I'M HAPPY

18  TO TAKE A RECESS.  WE HAVE THESE TWO DAYS.  I REMIND YOU WE

19  ALSO HAVE TWO DAYS -- I FORGOT WHAT OTHER MONTH WE HAVE.

20          MR. HORNGRAD:  NOVEMBER, YOUR HONOR.

21          THE COURT:  NOVEMBER, THAT WE SET ASIDE FOR THIS.

22  WE'LL GET IT DONE ONE WAY OR THE OTHER.  I GUESS EVENTUALLY

23  THE FIRST QUESTION IS DO YOU HAVE SOME THINGS THAT YOU WANT

24  ME TO LOOK AT ON THIS POINT?  DO YOU HAVE SOME CONCERNS?

25  YOU WANT TO DO SOME RESEARCH?  YOU WANT TO PUT THIS OFF TO

26  THIS AFTERNOON?  HOW WOULD YOU LIKE TO PROCEED?

27          MR. CARR:  WELL, YOUR HONOR, I CERTAINLY WOULD

28  LIKE TO DO THE RESEARCH.

1          THE COURT:  SURE.

2          MR. CARR:  GIVEN THE FACT OF THE NATURE OF THIS

3   CASE, IT'S IMPORTANT THAT ALL THE T'S ARE CROSSED AND I'S

4   ARE DOTTED.

5          THE COURT:  THAT'S WHY I WANTED TO GIVE YOU THE

6   OPPORTUNITY TO DO THIS.  IF YOU WOULD WANT TO CONTINUE THIS

7   TO TOMORROW MORNING THAT'S OKAY WITH ME AS WELL.  HOWEVER,

8   IT WOULD HELP ME -- NEVER MIND.  IT WOULD HELP ME IF WE

9   COULD GET BACK TOGETHER AGAIN LATE THIS AFTERNOON TO READ

10  ANY AUTHORITIES, IF YOU THINK THERE ARE SOME PROBLEMS,

11  BEFORE TOMORROW MORNING BEFORE I CAN MAKE A DECISION.

12         MR. CARR:  YOUR HONOR, THAT WOULD BE --

13         MR. HORNGRAD:  EXCUSE ME, COUNSEL.  THE RAP SHEET

14  WOULD HELP EVERYBODY REALIZE THE CONFLICT AND WE WOULD BE

15  ABLE TO CROSS THE WITNESS.

16         THE COURT:  OF COURSE, YOU KNOW, IN TERMS OF THE

17  RAP SHEET I DON'T WANT TO DEAL WITH THE QUOTE "RAP SHEET."

18  I'M SURE YOU HAVE AN OFFICE FILE.  YOU HAVE MATERIALS WHERE

19  YOU CAN LOOK IN YOUR OWN OFFICE FOR THESE.

20         MR. HORNGRAD:  I MADE A POINT, YOUR HONOR, WE'VE

21  NOT TOUCHED OUR OLD FILES FOR MR. SMITH.  I WOULD AGAIN MAKE

22  THAT REPRESENTATION TO THE COURT AS AN OFFICER OF THE COURT.

23         THE COURT:  WELL, YOU COULD ASK SOMEONE IN YOUR

24  OFFICE TO LOOK IN THE FILE AND SEE WHEN YOUR REPRESENTATION

25  BEGAN AND WHEN IT ENDED.

26         MR. HORNGRAD:  SURE.

27         MR. RAPPAPORT:  YES.

28         THE COURT:  I REALIZE THAT YOU'RE GOING TO WANT TO

14

1   IMPEACH THE WITNESS WITH HIS CRIMINAL HISTORY, BUT LET ME

2   JUST DEAL WITH ONE THING AT A TIME HERE.

3              MR. HORNGRAD:  OF COURSE, PARDON ME.

4              THE COURT:  IF YOU WANT ME TO MAKE AN ORDER ON THE

5   RAP SHEET I'LL BE HAPPY TO DO THAT.  I WANT TO FOCUS ON THIS

6   ISSUE SO WE GET IT RESOLVED IN A CERTAIN WAY.

7              MR. CARR:  THE PEOPLE BELIEVE WE CAN CONCLUDE THIS

8   CASE IN A DAY.  I BELIEVE WE CAN GET DONE WITH IT TOMORROW.

9              THE COURT:  WELL, I'M NEVER THAT OPTIMISTIC.  IT

10  NEVER WORKS OUT QUITE -- THE TIMING ISN'T ALWAYS PERFECT ON

11  THESE THINGS, BUT IF YOU CAN I'D BE VERY HAPPY.  SO IF YOU

12  WANT TO TAKE THE REST OF THE DAY TO LOOK AT THIS ISSUE.

13  WHAT I AM GOING TO ASK IS WE HAVE A CERTAIN EXCHANGE OF

14  INFORMATION.  I THINK IT WOULD BE APPROPRIATE FOR ME TO KNOW

15  AND, COUNSEL, I CAN ASK YOU TO PRODUCE FOR COUNSEL THE RAP

16  SHEET.  ON THE OTHER HAND, I DON'T WANT YOU TO RELY ON THAT.

17  I WANT YOU TO HAVE WHOEVER IN YOUR OFFICE, YOUR OFFICE

18  MANAGER SO YOU'RE NOT DOING IT, JUST GO INTO YOUR FILES AND

19  GET TWO DATES:  THE DATE YOUR REPRESENTATION BEGAN AND THE

20  DATE IT CONCLUDED.

21             MR. HORNGRAD:  OUR FILES MAY BE IN STORAGE.  I'LL

22  CALL MY OFFICE AND I'LL GET THEM TOGETHER.

23             THE COURT:  YOU SHOULDN'T RELY ON WHAT MR. CARR IS

24  GOING TO PRESENT.  THE RAP SHEETS AREN'T ALWAYS PERFECT.

25  YOUR OFFICE FILES ARE GOING TO BE THE BEST INDICATION OF

26  WHEN YOU BEGAN AND WHEN YOU CONCLUDED YOUR REPRESENTATION IN

27  THIS MATTER.  SO I'M DIRECTING YOU TO DO THAT.

28             MR. HORNGRAD:  WE'LL DO RIGHT AWAY.

15

```
 1          THE COURT:  OKAY.

 2          MR. CARR:  YOUR HONOR, IN ADDITION, THE CONTENT

 3  THEREOF I THINK IN ORDER TO APPRISE THIS PARTICULAR --

 4          THE COURT:  THE CONTENT OF THE FILES?

 5          MR. CARR:  YES, YOUR HONOR.

 6          THE COURT:  THE CONFIDENTIAL --

 7          MR. CARR:  WE HAVE TO MAKE SURE THAT HE IS AWARE

 8  OF THE PARTICULAR CONFLICTS AND THE DOWN SIDES OF THOSE

 9  PARTICULAR CONFLICTS, I BELIEVE --

10          THE COURT:  I WASN'T AWARE THAT THEY HAD --

11          MR. HORNGRAD:  I'M NOT GOING TO LOOK AT THE FILE,

12  WHICH I'VE NOT DONE.

13          THE COURT:  I DON'T THINK THEY'RE SUPPOSED TO LOOK

14  AT THE FILE.

15          MR. CARR:  VERY WELL, YOUR HONOR.

16          THE COURT:  THAT'S WHY I'M ASKING THAT THEY HAVE

17  SOMEBODY IN THEIR OFFICE LOOK AT THE FILE TO DETERMINE WHEN

18  THE REPRESENTATION BEGAN AND WHEN IT ENDED AND ONLY THAT.

19          MR. HORNGRAD:  YES, YOUR HONOR.

20          THE COURT:  AND NOT YOU.  NEITHER OF YOU.  AND NOT

21  HAVE ANY COMMUNICATION BEYOND THAT ABOUT THE FILES.

22          MR. HORNGRAD:  WILL DO.

23          THE COURT:  BECAUSE I'M NOT COMFORTABLE WITH YOU

24  RELYING ON THE RAP SHEET.  THEY CONTAIN ERRORS OFTEN,

25  PARTICULARLY WITH THIS KIND OF INFORMATION.  AND IF YOU WISH

26  TO HAVE THE RAP SHEET FOR MR. SMITH, THEN I WILL ASK THAT

27  MR. CARR PROVIDE THAT TO YOU TOMORROW MORNING.

28          MR. HORNGRAD:  THANKS.
```

16

1      MR. CARR:  HOWEVER, THAT IS NOT AN ORDER, CORRECT,

2  YOUR HONOR?

3      THE COURT:  I'M SORRY?

4      MR. CARR:  THAT'S NOT AN ORDER OF THE COURT?

5      THE COURT:  IT'S A REQUEST.

6      MR. CARR:  VERY WELL, YOUR HONOR.

7      MR. HORNGRAD:  SO STIPULATED.

8      MR. CARR:  I'LL HONOR THE COURT'S REQUEST.

9      THE COURT:  OKAY.

10      MR. HORNGRAD:  WE'LL STIPULATE TO THAT.

11      THE ONE THING THAT I WANTED TO MENTION TO THE

12  COURT WAS THAT YOUR HONOR WAS KIND ENOUGH TO APPRISE US OF A

13  PHONE CALL, AND I UNDERSTAND THERE'S AN ATTORNEY COMING FOR

14  A WITNESS AT 10:30, WHETHER YOU WANT TO DEAL WITH IT THEN.

15  I DON'T KNOW.  I'LL REMIND THE COURT OF THAT.  I WONDER IF

16  WE COULDN'T JUST DEAL WITH THAT ONE.

17      MR. CARR:  THE PEOPLE WOULD LIKE TO -- WE'D LIKE

18  TO GET THAT ISSUE OUT OF THE WAY, IF POSSIBLE.

19      THE COURT:  BUT IF THEY'RE -- I STILL NEED TO GET

20  A WAIVER.

21      MR. CARR:  THAT IS TRUE.

22      THE COURT:  SO I DON'T THINK WE CAN DEAL WITH IT.

23      MR. CARR:  HOWEVER --

24      THE COURT:  I THINK THAT THIS MATTER TAKES

25  PRECEDENCE OVER THAT, AND I DON'T THINK I SHOULD GO AHEAD

26  AND DEAL WITH THAT BECAUSE MR. SALCIDO HAS TO HAVE HIS

27  REPRESENTATION CONFLICT FREE IN ORDER TO ADDRESS THAT.  SO I

28  DON'T SEE HOW I CAN DO THAT.

17

1    MR. HORNGRAD:  I WOULD ONLY SAY TO THE COURT

2  WHATEVER THE COURT WISHES TO DO.  BUT I DON'T THINK, WHETHER

3  OR NOT IT'S A VALID ASSERTION OF THE FIFTH AMENDMENT, I

4  DON'T THINK THAT THAT'S WHAT THE DEFENSE IS NECESSARILY

5  INVOLVED IN.  IT'S BETWEEN THE COUNSEL, WITNESS AND

6  WITNESS'S COUNSEL.  BUT WHATEVER THE COURT LIKES.

7    THE COURT:  IS THAT YOUR POSITION AS WELL,

8  MR. CARR?

9    MR. CARR:  MY INITIAL REACTION IS YES, YOUR HONOR.

10    THE COURT:  ALL RIGHT.  THEN WE'LL ATTEMPT TO DEAL

11  WITH THAT AS WELL.

12    NOW, THE ISSUE FOR ME, MR. CARR, IS BEING ABLE TO

13  GET WHATEVER YOU COME UP WITH THIS AFTERNOON SO I CAN READ

14  IT.  WHAT I'D LIKE TO ASK YOU TO DO, WE HAVE A FAX HERE THAT

15  WE COULD -- I DON'T HAVE THE NUMBER HANDY, BUT WE HAVE A

16  NUMBER.  JANET WILL WRITE IT DOWN FOR YOU, AND IF YOU COULD

17  FAX WHATEVER CASES YOU WANT ME TO LOOK AT TO ME, SAY, BY

18  FOUR THIS AFTERNOON.  DO YOU THINK YOU CAN DO THAT?

19    MR. CARR:  YES, YOUR HONOR, I WILL DEFINITELY DO

20  THAT.

21    THE COURT:  AND ALSO, MR. HORNGRAD, DO YOU WISH TO

22  BE FAXED TO YOU OR MR. RAPPAPORT OR WHO SHOULD GET THAT?

23    MR. HORNGRAD:  MY OFFICE WOULD BE FINE, PLEASE,

24  YOUR HONOR.

25    THE COURT:  ALL RIGHT.  IF YOU WOULD THEN,

26  WHATEVER YOU FAX TO ME, IF YOU WOULD ALSO FAX TO

27  MR. HORNGRAD, AND COULD YOU HAVE WHOEVER THE FAXER IS CALL

28  BOTH OF US AND MAKE SURE THAT WE'VE GOTTEN IT?

18

1        MR. CARR:  YES, YOUR HONOR.

2        MR. HORNGRAD:  AND, YOUR HONOR, ONE THING THAT I

3    SHOULD MENTION, I DO NOT WANT TO CONFUSE --

4        THE COURT:  COULD YOU ALSO LEAVE YOUR CARDS WITH

5    THE CLERK SO THAT IF I NEED TO REACH YOU I CAN DO THAT?

6        MR. HORNGRAD:  OF COURSE.  OF COURSE.  AND I'M

7    GIVING MR. CARR MY FAX NUMBER NOW.

8        ONE THING THAT I SHOULD MENTION FOR THE COURT JUST

9    SO -- I SHOULD MENTION TO THE COURT SO IT DOESN'T BECOME YET

10    ANOTHER PROBLEM, THERE IS A WITNESS WHO FEATURES IN THE

11    POLICE REPORTS WHO I PREVIOUSLY REPRESENTED ON A PRETRIAL

12    WRIT ONLY.  AND HE'S NOT APPARENTLY TESTIFYING TODAY, BUT I

13    FELT THAT, PERHAPS, I SHOULD BRING THIS TO THE COURT'S

14    ATTENTION TOO.  THAT'S MR. MARGULIES.  MR. MARGULIES HAD A

15    DRUG CASE PENDING IN THIS COUNTY, AND IN THE MIDDLE OF THAT

16    DRUG CASE ASKED ME TO TAKE AN INTERLOCUTORY WRIT TO THE

17    COURT OF APPEAL ALLEGING THAT HIS THEN ATTORNEY WAS

18    INCOMPETENT IN A 1538.5.  I NEVER DID APPEAR IN COURT WITH

19    MR. MARGULIES.  I DID THAT AND THE WRIT WAS, AS THEY

20    FREQUENTLY ARE, SUMMARILY DENIED BY THE COURT OF APPEAL.  I

21    NEVER DISCUSSED THIS CASE WITH MR. MARGULIES, BUT I DID HAVE

22    HIM IN MY OFFICE AT LEAST ON A WRIT FOR THAT BRIEF PERIOD OF

23    TIME.  AND I THINK I SHOULD MENTION THAT TO THE COURT.

24        THE COURT:  OKAY.  HE'S NOT A WITNESS HERE TODAY

25    SO I CAN'T GET HIS WAIVER.  I THINK WHAT WE'LL NEED TO DO IS

26    ADDRESS WHAT WE HAVE NOW AND THEN -- HAVE YOU SPOKEN WITH

27    MR. MARGULIES?

28        MR. HORNGRAD:  I'VE SPOKEN TO HIM, NOT ABOUT THIS

19

1   CASE, I'VE SPOKEN TO HIM ON OCCASION ONLY BECAUSE

2   MR. MARGULIES WORKS AT MR. SALCIDO'S FATHER'S BODY SHOP.

3   AND WHEN I CALLED MR. SALCIDO, SENIOR, OCCASIONALLY

4   MR. MARGULIES WILL ANSWER THE PHONE.  BUT I'VE NOT DISCUSSED

5   THE CASE WITH HIM JUST, "HI, I'M HERE TO SPEAK TO FELIX,

6   SENIOR."

7           THE COURT:  TO THE EXTENT THAT THERE IS ANY

8   CONFLICT INVOLVED, YOU HAVE NOT ASKED MR. MARGULIES WHETHER

9   HE WOULD WAIVE IT?

10          MR. HORNGRAD:  I THINK ACTUALLY I DID HAVE SUCH A

11  CONVERSATION WITH HIM VERY BRIEFLY WHEN THE CASE FIRST

12  STARTED, BY TELEPHONE, AND HE INDICATED THAT HE WAS

13  AGREEABLE BUT THAT WAS SOME TIME BACK.  SINCE THEN I'VE

14  NEVER DISCUSSED ANY OF THE FACTS WITH MR. MARGULIES.

15          THE COURT:  HAVE YOU DISCUSSED THAT REPRESENTATION

16  WITH MR. SALCIDO AND IS HE PREPARED TO WAIVE IT AS WELL?

17          MR. HORNGRAD:  ABSOLUTELY, YES, HE'S WELL APPRISED

18  OF IT AND MINDFUL OF IT.

19          THE COURT:  IS THERE ANYBODY ELSE THAT MAY BE A

20  POTENTIAL WITNESS WHERE THERE MAY BE A PROBLEM?

21          MR. HORNGRAD:  NO.  BUT I WILL SAY THAT I DON'T

22  THINK THAT THIS IS THE NEXT CLIENT, BUT I'LL TELL IT TO THE

23  COURT.  THERE'S ANOTHER WITNESS, AND WHAT HAPPENS IS ALL OF

24  THESE FOLKS WORK AROUND MR. SALCIDO'S FATHER'S SHOP WHICH IS

25  WHY THEY ALL FEATURE.  BUT THERE IS A FELLOW BY THE NAME OF

26  JOHN BERGSTROM, A CORRECTIONAL COUNSELOR IN LAKE COUNTY.

27  MR. BERGSTROM REFERRED MR. SMITH TO ME, PERIOD.  I NEVER

28  REPRESENTED MR. BERGSTROM.  I DO KNOW HIM.  JUST IN THE

20

1  SPIRIT OF PUTTING EVERYTHING ON THE TABLE I'LL THROW THAT

2  OUT.

3          THE COURT:  ALL RIGHT.  VERY WELL.  SO I'M

4  ASSUMING THAT I'VE HEARD EVERYTHING?

5          MR. HORNGRAD:  YES, YOUR HONOR.

6          THE COURT:  AND ANY POTENTIAL CONFLICTS THAT

7  ANYONE MAY HAVE?

8          MR. HORNGRAD:  YES, YOUR HONOR.

9          THE COURT:  WITH RESPECT TO MR. MARGULIES, I DON'T

10  NEED TO DEAL WITH THAT IN THE CONTEXT OF THE -- EXCEPT I

11  WILL TAKE A WAIVER FROM YOUR CLIENT --

12          MR. HORNGRAD:  OF COURSE.

13          THE COURT:  -- WITHIN THE CORNERS OF THE PRELIM.

14  BUT SHORTLY THEREAFTER I THINK WE SHOULD HAVE HIM COME IN

15  AND JUST ARTICULATE THAT FOR US IF I DETERMINE THAT IT'S

16  APPROPRIATE FOR YOU TO CONTINUE THE REPRESENTATION AFTER

17  LOOKING AT THE CASES.  SO THAT WAY WE WON'T GET TOO FAR

18  ALONG IN THIS CASE AND THEN DECIDE THAT THERE'S A PROBLEM.

19  SO I THINK WE CAN HAVE A TIME WHERE YOU CAN SELECT TO DO

20  THAT AND MAYBE ONE OF THOSE DATES WE PICK IN NOVEMBER, IF WE

21  DON'T USE IT FOR THE PRELIM.  WE CAN WAIT THE HALF HOUR

22  UNTIL MISS DIAMOND GETS HERE.

23          MR. CARR:  THAT WILL BE FINE WITH THE PEOPLE.

24          THE COURT:  I THINK WE'LL JUST RECESS.  WHAT

25  WITNESS IS MISS DIAMOND REPRESENTING?

26          MR. CARR:  KOJO WILLIAMS.

27          THE COURT:  ALL RIGHT.  AND WHAT IS HIS

28  RELATIONSHIP TO THIS SITUATION?

1    THOSE PARTICULAR PHOTOGRAPHS.

2              THE COURT:  I UNDERSTAND.

3              MR. RAPPAPORT:  OKAY.  JUST FOR CLARIFICATION

4    PURPOSES.

5              THE COURT:  BECAUSE THE PHOTOGRAPHS ARE

6    INEXTRICABLY -- WELL, I'LL QUALIFY THAT, TOO.  THE TESTIMONY

7    OF MR. RIDOLFI WENT TO OTHER THINGS OTHER THAN THESE KEY

8    PHOTOS.  BUT HIS TESTIMONY IS INEXTRICABLY WOUND IN WITH

9    THESE KEY PHOTOS, TOO.  IF THE PHOTOS WENT OUT AND HIS

10   TESTIMONY WERE ALLOWED TO STAY, THAT MIGHT NOT BE

11   APPROPRIATE.  AND IT MAY NOT BE APPROPRIATE TO SEEK OUT AND

12   REQUEST TO STRIKE.  THAT MAY BE A HERCULIAN OR IMPOSSIBLE

13   TASK.  LET'S LEAVE THAT GO THEN AND PONDER MY OTHER

14   SUGGESTION.

15             ALL RIGHT.  MR. MEDVED IS OFF THE PHONE AGAIN SO

16   I AM GOING TO PRESUME HE GOT SOME KIND OF ANSWER.  WOULD YOU

17   PLEASE SHARE IT WITH ME BY WAY OF AN OFFER OF PROOF.

18             MR. CARR:  YES, YOUR HONOR.  HE SPOKE TO GRADY

19   GOLDMAN AND HE INDICATED THAT THERE'S SIXTY-FOUR NEGATIVES.

20             THE COURT:  I'M CURIOUS.  I NEVER HEARD THE NAME

21   GRADY GOLDMAN BEFORE.  WHO IS GRADY GOLDMAN?

22             MR. CARR:  HE IS THE DIRECTOR OF THE CRIME LAB.

23             MR. MEDVED:  HE IS THE SUPERVISOR, YOUR HONOR.

24             MR. CARR:  SUPERVISOR OF THE CRIME LAB.

25             THE COURT:  MR. RAPPAPORT.

26             MR. RAPPAPORT:  THERE ARE SIXTY-FOUR

27   PHOTOGRAPHS.  I HAVEN'T EVEN SEEN PROBABLY HALF OF THEM.

28   I'VE SEEN SOME OF THEM HERE IN THIS COURTROOM.

1    MR. CARR:  NOT AT THIS TIME, BUT ARE WE GOING TO

2  HAVE A SUBSEQUENT TIME TO DISCUSS THIS WITH THE COURT OR IS

3  THIS --

4    THE COURT:  NOT REALLY.  BECAUSE WHAT I'M ABOUT

5  TO DO PRESENTLY IS HAVE THE JURY BROUGHT UP, TELL THE JURY

6  THAT THE MATTER IS GOING OVER, NOT TO SPECULATE WHY, THAT

7  IT'S A MATTER OF LAW.

8    MR. CARR:  THERE'S NOTHING ELSE THAT THE PEOPLE

9  WOULD LIKE TO PUT ON THE RECORD AS OF RIGHT NOW IN REGARDS

10  TO THE PHOTOGRAPHS.

11    THE COURT:  OKAY.  MR. RAPPAPORT, ANYTHING YOU

12  WANT TO PUT ON THE RECORD, YOU MAY.

13    MR. RAPPAPORT:  YES, YOUR HONOR.  COMMENT ONE

14  PERTAINING TO THE FACTUAL BASIS OF OUR REQUESTS AND, TWO,

15  LEGALLY WHAT OUR REQUESTS ARE.

16    FACTUALLY, MR. CARR, DURING MR. RIDOLFI'S

17  TESTIMONY, WAS MARKING, OR HAD PREMARKED ACTUALLY, EXHIBITS

18  THAT WERE NOT PREVIOUSLY SEEN BY THE DEFENSE, NOT PROVIDED

19  IN DISCOVERY AND DID NOT HAVE THE COURTESY OF SEEING THEM

20  BEFORE COURT STARTED.  SO CONSEQUENTLY, DURING MR. RIDOLFI'S

21  TESTIMONY THE DEFENSE IS PANICKING.  WE'RE LOOKING THROUGH

22  OUR PHOTO ALBUM TRYING TO MATCH THE HUNDRED FIFTY-FIVE

23  PICTURES THAT WE HAVE WITH THOSE PICTURES THAT ARE BEING

24  PRESENTED IN COURT.  I AM TRYING TO LISTEN TO THE EVIDENCE

25  WHICH IS CONTINUING.  I OBJECTED.  WE APPROACHED.  I

26  INDICATED WE DIDN'T HAVE THEM.  THE COURT INDICATED WE WILL

27  PROCEED AND WE WILL ADDRESS THIS ISSUE ONCE WE GET A BREAK

28  IN THE TESTIMONY.

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1    SO I'M TRYING TO LISTEN TO THE EVIDENCE, I'M

2 MARKING THE PHOTOS, I'M COMPARING THE PHOTOS THAT ARE BEING

3 USED IN EVIDENCE WITH THOSE THAT I HAVE.  I'M NOT FINDING

4 THEM.  THE WITNESS IS TESTIFYING AS TO THOSE PARTICULAR

5 PHOTOGRAPHS AND WHAT HE SEES ON THOSE PHOTOGRAPHS AND I

6 DON'T HAVE A COPY SO I CAN'T FOLLOW.  I TRY TO APPROACH BUT

7 IT'S DIFFICULT TO REMEMBER WHAT HE'S TALKING ABOUT AS IT

8 RELATES TO ONE PARTICULAR BLOOD SPATTER.  WE'RE TALKING

9 ABOUT PHOTOGRAPHS HERE.  ALL SIXTY-FOUR PHOTOGRAPHS THAT THE

10 DEFENSE DID NOT RECEIVE PERTAIN TO BLOOD SPATTER IN THE

11 CAR.  AS MR. RIDOLFI TESTIFIED TO, WE'RE TALKING ABOUT

12 EVIDENCE THAT IS LESS THAN ONE TENTH OF A MILLIMETER IN

13 SIZE.  THAT CONSTITUTES THE SIZE OF A HIGH SPEED BLOOD

14 SPATTER.  AND SO --

15        THE COURT:  LET ME INTERRUPT YOU FOR A MOMENT.

16 GO OFF THE RECORD.

17        (DISCUSSION OFF THE RECORD.)

18        THE COURT:  ALL RIGHT.  BACK ON THE RECORD.  LET

19 ME SUPPLEMENT THERE.  THERE WAS JUST A PHONE CALL FROM MR.

20 MEDVED RELATIVE TO WHAT THE CRIME LAB CAN AND CANNOT DO AND

21 WHAT ATTEMPTS HE'S MADE TO FIND A COMMERCIAL ESTABLISHMENT

22 TO DO THE COPY WORK.  WE NEED NOT GET INTO ANY MORE DETAIL

23 ABOUT THIS NOW OTHER THAN THE FACT HE'S UPDATED US.  PLEASE

24 CONTINUE WITH YOUR COMMENTS.

25        MR. RAPPAPORT:  THANK YOU.  AS I WAS SAYING, THE

26 EVIDENCE IN THOSE PHOTOGRAPHS IS MINUTE.  AND THAT'S THE

27 NECESSITY TO PUT THEM ON THE CD ROM BECAUSE APPARENTLY THE

28 NEGATIVES HAVE A LOT MORE INFORMATION ON THERE THAN CAN

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1  ACTUALLY BE SEEN IN THE PHOTOGRAPHS THEMSELVES.

2          SO WHILE THE TESTIMONY IS PROCEEDING, I'M TRYING

3  TO LISTEN.  AS I SAID, I'M TRYING TO LOOK AT OUR PHOTO ALBUM

4  TO MATCH WHAT I BELIEVE TO BE THE PHOTOGRAPHS WITH THOSE

5  THAT ARE BEING DISCUSSED.  I DON'T HAVE THOSE.  SO I'M AT

6  SOMEWHAT OF A DISADVANTAGE DURING THE TESTIMONY OF THE

7  WITNESS BECAUSE I CAN'T FOLLOW ALONG ON THE PHOTOGRAPHS, SO

8  IT PREVENTS ME FROM CROSS-EXAMINING WHEN HE TALKS ABOUT A

9  PARTICULAR AREA OR A PARTICULAR PIECE OF EVIDENCE THAT I'VE

10 NEVER SEEN.  BY MY COUNT, THE DEFENSE HAS NOT RECEIVED

11 PHOTOGRAPHS THAT RELATE TO TESTIMONY.  THOSE PHOTOGRAPHS

12 BEING NUMBERED 57, 59, 60, 61, 62, 63, 65, 67, 68, 70, 72,

13 76, 84, 85, 86, AND  87.

14          THE COURT:  YOU HAVE A TOTAL OF SIXTEEN.  I JUST

15 COUNTED THEM.

16          MR. RAPPAPORT:  YEAH.  THOSE WERE THE ONES THAT

17 WERE DISCUSSED HERE IN THIS COURTROOM THAT WE HADN'T SEEN.

18 I ONLY FIGURED THAT OUT AFTER SPENDING ABOUT FORTY-FIVE

19 MINUTES SITTING IN THE COURTROOM DURING THE LUNCH BREAK

20 GOING THROUGH THEM.  IT'S SOMETHING I JUST COULDN'T DO WHILE

21 THE TESTIMONY WAS PROCEEDING.  SO MR. SALCIDO IS AT A

22 DISADVANTAGE THAT I COULDN'T EFFECTIVELY LISTEN TO THE

23 WITNESS AND PREPARE CROSS-EXAMINATION IN MY NOTES AS TO THE

24 RELEVANT AND SIGNIFICANT ISSUES AS IT RELATED TO THOSE

25 PARTICULAR PHOTOGRAPHS.

26          MOREOVER, AT THIS POINT I DON'T KNOW WHETHER OR

27 NOT THEY WILL CHANGE THE THEORY OF THE CASE SIGNIFICANTLY OR

28 GO ANOTHER WAY IN TOTO OR IN PART.  I DON'T KNOW IF IT WILL

1    MR. RAPPAPORT:  IS THAT I JUST RECEIVED THIS

2  MORNING, ALTHOUGH IT WAS PROVIDED BY THE D.A. YESTERDAY

3  AFTERNOON, THIS STACK OF DISCOVERY.  I'M HOLDING UP

4  SOMETHING THAT'S APPROXIMATELY THREE AND A HALF, FOUR INCHES

5  THICK.  IT'S COMPRISED OF THE ENTIRE, APPARENTLY, THE

6  TRANSCRIPTS FROM THE TAPED STATEMENTS IN THIS CASE.  I

7  BELIEVE THREE, AT LEAST TWO OF THEM, ARE DUPLICATIVE -- IS

8  THAT CORRECT? -- THAT I HAVEN'T RECEIVED PREVIOUSLY.

9    I BELIEVE THERE'S ONE OF CHRISTIAN SMITH, OR

10  EXCUSE ME, OF KOJO WILLIAMS IN HERE WHICH I RECEIVED DURING,

11  AS I INDICATED YESTERDAY, IN THE MIDDLE OF HIS TESTIMONY.

12  AND THEN THERE'S ONE FROM MR. BERGSTROM WHICH I RECEIVED IN

13  THE MIDDLE OF HIS TESTIMONY.

14    I WAS GOING TO DOCUMENT WHICH TRANSCRIPTS I HAVE,

15  BUT AT THIS POINT THERE'S A CONSIDERABLE, IT MUST BE, I

16  WOULD GUESS SEVEN HUNDRED FIFTY TO A THOUSAND PAGES OF

17  READING HERE I NEED TO DO AND COMPARE THEM TO THE TAPED

18  STATEMENTS.

19    I'VE ALSO RECEIVED A VIDEO TAPE THAT APPARENTLY

20  WAS SHOT -- IT'S DISCOVERY IN THIS CASE AND MR. CARR HAS

21  REPRESENTED TO ME THAT IT IS BASICALLY THE CORNER OF

22  UNIVERSITY AND SOMETHING IN PALO ALTO UP TO THE SCENE OF THE

23  CRIME.  SO I NEED TO REVIEW THAT AND FIGURE OUT, YOU KNOW,

24  TAKE A LOOK AT MAPS AND FIGURE OUT WHAT THE ROUTE IS HERE ON

25  THIS VIDEO.

26    I'VE ALSO BEEN PROVIDED A PHOTOCOPY OF WHAT APPEAR

27  TO BE FACE PAGES OF MAPS.  ONE HAS A PICTURE OF STANFORD

28  UNIVERSITY ON IT WITH THE NAME PALO ALTO, AND THE OTHER ONE

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1  IS A --

2          THE COURT:  I DON'T THINK YOU NEED TO GO THROUGH

3  EACH AND EVERY PIECE OF PAPER.  THE BOTTOM LINE IS YOU'VE

4  BEEN GIVEN A BUNCH OF NEW INFORMATION.  WHAT IS IT YOU WANT

5  TO SUGGEST?

6          MR. RAPPAPORT:  AGAIN, EXCLUSION OF THESE

7  PARTICULAR TRANSCRIPTS.  AT LEAST AS TO THE WITNESSES THAT

8  HAVE ALREADY TESTIFIED.  I'M GONNA TRY TO READ THE ONES FROM

9  THE WITNESSES WHO HAVE YET TO TESTIFY.  BUT I'VE GOT A LOT

10  OF WORK HERE AHEAD OF ME.

11          THE COURT:  MY SUGGESTION IS YOU READ THEM AND

12  THEN WE'LL TAKE UP YOUR REQUESTS AFTER YOU READ THEM.

13          WHAT IS THE MATERIAL THAT'S JUST BEEN PRESENTED,

14  MR. CARR?  WHAT DOES IT CONSIST OF, I SHOULD SAY.

15          MR. CARR:  THE VIDEOTAPE IS SOMETHING THE PEOPLE

16  ANTICIPATE TO USE IN REBUTTAL WHEN THE DEFENDANT TESTIFIES.

17  I, I BELIEVE THAT PARTICULAR TAPE WILL BE USED IN THE

18  REBUTTAL CASE.  IT'S A VIDEOTAPE OF A CAR RIDE FROM THE

19  CORNER OF UNIVERSITY, OF 101 TO THE CRIME SCENE.

20          THE COURT:  WAS A POLICE REPORT OR INVESTIGATIVE

21  REPORT PREPARED IN CONJUNCTION WITH THAT VIDEO?

22          MR. CARR:  NO.

23          THE COURT:  OKAY.  WHO DID THE VIDEO?

24          MR. CARR:  INVESTIGATOR MEDVED.

25          THE COURT:  OKAY.  BEFORE YOU LEAVE HERE TODAY,

26  MR. RAPPAPORT, SIT DOWN WITH MR. MEDVED AND ORALLY GET FROM

27  HIM, SINCE THERE'S NO INVESTIGATIVE REPORT, THE ROUTE WHICH

28  MAY ASSIST YOU AND SAVE SOME TIME.  WHAT ELSE?

1  Q.   OKAY.  WHAT DID HE TELL YOU ABOUT BEING A DRUG DEALER?

2  A.   I DON'T KNOW.  IT WAS AGAIN OVER DRINKS, AND HE TOLD ME

3  THAT HE SOLD COCAINE AT ONE POINT, AND I THINK THAT WAS THE

4  END OF THE CONVERSATION.  I DON'T KNOW.  IT WAS JUST A

5  CONVERSATION AND THAT'S BASICALLY HOW IT CAME OUT.

6  Q.   DID HE EVER TELL YOU HE DEALT OR WAS A DEALER IN ROCK

7  COCAINE?

8  A.   I DON'T REMEMBER THAT.

9  Q.   DO YOU RECALL HOW MANY TIMES HE TOLD YOU HE WAS A DRUG

10  DEALER?

11  A.   NO, I DON'T RECALL THAT EITHER.

12  Q.   WAS IT ON MORE THAN ONE OCCASION?

13  A.   I DON'T RECALL THAT EITHER.

14  Q.   DO YOU RECALL THE DEFENDANT EVER TELLING YOU THAT HE

15  KILLED SOMEBODY BECAUSE THIS PERSON THAT HE KILLED SET

16  HIM UP?

17  A.   NO.

18  Q.   DO YOU RECALL HIM EVER TELLING YOU THAT THIS PERSON WAS

19  KILLED BECAUSE OF A DRUG DEAL GONE BAD?

20  A.   THE WAY -- COULD I SAY SOMETHING.

21          THE COURT:  NO.  FIRST RESPOND TO THE QUESTION.

22          THE WITNESS:  I WOULD SAY NO AGAIN.  IT'S THE WAY

23  YOU'RE PHRASING THE QUESTIONS AND I'M NOT GONNA TESTIFY TO

24  SOMETHING THAT I DON'T KNOW.

25  Q.   (BY MR. CARR) DO YOU RECALL HIM TELLING YOU THAT

26  SOMEBODY SET HIM UP ON A DRUG DEAL?

27  A.   VAGUELY I REMEMBER SOMETHING ABOUT THAT, YES.

28  Q.   AND THAT THE DEFENDANT AND ANOTHER PERSON GOT SET UP IN

1  A DRUG DEAL?

2  A.  YES, I REMEMBER SOMETHING ABOUT THAT.

3  Q.  DID HE TELL YOU THAT -- WELL, WHEN HE TOLD YOU ABOUT

4  THIS DRUG DEAL OR BEING SET UP IN A DRUG DEAL, DID HE TELL

5  YOU THAT THE DRUG DEAL WENT BAD?

6  A.  IT WAS A LONG TIME AGO WHEN HE TOLD ME THESE THINGS AND

7  I DON'T REALLY FEEL, I'M TESTIFYING UNDER OATH SO I'M, I

8  DON'T WANT TO READ INTO OR MAKE IT SOUND DIFFERENTLY THAN

9  WHAT I CAN ANSWER.

10  Q.  OKAY.  DID HE TELL YOU THAT HE AND ANOTHER PERSON WERE

11  INVOLVED IN A DRUG DEAL THAT WENT BAD?

12  A.  YEAH.  I ALREADY ANSWERED THAT.  I SAID YES.

13  Q.  AND THAT THE PERSON THAT HE FELT, THE DEFENDANT FELT

14  THAT A PARTICULAR INDIVIDUAL SET THOSE TWO PEOPLE UP,

15  HIMSELF AND THIS OTHER INDIVIDUAL?

16  A.  SOMETHING LIKE THAT, YES.

17  Q.  AND DID THE DEFENDANT TELL YOU THAT BECAUSE THIS DRUG

18  DEAL, OR BECAUSE HE WAS SET UP THAT THIS PERSON WAS KILLED

19  BY HIM?

20  A.  NO, HE NEVER TOLD ME THAT.

21  Q.  DID HE INDICATE TO YOU OR WAS HE COCKY ABOUT HOW HE

22  WEASELED HIS WAY OUT OF THE KILLING?

23  A.  NO.

24  Q.  DID HE INDICATE TO YOU THAT HE WAS BLAMING THIS PERSON

25  THAT HE KILLED FOR SETTING UP HIMSELF AND HIS FRIEND?

26  A.  NO.

27        MR. RAPPAPORT:  OBJECTION.  MISSTATES THE

28  TESTIMONY.

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1    THE COURT:  REREAD THE QUESTION, CAROLYN.

2    (RECORD READ BY THE REPORTER.)

3    THE COURT:  THE OBJECTION IS SUSTAINED.  REPHRASE

4    IT.

5    Q.    (BY MR. CARR) DID THE DEFENDANT TELL YOU THAT HE KILLED

6    A PERSON BECAUSE HE WAS SET UP?

7    A.    NO.

8    Q.    DID HE TELL YOU THAT THIS DRUG DEAL THAT WENT BAD, THAT

9    THIS DEFENDANT AND THIS PERSON THE DEFENDANT WAS WITH GOT

10    SHOT AT?

11    A.    SOMETHING LIKE THAT.

12    Q.    AND BECAUSE THIS DRUG DEAL WENT BAD AND THE DEFENDANT

13    AND HIS FRIEND GOT SHOT AT, DID THE DEFENDANT TELL YOU THAT

14    HE GOT REALLY PISSED OFF AND THEN EVENTUALLY WENT BACK AND

15    ENDED UP KILLING THE GUY THAT SET HIM UP?

16    A.    NO.  THE CONVERSATION NEVER WENT ON LIKE THAT.

17    Q.    NOW, THIS PARTICULAR -- WELL, DID HE INDICATE TO YOU

18    THAT HE WAS INVOLVED IN A KILLING?

19    A.    NO.

20    Q.    DID HE EVER BRAG TO YOU THAT HE WAS INVOLVED IN A

21    KILLING?

22    A.    NO.

23    Q.    DID HE EVER BRAG TO YOU THAT HE WAS INVOLVED IN A

24    KILLING AND GOT AWAY WITH IT?

25    A.    NO.

26    Q.    DID HE INDICATE TO YOU THAT HE WAS INVOLVED IN THIS

27    KILLING AND SHOWED NO REMORSE?

28    A.    NO.

1    REGARDING REQUEST FOR SANCTIONS BY WAY OF CALJIC 2.28, THE

2    COURT FINDS NO JUSTIFICATION FOR GIVING IT.  I FIND NO BAD

3    FAITH RELATIVE TO THIS.  THE PHOTOGRAPHS WERE HANDLED

4    SEPARATELY.  THERE'S BEEN A SEPARATE DISCUSSION.  DENIED FOR

5    THE RECORD.

6         THE NEXT ARE A GROUP OF FORECITE INSTRUCTIONS

7    REQUESTED BY THE DEFENSE.  I AM DENYING EACH.  WE WILL GO

8    THROUGH THE FORECITE IN SEQUENTIAL ORDER.  I GENERALLY USE

9    FORECITE BUT I HAVE NOT BEEN ABLE TO ACCESS IT TODAY.  THE

10   "F" IN THE STRING OF ALPHA NUMERICS REFERS TO FORECITE.

11   THE NUMBER GENERALLY CONFORMS TO THE CALJIC INSTRUCTION AND

12   THEN THERE MIGHT BE A LETTER SOMETIMES AT THE END, SOMETIMES

13   NOT.  BUT IT'S CROSS REFERENCE BETWEEN FORECITE AND CALJIC.

14        THE FIRST IS THE F2.03D, CAPTIONED CONSCIOUSNESS

15   OF GUILTY, FALSEHOOD - APPLICATION TO THIRD PARTY.  THERE IS

16   ANOTHER INSTRUCTION THAT I BELIEVE NEEDS TO BE CONSIDERED

17   WITH THIS IN CONTEXT.  AND THAT IS F4.020, CAPTIONED THIRD

18   PARTY CULPABILITY.  I BELIEVE THESE TWO INSTRUCTIONS THAT

19   ARE IN OUR DISCUSSION THIS MORNING OVERLAPPED.  IT'S A BASIC

20   REQUEST FOR THIRD PARTY CULPABILITY INSTRUCTIONS.  MR.

21   RAPPAPORT.

22        MR. RAPPAPORT:  THE ARGUMENT RELATES AS AN

23   UMBRELLA TO BASICALLY ALL THE REQUESTED INSTRUCTIONS FOR

24   THIRD PARTY CULPABILITY, WHICH IS THAT THERE IS SOME

25   EVIDENCE SUGGESTING THAT A THIRD PARTY COMMITTED THIS ACT.

26   THE ERRATIC NATURE OF THE CRIME SCENE, THE GLASS SMASHED OUT

27   OF THE CAR WINDOW BY THE BULLET, THE BLOOD SCATTERED

28   EVERYWHERE, SUGGESTS THE LACK OF CRIMINAL INTENT.  IT SHOWS

1    A RANDOM ACT THAT WAS COMMITTED BY A THIRD PARTY.

2            AND THERE'S SOME EVIDENCE TO SUGGEST THAT SOMEBODY

3    WAS IN THE BACK SEAT.   THERE HAS BEEN LITTLE EVIDENCE TO

4    SUGGEST THAT MR. SALCIDO KNOWS THAT PERSON.   THERE'S BEEN

5    LITTLE EVIDENCE OF ANY LINK BETWEEN MR. SALCIDO AND A THIRD

6    PERSON.   I DON'T THINK THE TELEPHONE RECORDS AT THIS POINT

7    ESTABLISH THIS.   THE ONLY EVIDENCE THAT THERE WAS A THIRD

8    PERSON KNOWN TO MR. SALCIDO WAS THAT HE BORROWED A FOUR-DOOR

9    CAR, AND THAT ALONE I THINK IS INSIGNIFICANT OR DOES NOT

10   RISE TO THE LEVEL SUGGESTING THAT HE KNEW WHO THAT THIRD

11   PERSON WAS IN THE BACK SEAT.   SO CONSEQUENTLY WE'RE ASKING

12   FOR THESE JURY INSTRUCTIONS.

13           THE COURT:   ALL RIGHT.   I WILL LET MR. CARR

14   RESPOND SEPARATELY, BUT FIRST I AM GOING TO NOTE THAT YOU

15   ELECTED TO MAKE AN OPENING STATEMENT.   YOU DID NOT HAVE TO

16   MAKE AN OPENING STATEMENT.   YOU COULD HAVE DEFERRED YOUR

17   RIGHT TO MAKE AN OPENING STATEMENT.   THE TENOR AND THRUST OF

18   YOUR OPENING STATEMENT WAS THAT THERE WOULD BE EVIDENCE TO

19   SUGGEST THAT ONE OR MORE MALE AFRICAN-AMERICANS IN EAST PALO

20   ALTO SHOT AND KILLED THE VICTIM AND THAT YOUR CLIENT

21   TRANSPORTED HIM UP INTO THE FOOTHILLS ABOVE PALO ALTO AND

22   LOS ALTOS AND IN A PANIC GOT RID OF THE BODY.

23           HAD THERE BEEN EVIDENCE TO THAT EFFECT IN THIS

24   CASE, I WOULD GIVE THE THIRD PARTY CULPABILITY INSTRUCTION.

25   THERE IS ABSOLUTELY NO EVIDENCE IN THIS COURT'S MIND THAT

26   THERE IS ANY THIRD PARTY CULPABILITY.   THE ONLY EVIDENCE IN

27   THIS CASE WOULD SUGGEST, DIRECT AND CIRCUMSTANTIAL EVIDENCE,

28   ONE, THAT THE DEFENDANT DID REQUEST FOR SOME REASON -- IT'S

1    UP TO THE TWO OF YOU TO ARGUE IT TO THE JURY COHERENTLY -- A

2    FOUR-DOOR AUTOMOBILE AS OPPOSED TO THE PICKUP TRUCK THAT HE

3    NORMALLY DROVE.  MR. BERGSTROM ARRANGED, IF YOU WILL, FOR

4    THAT SWAP.

5             NUMBER TWO, THERE IS BLOOD EVIDENCE TO SUGGEST

6    THAT THERE WAS SOMEONE, SOME PERSON SEATED IN THE RIGHT REAR

7    PASSENGER SEAT.  THAT COULD BE ASCERTAINED BECAUSE THERE IS,

8    IF YOU WILL, A WHITEOUT.  NO BLOOD HIT THE SEAT WHERE THAT

9    PERSON WOULD HAVE BEEN SITTING.

10            THERE IS SOME EVIDENCE TO SUGGEST THAT A BELT HAD

11   BEEN PLACED AROUND THE VICTIM'S NECK OR BODY AREA, WHICH

12   MIGHT SUGGEST A THIRD PARTY WITHIN THE CAR.

13            THERE WAS A FINGERPRINT IN THE CAR BUT THE

14   EVIDENCE WAS WE DO NOT KNOW HOW LONG THAT FINGERPRINT MAY

15   HAVE BEEN THERE.  I BELIEVE THE FINGERPRINT WAS IDENTIFIED

16   TO BELONG TO A PARTICULAR PERSON.

17            THERE IS NO EVIDENCE TO SUGGEST THAT THE DEFENDANT

18   WAS WITH A STRANGER UP IN THE HILLS IN THE GENERAL AREA

19   WHERE THE BODY WAS FOUND.  THE RECORD IS DEVOID OF

20   EVIDENCE.  OPENING STATEMENT, YES.  NO EVIDENCE.

21            I FIND NO JUSTIFICATION WITH THE STATE OF THE

22   RECORD TO GIVE THIRD PARTY CULPABILITY INSTRUCTION.  MORE

23   SPECIFICALLY, FORECITE 2.03D OR FORECITE 4.020.

24            MR. CARR, IS THERE ANYTHING YOU WISH TO ADD TO

25   THAT?

26            MR. CARR:  NO, YOUR HONOR.  THE PEOPLE WOULD

27   SUBMIT IT.

28            THE COURT:  ALL RIGHT.  THE INSTRUCTIONS ARE

1    REFERRED TO AS PRINCIPALS IN THAT CRIME.  EACH PRINCIPAL,

2    REGARDLESS OF THE EXTENT OR MANNER OF PARTICIPATION, IS

3    EQUALLY GUILTY.  PRINCIPALS INCLUDE:

4           ONE, THOSE WHO DIRECTLY AND ACTIVELY COMMIT THE

5    ACT CONSTITUTING THE CRIME;

6           OR TWO, THOSE WHO AID AND ABET THE COMMISSION OF

7    THE CRIME.

8           A PERSON AIDS AND ABETS THE COMMISSION OF A CRIME

9    WHEN HE OR SHE:

10          ONE, WITH KNOWLEDGE OF THE UNLAWFUL PURPOSE OF THE

11   PERPETRATOR;

12          AND TWO, WITH THE INTENT OR PURPOSE OF COMMITTING

13   OR ENCOURAGING OR FACILITATING THE COMMISSION OF THE CRIME;

14          AND THREE, BY ACT OR ADVICE AIDS, PROMOTES,

15   ENCOURAGES OR INSTIGATES THE COMMISSION OF THE CRIME.

16          A PERSON WHO AIDS AND ABETS THE COMMISSION OF A

17   CRIME NEED NOT BE PRESENT AT THE SCENE OF A CRIME.  MERE

18   PRESENCE AT THE SCENE OF A CRIME WHICH DOES NOT ITSELF

19   ASSIST THE COMMISSION OF THE CRIME DOES NOT AMOUNT TO AIDING

20   AND ABETTING.  MERE KNOWLEDGE THAT A CRIME IS BEING

21   COMMITTED AND THE FAILURE TO PREVENT IT DOES NOT AMOUNT TO

22   AIDING AND ABETTING.

23          ONE WHO AIDS AND ABETS IN THE COMMISSION OF A

24   CRIME IS NOT ONLY GUILTY OF THAT CRIME, BUT IS ALSO GUILTY

25   OF ANY OTHER CRIME COMMITTED BY A PRINCIPAL WHICH IS A

26   NATURAL AND PROBABLE CONSEQUENCE OF THE CRIME ORIGINALLY

27   AIDED AND ABETTED.

28          IN ORDER TO FIND THE DEFENDANT GUILTY OF THE CRIME

1   AFTERNOON SESSION                        SEPTEMBER 18, 2000

2                          PROCEEDINGS

3           THE COURT:  ON THE RECORD FOR A MINUTE OUTSIDE

4   THE PRESENCE OF THE JURY.  BOTH COUNSEL AND THE DEFENDANT

5   ARE PRESENT.  MR. RAPPAPORT INDICATED WHILE YOU WERE OUTSIDE

6   HE WANTED TO PUT SOMETHING ON THE RECORD REGARDING

7   DISCOVERY.

8           MR. RAPPAPORT:  THAT'S CORRECT.  THIS MORNING MR.

9   CARR HANDED ME TWO TAPES.  THAT OF NORMAN JACKSON REDACTED

10  AND THAT OF ED ALLISON REDACTED.  HE ALSO HANDED ME, ALONG

11  WITH THESE TAPES, SEVERAL TRANSCRIPTS THAT APPARENTLY

12  PERTAIN OR ARE TRANSCRIPTS OF THESE TAPES.

13          THE FACT THAT THEY WERE GIVEN TO ME THIS MORNING

14  HAS PROVIDED ME WITH NO OPPORTUNITY TO REVIEW THE

15  TRANSCRIPTS FOR ACCURACY, TO REVIEW THE REDACTED PORTIONS OF

16  THE TAPES TO DETERMINE IF THERE WAS ANYTHING THAT HAS BEEN

17  TAKEN OFF OF THOSE TAPES THAT IS ADMISSIBLE IN THIS COURT

18  AND WOULD BENEFIT MR. SALCIDO OR IN SOME WAY UNDERMINE THE

19  PROSECUTION'S THEORY OF THIS CASE AND/OR THE WITNESS THAT

20  THEY ARE CALLING TO TESTIFY.

21          THE COURT:  WAIT A MINUTE.  WHO ARE THE TWO

22  PEOPLE?  JACKSON?

23          MR. RAPPAPORT:  NORMAN JACKSON AND ED ALLISON.

24          THE COURT:  ARE JACKSON AND ALLISON GOING TO BE

25  CALLED AS WITNESSES TODAY?

26          MR. CARR:  YES, YOUR HONOR.

27          THE COURT:  OKAY.  FILL ME IN BECAUSE THERE'S TOO

28  MANY PLAYERS HERE.  I'M LOSING TRACK.  WHO WERE JACKSON AND

                REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1   ANY WAY?

2           MR. RAPPAPORT:  I HAVEN'T HAD THE OPPORTUNITY TO

3   GO THROUGH THE TRANSCRIPT.

4           THE COURT:  ALL RIGHT.  I SAID TO LISTEN TO THE

5   TAPE.  YOU CAN READ ALONG IN THE REDACTED VERSION OR YOUR

6   OTHER VERSION.  IF YOU WANT THIRTY MINUTES I WILL GIVE IT TO

7   YOU.  AS SOON AS YOU HAVE FINISHED LISTENING TO THE TAPE,

8   LET ME KNOW AND I WILL COME BACK ON THE BENCH.

9           MR. CARR:  YOUR HONOR, I WOULD LIKE TO OPEN UP

10  ONE ADDITIONAL ISSUE IN MR. ALLISON'S STATEMENT WHERE

11  MR. ALLISON DOES SAY THAT THE DEFENDANT ON A NUMBER OF TIMES

12  TOLD HIM, OR SAID THAT MANY TIMES THAT HE USED TO BE A DRUG

13  DEALER.

14          THE COURT:  WE WILL TAKE IT UP AFTER I COME

15  BACK.

16          MR. RAPPAPORT:  I REALLY NEED TIME JUST TO READ

17  IT AND COMPARE TO IT THE REDACTED TRANSCRIPT IS WHAT I NEED

18  TO DO FIRST.

19          THE COURT:  I AM GIVING YOU THIRTY MINUTES.  THE

20  MACHINE SHOULD BE AVAILABLE TO LISTEN TO THE TAPE HERE IN

21  COURT.

22          (RECESS TAKEN.)

23          THE COURT:  BACK ON THE RECORD OUT OF THE

24  PRESENCE OF THE JURY.  BOTH COUNSEL AND THE DEFENDANT ARE

25  PRESENT.  MR. RAPPAPORT, HAVE YOU HAD AN OPPORTUNITY TO

26  LISTEN TO THE ALLISON CASSETTE?

27          MR. RAPPAPORT:  I ACTUALLY READ THE TRANSCRIPTS

28  AND COMPARED THEM.

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1    HOPEFULLY TOMORROW WILL BE A FULL DAY.  8:45.  IF WE GET

2    EVERYBODY HERE I AM GOING TO TRY AND SURPRISE YOU AND EVEN

3    START A FEW MINUTES BEFORE 9:00.  THE ADMONITION IS IN

4    EFFECT.  THANK YOU AND GOOD EVENING.

5              (WHEREUPON, THE JURY DEPARTED THE COURTROOM.)

6              MR. RAPPAPORT:  YOUR HONOR, THIS MORNING AT THE

7    BEGINNING OF EVIDENCE I WAS HANDED TWO TAPES FROM THE

8    PROSECUTOR.  THEY ARE APPARENTLY REDACTED VERSIONS OF

9    CONVERSATIONS WITH MR. BERGSTROM AS WELL AS MR. WILLIAMS.

10   SO AGAIN, DISCOVERY IS BEING PROVIDED AT THIS LATE DATE.

11             IN ADDITION, I ALSO RECEIVED AN ADDITIONAL POLICE

12   REPORT -- EXCUSE ME -- INVESTIGATION REPORT THAT IS DATED

13   JANUARY 28TH, 1999 THAT I'VE NEVER RECEIVED RELATED TO A

14   VIDEOTAPE THAT I RECEIVED SEVERAL DAYS AGO.  IT IS

15   APPARENTLY INSPECTOR MEDVED, AS WELL AS SOME OTHER

16   WITNESSES, WENT FROM EAST PALO ALTO TO PRIMARILY MOODY

17   ROAD.  I DON'T KNOW, I HAVEN'T HAD AN OPPORTUNITY TO TAKE A

18   LOOK AT IT IN LIGHT OF ALL THE LATE DISCOVERY I'VE BEEN

19   CATCHING UP TO.

20             SO AT THIS POINT I WOULD MOVE SIMPLY TO EXCLUDE

21   THESE PARTICULAR TAPES.  I DON'T HAVE THE TIME BEFORE THE

22   WITNESSES TESTIFY TO LISTEN TO THEM, TO INSURE THEIR

23   ACCURACY, TO COMPARE THEM TO THE ORIGINALS AND TO COMPARE

24   THEM TO THOSE TRANSCRIPTS THAT WERE PROVIDED.

25             MR. CARR:  DEFENSE COUNSEL HAS HAD THESE TAPES

26   FOR YEARS.

27             THE COURT:  WAIT A MINUTE.  ARE YOU TALKING ABOUT

28   UNREDACTED OR REDACTED TAPES?

1    AFTER 1:00 IF YOU WANT TO SEND SOMEBODY UP TO

2    MR. RAPPAPORT'S OFFICE TO GET THEM.  ANYTHING FURTHER?

3              MR. CARR:  NO, YOUR HONOR.

4              MR. RAPPAPORT:  JUST THAT, FOR THE RECORD, SO

5    IT'S ALL IN ONE PLACE, OVER THE COURSE OF THE NEXT -- I

6    GUESS TODAY IS OVER.  IT'S QUARTER OF FOUR.  BY THE TIME I

7    GET BACK TO MY OFFICE I HAVE NO STAFF.  I'M REQUIRED TO GO

8    THROUGH KOJO WILLIAMS' TAPED STATEMENT, I'M REQUIRED TO GO

9    THROUGH MR. BERGSTROM'S TAPED STATEMENT, I'M REQUIRED TO GO

10   THROUGH MR. SMITH'S TAPED STATEMENT, I AM REQUIRED TO GO

11   THROUGH MR. JACKSON'S TAPED STATEMENT, MR. ALLISON'S TAPED

12   STATEMENT, COMPARE THOSE TO THE TRANSCRIPTS SO I CAN BE

13   PREPARED FOR CROSS-EXAMINATION OF THOSE WITNESSES THAT WILL

14   TAKE PLACE SOMETIME NEXT WEEK.

15              THERE IS OVER A MINIMUM OF FIVE HUNDRED PAGES OF

16   TRANSCRIPTS AND A NUMBER OF HOURS OF TAPE, AT LEAST TEN

17   HOURS OF TAPE.  THERE'S ALSO A HUNDRED FIFTY PAGE

18   TRANSCRIPT, A HUNDRED FORTY-SIX PAGE TRANSCRIPT OF DOUGLAS

19   RIDOLFI THAT I AM REQUIRED TO READ AS WELL AS COMPARE TO THE

20   CHARTS AND PHOTOGRAPHS.

21              I AM ALSO REQUIRED TO MEET WITH OUR EXPERT

22   WITNESS, MR. MORTON, WHO IS REQUIRED BY THIS COURT TO WHAT

23   AMOUNTS TO WORK OVER THE WEEKEND.  I HAVE A MEETING WITH HIM

24   TO GO OVER THE FORENSIC EVIDENCE IN DETAIL.  I AM ALSO

25   REQUIRED, OF COURSE, TO COMMUNICATE THOSE FINDINGS WITH MY

26   CLIENT, MR. SALCIDO.  THAT IS ALL ON SATURDAY, SUNDAY AND

27   MONDAY.

28              I CAN TELL THIS COURT DEFINITIVELY THAT GIVEN THAT

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1  AMOUNT OF WORK, THAT IT WILL BE IMPOSSIBLE FOR ME.  AND I

2  WILL TELL THIS COURT I AM GOING TO GIVE IT MY BEST EFFORTS,

3  AS I HAVE FROM DAY ONE, BUT I'VE BEEN DOING THIS LONG ENOUGH

4  TO KNOW THAT I CANNOT ADEQUATELY BE PREPARED GIVEN THE

5  NUMBER OF TASKS THAT I AM REQUIRED TO DO IN THE VERY LIMITED

6  TIME THAT I AM REQUIRED TO DO THEM IN.  AND THIS IS EXACTLY

7  WHY 1054 SAYS THIRTY DAYS BEFORE TRIAL.  HAD I RECEIVED THIS

8  MATERIAL ON THE THIRTY-FIRST DAY, I WOULD HAVE TOLD THE

9  COURT I AM NOT PREPARED TO PROCEED.

10        THE COURT:  ALL RIGHT.  COMMENTS ARE NOTED.  WE

11  ARE ADJOURNED.  9:00.  NO.  8:30 MONDAY MORNING FOR COUNSEL

12  WITH THE STATEMENTS.  8:30 TUESDAY MORNING.

13        (THE EVENING RECESS WAS TAKEN.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO.  4513

1  CHANGE THE CROSS-EXAMINATION OF VARIOUS WITNESSES THAT HAVE

2  TESTIFIED, FOR EXAMPLE, DID MR. SALCIDO KNOW A PARTICULAR

3  INDIVIDUAL.   THE PEOPLE'S THEORY HAS ALWAYS BEEN THAT

4  MR. SALCIDO KNEW THE PERPETRATOR THAT COMMITTED THE OFFENSE,

5  THAT HE HAD CALLED THEM.   THERE IS A SEPARATE AND DISTINCT

6  DEFENSE HERE THAT THIS PERSON IN THE BACK SEAT ACTED

7  INDEPENDENTLY, ALBEIT IT WAS SOMETHING THAT MR. SALCIDO

8  KNEW.   DEPENDING ON TO A CERTAIN DEGREE THE BLOOD SPATTER

9  EVIDENCE.

10         I CAN SAY THE COURT ASKED US YESTERDAY CERTAIN

11  QUESTIONS AND WANTED US TO ADDRESS THOSE PARTICULAR

12  QUESTIONS, WHICH IS ONE, WHAT SANCTIONS WE'RE REQUESTING

13  AND, TWO, WHETHER THEY ARE APPROPRIATE IN THIS CASE AND,

14  THREE, WHETHER THERE IS GOOD OR BAD FAITH HERE.   WHETHER THE

15  VIOLATION, THE FAILURE TO TURN OVER THE PHOTOGRAPHS, WAS

16  WILLFULLY I THINK IS WHAT THE COURT WAS ASKING.   AND I WOULD

17  LIKE TO ADDRESS THAT BECAUSE I'M HEADING INTO THE LEGAL

18  ASPECT WHAT WE'RE REQUESTING.

19         THE COURT:   LET ME STOP YOU JUST FOR A MOMENT.

20  COULD YOU GIVE ME SOME IDEA OF HOW LONG YOUR COMMENTS MIGHT

21  TAKE, BECAUSE I'M INCLINED TO BRING THE JURY UP RATHER THAN

22  MAKE THEM WAIT LONGER AND THEN LET YOU CONTINUE WITH YOUR

23  COMMENTS.

24         MR. RAPPAPORT:   PROBABLY ANOTHER FIVE MINUTES.

25         THE COURT:   ALL RIGHT.   GO AHEAD THEN.

26         MR. RAPPAPORT:   WE'RE REQUESTING ONE OF TWO

27  SANCTIONS.   THE SANCTION THAT WE REALLY WANT HERE AND I

28  THINK IS MOST APPROPRIATE IS EXCLUSION OF THE EVIDENCE AND

1    MR. RAPPAPORT:  THAT IS CORRECT.

2    THE COURT:  OKAY.  THAT LEAVES WHAT I BELIEVE TO

3    BE THE FOLLOWING.  YOUR REQUEST TO EXCLUDE THE EVIDENCE, IT

4    WAS EITHER TO EXCLUDE IT WITH OR WITHOUT AN ADMONITION OR,

5    IF ALLOWED, WITH AN ADMONITION.  IS THAT CORRECT?

6    MR. RAPPAPORT:  CORRECT.

7    THE COURT:  ALL RIGHT.  WHAT DO YOU PROPOSE?  AND

8    I WILL TELL YOU WHAT I AM INCLINED TO DO.  I AM INCLINED TO

9    ADMIT IT.  I WILL CONSIDER FROM BOTH OF YOU AN ADMONITION

10   REQUEST.

11   MR. RAPPAPORT:  I HAVE DRAFTED SUCH AN

12   ADMONITION.

13   THE COURT:  ALL RIGHT.  HAND IT UP TO THE CLERK.

14   LET ME SEE IT.  HAVE YOU ALSO PROVIDED COUNSEL WITH A COPY?

15   MR. RAPPAPORT:  I WASN'T SURE IF IT WAS GOING TO

16   BE GERMANE BUT I HAVE ONE FOR HIM, SURE.

17   THE COURT:  IT'S GERMANE.  THIS GETS BACK TO THE

18   BOTTOM LINE RULES.  EACH OF YOU ARE GOING TO SHOW EACH OTHER

19   ALL ITEMS OF EVIDENCE AND ANY MOVING PAPERS BEFORE I SEE

20   THEM.  YOU CAN FILE STAMP IT LATER.  LET ME SEE IT,

21   MARIANNE.

22   I'LL GIVE THE DISTRICT ATTORNEY AN OPPORTUNITY TO

23   REVIEW YOUR PROPOSED ADMONITION.  ALL RIGHT.  MR. CARR, HAVE

24   HAD YOU AN OPPORTUNITY TO READ IT?

25   MR. CARR:  YES, I HAVE, YOUR HONOR.

26   THE COURT:  LET ME READ IT INTO THE RECORD.  THIS

27   IS THE PROPOSED DEFENSE ADMONITION.

28   IT'S CAPTIONED, PROPOSED JURY INSTRUCTION

1    REGARDING LATE DISCOVERY.  IT WAS FILED TODAY.  AND THAT

2    CAPTION DOES NOT SPEAK TO AN ADMONITION.  THAT CAPTION IS

3    SPEAKING TO A JURY INSTRUCTION AND I HAVE YET TO CONSIDER

4    JURY INSTRUCTIONS, FOR THE RECORD.  QUOTE:  THE DISTRICT

5    ATTORNEY HAS FAILED TO PROVIDE THE DEFENSE WITH PHOTOGRAPHS

6    NUMBERED BLANK -- APPARENTLY THAT'S AN INSERT -- AS WELL AS

7    ALL WRITTEN TRANSCRIPTS OF TAPED STATEMENTS IN A TIMELY

8    FASHION AS REQUIRED BY LAW.  THIS IS A VIOLATION OF THIS

9    COURT'S RULES AND YOU SHOULD CONSIDER THIS FACT IN YOUR

10   DELIBERATIONS.  YOU MAY GIVE THIS VIOLATION WHATEVER WEIGHT

11   YOU DEEM APPROPRIATE.  CLOSE QUOTE.

12          NOW, NUMBER ONE, THE PROPOSED -- I SPOKE IN TERMS

13   OF AN ADMONITION.  YOUR PROPOSED ORDER SPEAKS IN TERMS OF

14   JURY INSTRUCTIONS.  MY QUESTION WAS FOCUSING ON

15   PHOTOGRAPHS.  YOUR PROPOSED ORDER IS GOING BEYOND

16   PHOTOGRAPHS, PICKING UP TRANSCRIPTS.  NOW, TRANSCRIPTS ARE

17   NOT INCLUDED IN MY QUESTION.  MY QUESTION -- I'LL TAKE THAT

18   SEPARATELY -- DEALS WITH AN ADMONITION WHICH MEANS NOW AS

19   OPPOSED TO A JURY INSTRUCTION LATER.  SO LET'S CONSIDER THIS

20   IN THE FORM OF AN ADMONITION AS TO TRANSCRIPTS.  DOES THIS,

21   IN YOUR OPINION, CONTAIN ANY ELEMENT OF BAD FAITH?

22          MR. RAPPAPORT:  THE ADMONITION?

23          THE COURT:  THE WORDING.  BAD FAITH ON THE PART

24   OF THE DISTRICT ATTORNEY.

25          MR. RAPPAPORT:  NO.  IT DOESN'T SAY THAT THE

26   PEOPLE HAVE WILLFULLY FAILED TO --

27          THE COURT:  POOR QUESTION THEN BY ME.  WHETHER

28   THE WORDS "BAD FAITH" APPEAR LITERALLY ON THE ADMONITION,

1   SANCTION.  BUT IF DONE INCORRECTLY IT COULD RESULT IN THE

2   ULTIMATE SANCTION BECAUSE JEOPARDY WOULD SET IN.   I WOULD

3   NEVER, EVER CONSIDER A MISTRIAL MOTION WITHOUT THE ACTIVE

4   PARTICIPATION AND CONSENT OF THE DEFENDANT.   NOT ON A

5   DEFENSE ATTORNEY'S SINGULAR MOTION.   AND IF WHAT YOUR

6   ATTORNEY SAYS, MR. SALCIDO, IS CORRECT, LISTEN TO ME.

7   NAMELY, THAT HE HAS SOME TYPE OF RETAINER AGREEMENT THAT IS

8   ONLY FOR ONE TRIAL, WHICH WOULD INCLUDE A MISTRIAL, IF YOU

9   CONSENTED TO A MISTRIAL MOTION, YOU WOULD HAVE TO UNDERSTAND

10  THAT HE WOULD PROBABLY NO LONGER BE YOUR ATTORNEY AND YOU

11  WOULD BE SUBJECT TO A COURT-APPOINTED ATTORNEY, IF YOU

12  DIDN'T HAVE THE FUNDS TO HIRE YOUR OWN ATTORNEY.

13          NUMBER TWO, I'VE ALREADY DETERMINED THAT THERE IS

14  A CONFLICT OF INTEREST THAT EXISTS WITH THE PUBLIC

15  DEFENDER'S OFFICE AND THE ALTERNATE PUBLIC DEFENDER'S

16  OFFICE.   THEREFORE, SOME ATTORNEY WOULD HAVE TO BE APPOINTED

17  OFF OF THE CONFLICTS PANEL.  AND WE KNOW IT COULD NOT BE

18  BRENDA MALLOY BECAUSE SHE IS NOW CONFLICTED BECAUSE SHE'S

19  COME INTO THIS CASE TO REPRESENT SOMEBODY, AND IT COULD NOT

20  BE PAT KELLY BECAUSE HE'S ALREADY COMMITTED.   YOU HAVE AN

21  EXCELLENT ATTORNEY REPRESENTING YOU BUT YOU HAVE TO KNOW

22  THIS.  IF YOU WERE TO EVER CONSENT TO A MISTRIAL MOTION,

23  YOU'RE GONNA PROBABLY LOSE HIM AS YOUR ATTORNEY.   DO YOU

24  UNDERSTAND WHAT I'VE JUST SAID?

25          THE DEFENDANT:  YES, SIR.

26          THE COURT:  YES OR NO?

27          THE DEFENDANT:  YES, SIR.

28          THE COURT:  OKAY.  WERE YOU ABLE TO CONTACT THE

REPORTED BY:  CAROLYN ANN WILLEFORD, CSR NO. 4513

1    Q.    THE CREDIT CARD THAT YOU GAVE TO THE DEFENDANT TO USE?

2    A.    I GAVE THE DEFENDANT A CREDIT CARD TO USE.  I DON'T

3    KNOW IF THAT IS THE ONE.

4    Q.    YOU DON'T KNOW IF THAT'S THE ONE?

5    A.    YOU'D HAVE TO CHECK IT WITH THE NUMBERS ON THAT OTHER.

6    Q.    LET ME SHOW YOU WHAT'S MARKED AS PEOPLE'S 106 AND

7    DIRECT YOUR ATTENTION TO ABOUT THE CENTER PORTION.  CAN YOU

8    CROSS REFERENCE THE NUMBERS OF 106 WITH 103?

9    A.    THE NUMBERS ARE THE SAME.  THAT WOULD BE THE ONE THEN.

10   Q.    SO IN FACT, THE CREDIT CARD THAT YOU LENT THE DEFENDANT

11   WAS USED TO RENT THIS MOTEL ROOM.  WOULD THAT BE ACCURATE?

12   A.    I HAVE NO KNOWLEDGE OF IT.  BUT FROM WHAT YOU'RE

13   SHOWING ME, YES.

14   Q.    WHEN YOU LOOK AT BOTH OF THESE DOCUMENTS TOGETHER,

15   WOULD THAT BE ACCURATE THEN?

16   A.    YES .

17   Q.    DO YOU KNOW IF THE DEFENDANT RENTED THE HOTEL ROOM AT

18   THE COZY 8 MOTOR LODGE ON JANUARY 11TH, 1994?

19   A.    NO.

20   Q.    DO YOU KNOW IF THAT COZY 8 MOTOR LODGE, THIS RECEIPT

21   HERE, CORRESPONDS TO THE COZY 8 MOTOR LODGE IN MOUNTAIN

22   VIEW, CALIFORNIA THAT IS ON THE BILL, PEOPLE'S 106?

23            MR. RAPPAPORT:  OBJECTION.  I'M SORRY.  YOU

24   WEREN'T FINISHED.

25            THE COURT:  STRIKE IT.  ASK YOUR QUESTION.

26   Q.    (BY MR. CARR) DO YOU KNOW IF THE CREDIT CARD THAT WAS

27   USED TO RENT THE COZY 8 MOTOR LODGE AS DEPICTED IN PEOPLE'S

28   103 IS THE SAME COZY 8 MOTOR LODGE IN MOUNTAIN VIEW,

# VERIFICATION

State of California          )
                         ss  )
County of Fresno             )


I, the undersigned, say:

I am the petitioner in this action.  I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to those matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Executed on this _20_ day of _August_, 2008, in Coalinga, California.


_____
Felix A. Salcido III, In Pro Se

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF PETITION FOR WRIT OF HABEAS CORPUS
### INTRUDUCTION

Petitioner's basic assertion is that he was denied his right to effective counsel when his attorney failed to present a defense. Also, on numerous occasions defense counsel misled Petitioner and/or compromised his allegiance to his client.

Petitioner was prejudiced by counsel's last minute decision not to present a defense considering the prosecution had already established: Petitioner's clothes and vehicle saturated in the victim's blood; Petitioner's statements from 1994 immediately admitting to the police that he deposited the body; and, overwhelming evidence that the victim was shot in the Petitioner's car. Moreover, defense counsel, in his opening statements, promised the jury the Petitioner would testify on his own behalf, led Petitioner to believe his testimony was pertinent to his defense and had available experts to corroborate Petitioner's testimony.

Without a defense , the jury was oblivious to Petitioner's proximity to the crime scene, Petitioner was deprived third party culprit instructions and lesser related instructions. It is a reasonable probability that had defense counsel utilized available forensic evidence, collated with Petitioner's testimony, the outcome of the trial would be different. It should be noted, Petitioner was initially detained, questioned and released in 1994 prior to his arrest in 1998 on said charges.

### ARGUMENT
### I.

## PETITIONER'S CONVICTION MUST BE SET ASIDE BECAUSE TRIAL
## COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO
## PRESENT EXCULPATORY EVIDENCE AND A DEFENSE

As described above, the prosecution's evidence against Mr. Salcido consisted of

proof of indisputable facts that Petitioner was in the car when William Justice was killed, coupled with testimony by the prosecution's expert and primary police investigator concerning their theories as to the manner in which the shooting occurred and testimony by two of Salcido's friends (Ed Allison and Norman Jackson) who testified to admissions by Mr. Salcido, made years after the shooting, in which Salcido indicated the killing happened during a drug deal.  Mr. Salcido herein asserts that defense counsel had available to him material to answer each aspect of the prosecution's evidence, but failed, without any justification, to present the exculpatory material to the jury.

Though Petitioner's trial counsel had evidence available, and had prepared Petitioner's testimony at great length, he presented no defense.  In fact, just moments before counsel closed the defense case, trial counsel instructed Petitioner he was not to testify, despite having told the jury during opening statements that Petitioner would testify "you'll hear from Mister Salcido himsel...he has nothing to hide" and that they would hear the defense theory of the case.

Had trial counsel presented the defense, he had at least partially prepared, the jury would have heard an explanation of the shooting which would have included Mr. Salcido's testimony and his prior consistent statements to the police in 1994, that Mr. Justice was killed in his car when a drug deal went bad and one of the drug dealers shot Mr. Justice while seated in the back seat of the car.  Salcido's prior statements have always match prosecution's opinion that the blood pattern in the car indicated someone was seated in the back passenger side seat of the car when Justice was shot in the head.

In addition, the defense should have called its expert witnesses, each of whom would have called into question the validity of the prosecution's theory of the shooting and supported Salcido's version of events.  Most importantly, the defense

**(39)**

experts would have testified, convincinly, that the forensic evidence was perfectly consistent with Salcido's description of Mr. Justice being stabbed first, then shot, then lying across Salcido's lap for some time before Salcido left the body on Moody Road.

Finally, Salcido's explanation of the shooting would have been consistent with his admissions to Ed Allison, made several years after the shooting, in which Salcido told Allison that an unidentified third party shot Mr. Justice during a drug deal gone awry.

A.    The Applicable Legal Standard

Both the United States and California constitutions guarantee a defendant the right to assistance of counsel.  It has been stated that the "ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result."   (*People v. Ledesma*(1987) 43 Cal. 3d 171, 215.)  This right to the assistance of counsel "entitles the defendant not to some bare assistance but rather to effective assistance"(Ibid.; emphasis in original.)  The right also entitles the defendant to "the reasonably competent assistance of an attorney as his diligent conscientious advocate." (Ibid.; citations omitted.)

The right to effective assistance of counsel, of course is fundamental:

"[A] fair trial is one in which evidence subject to adversarial testing is  presented to an impartial tribunal for resolution of issues defined in advance of the proceedings.  The right to counsel plays a crucial role in the adversarial system embodied by the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meed the case of the prosecution' to which they are entitled." (*Strickland v. Washington* (1984) 466 U.S. 668, 685 (citations omitted).)

Thus, the Sixth Amendment

"envisions counsel's playing role that is critical to the ability of the adversarial system to produce just results.  An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."(Id.)

In the *Strickland* case, the Supreme Court set for a two-pronged analysis by which claims of ineffective assistance of counsel must be judged.  A defendant claiming ineffective assistance of counsel must demonstrate both that [1] "counsel's representation fell below an objective standard of reasonableness," and that [2] there is a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different."  (Id. at 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (Id.)

"Counsel had a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." (*Strickland v. Washington*, supra, at p.691.)  A "tactical" decision can never be reasonable when the attorney has failed to investigate his options and make a reasonable choice among them. (*Horton v. Zant* (11th cir.1991) 941 F.2d 1449, 1462.)

Similarly, counsel's failure to seek out evidence, through discovery, in the possession of the prosecution relevant to guilt or innocence, or any potential motion, falls below the constitutional standards of adequate defense. (*Kimmelman v. Morrison* (1986) 477 U.S.365, 387.)  As the Ninth Circuit has expressed, the right to counsel is meaningless unless counsel is competent and adequately prepared. (*United States v. Tucker* (9th Cir.1983) 716 F.2d 576, 579.)

Since investigation and preparation are the keys to effective representation, counsel has a duty to interview potential witnesses and "make an independent examination of the facts, circumstances, pleadings and laws involved." (*Von Moltke v. Gillies* (1948) 332 U.S. 708, 721; see also *Strickland*, supra, at 691 ("counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant.").  Courts have long recognized that counsel's failure to investigate potential defense witnesses falls below the level of competent representation

required by professional standards and the Constitution. See e.g., *Cody v. Montgomery* (11th Cir.1986) 799 F.2d 1481, 1483.)

An evidentiary hearing is required on claims of ineffective assistance of counsel to establish that counsel's failure to investigate or present evidence was not the result of a reasonable strategic decision. (*Hendricks v. Vasquez* (9th Cir.1992) 974 F.2d 1099.)  "(W)ithout the benefit of an evidentiary hearing...(the court) cannot determine if counsel's decision was a strategic one, and if so, whether the decision was sufficiently  informed one." (*United States v. Siripongs* (9th Cir.1999) 167 F.3d 1225, 1315.)  In *Strickland* the Supreme Court observed that strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." (*Strickland*, at pp. 1109-1110.)

B.    Trial Counsel's Representation Failed The "Performance" Element
      of the *Strickland*  Test For Effective Assistance.

Mr. Salcido's argument concerning trial counsel's ineffectiveness, while involving a fairly vast array of facts, is fairly straightforward.  Salcido contends that trial counsel failed in his duty to Salcido by declining to present a defense case that was both available and credible.

Though a jury may often view a defendant's testimony with skepticism, here Mr. Salcido's testimony would have been corroborated in great detail by his statements to the police on the night of the shooting.  And it cannot be disputed that Salcido's statements to the police in 1994 were convincing enough to cause the police to release him without being charged.  There simply is no discernable tactical reason for counsel to decide not to utilize Salcido's testimony.[3]

---

[3] Salcido's testimony also could have explained the phone numbers shown on the billing records for Salcido's cell phone.  This testimony could have corroborated by evidence from the phone service.  Thereby, the prosecution would not have been able to argue that Salcido was communicating to an "unknown accomplice."  Instead, the jury would have been informed of this number to his sons' maternal grandmother.

Even assuming arguendo that trial counsel had some valid tactical reason for not calling Salcido to the stand, there is simply no explanation as to why counsel did not call the defense experts. Each expert would have impeached the prosecution's case and provided critical support for Salcido's description of the shooting.

Dr. Hermann and Dr. Benson would have called into question: the coroner's thoroughness; his opinion that Justice was shot first and then stabbed; and, his opinion that Justice was still alive when he was deposited alongside Moody Road.

Both Dr. Hermann and Dr. Benson would have supported the defense contension that Mr. Justice was stabbed first, then shot and had lain profusely bleeding across Salcido's lap, on the driver's seat of the car, for a considerable period of time. Both doctors also would have testified that there is insufficient evidence that the victim was garroted based on the absence of petechiae in the eyes and eyelids, which would be typically found if the victim had been strangled in any manner.

Mr. Morton would have confirmed that the forensic evidence showed there was a person in the back seat of the car when Justice was shot. However, Morton would have disputed the prosecution's assertion that the blood spatter evidence indicated the fatal gunshot was shot from the front driver's seat, a crucial area of the prosecution's case. Mr. Morton also would have called into question the methods used by the prosecution's relatively inexperienced blood spatter expert, Mr. Ridolfi, and noted key objective deficiencies in Ridolfi's analysis. Also, Mr. Morton would have agreed with the doctors above that the presence of the belt found near the victim did not indicate Justice had been garroted when he was shot. Mr. Morton's opinion is based on the absence of abrasion marks on the victim's neck. Mr. Morton, like Dr. Hermann and Dr. Benson, would have supported Salcido's previous statements to the police and potential testimony at trial that the belt was used postmortem as a gurney to lift Mr. Justice's body off of his lap.

(43)

James Norris, the defense firearms expert, would have convincingly severed the prosecution's claim of a forensic connection between the bullet casing found in Salcido's car and the 9mm Beretta once owned by Kojo Williams. Norris would have informed the jury that the marking on the casing were commonplace on any casings fired in commercially available 9mm handgun in the United States. Mr. Norris would have similarly contradicted the prosecution's expert's testimony that the position of the casing on the floor of car indicated that the shot had been fired from the front driver's side area of the car.

In sum, there is simply no downside to calling these witnesses. Trial counsel's failure to utilize such important, exculpatory evidence was unjustified and ineffective.

C.    Trial Counsel's Representation Prejudiced  Mr. Salcido

Whether Mr. Salcido intended to kill Mr. Justice, or Justice was killed by a third party, drug deal gone bad, should have been the focus of Salcido's defense. There was a considerable credible testimony at trial indicating Salcido and the victim were friends and that the victim was shot by someone who was seated in the back seat of Salcido's car. And, though the prosecution's theory of the case rested on a robbery felony-murder theory, Salcido's consented search of his person, car and residence never produced any evidence of monetary gain. Ultimately, the jury acquitted Salcido of first degree murder and personal use of a firearm.

The court instructed the jury solely concerning murder. Had trial counsel presented Salcido's testimony and the testimony of the defense experts, in addition to the evidence adduced at trial, the court would have instructed the jury on third party instructions, voluntary manslaughter and involuntary manslaughter instructions.

In *People v. Breverman* (1998) 19 Cal. 4th 142, the trial court did not instruct the jury on involuntary manslaughter as an unintentional killing by the reckless  or

grossly negligent commission of a highly dangerous act.  The Supreme Court found that this omission deprived appellant of his right to have the jury determine every material issue presented by the evidence, and that California law requires a trial court to instruct fully on all lesser necessarily included offenses supported by the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 149.)  The duty to instruct on all supportable theories of lesser included offenses includes voluntary and involuntary manslaughter.

"A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of...voluntary manslaughter.  (Pen. Code §192." (*People v. Breverman* (1998) 19 Cal.4th, 142, 149; *People v. Barton* (1995) 12 Cal.4th 186, 199.) "But a defendant who intentionally and unlawfully kills lacks malice...in limited, explicitly defined circumstances; either when the defendant acts in a 'sudden quarrel or heat of passion' (Pen. Code § 192, subd.(a)), or when the defendant kills in 'unreasonable self-defense'--the unreasonable but good faith belief in having to act in self-defense." (*People v. Breverman, supra*, 19 Cal.4th at p. 154.)  Because heat of passion reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide, voluntary manslaughter of this form is considered a lesser necessarily included offense of intentional murder. (*Ibid.*)

In Salcido's case the jury was exposed to evidence that could have supported a finding that Mr. Justice was killed by someone other than Salcido during an argument over a drug deal.  In fact, one of the main features of evidence adduced at trial was the likely presence of an unidentified third party who was present in the car when  Mr. Justice was killed.  And the jury found that it was someone other than Salcido who shot Mr. Justice.  The remaining question was, therefor, how this third party came to be in the car and whether the third party acted in

concert with Salcido, or during a sudden quarrel.

Ed Allison testified that Salcido had indicated that Mr. Justice was killed during a "drug deal that went bad," that Salcido and Justice had been "set up" in a drug deal, and that a third party in the drug deal, "the person in the back seat," shot and killed Mr. Justice. (RT 2-37-2039.)

The state's own expert, Mr. Ridolfi, concluded that there was a person seated in the car when Mr. Justice was shot inside the car, and that the person in the back seat had "contact" with Mr. Justice after Justice had been shot. (RT 1463.) Ridolfi further indicated that the forensic evidence "suggested" that Justice had been garroted from behind during the shooting. (RT 1463.)

Had defense counsel presented Salcido's testimony and prior statements to the police, buttressed by the defense experts' opinions concerning the forensic evidence, the jury might have reasonably inferred several versions of the shooting. First, the jury could have decided that Salcido and Mr. Justice were involved in a sudden quarrel between a drug dealer, who was seated in the back seat of Salcido's car. If the jury found that the drug dealer and Salcido killed Mr. Justice as a result of the quarrel, the jury should have been instructed on voluntary manslaughter as a result of a sudden quarrel.

The jury also may have reasonably inferred that both Salcido and Mr. Justice fell victims to a robbery stemmed from a drug deal that gone bad. The jury could have reasonably inferred that Salcido did not have any prior knowledge of the person in the back seat and his intentions to kill Mr. Justice, nor did Salcido assist the third party in attacking Mr. Justice. However, the jury might have supported a finding of involuntary manslaughter against Salcido for his role in bringing himself and Mr. Justice into a situation involving a drug deal. A crime that was inherently dangerous and resulted in Mr. Justice's death.

D. **Had Defense Counsel Presented A Defense Case,   The Court Would Have Instructed The Jury On Third Party Culpability**

Mr. Salcido Requested that the trial court instruct the jury regarding the possibility that a third party was responsible for the killing of Mr. Justice. (See CT at 1228; RT 2377-2378.)  The court refused the instruction on the basis that "there [was] no evidence to suggest that the defendant was with a stranger up in the hills in the general area where the body was found."  (RT 2379 [emphasis added].)  However, the court implicitly acknowledged that there was substantial evidence that another person was involved in the killing when it instructed the jury concerning aiding and abetting liability (See RT 2416), though the trial court found the evidence sufficient to support an instruction on the possible presence of an accomplice.[4]

The defense evidence available to trial counsel would have further informed the court's decision on the issue of third party liability instruction and warrant an instruction on this issue.  If there was additional credible evidence that it was someone other than Salcido who shot and killed  Mr. Justice, and the court gave third part liability instruction, the crucial decision for the jury would have been whether the evidence indisputably showed that Salcido acted in concert with the unknown shooter.  Or, according to Allison's testimony, Salcido and Justice "was set up."  On that issue, there is a reasonable probability that  Mr. Salcido would prevail.

---

[4] In the course of denying Salcido's request for a third party liability instruction, the court listed the evidence that supported an inference that there was a third party involved in the shooting, including Salcido's acquisition of a four door car, the blood spatter evidence, the evidence suggesting Justice was garroted when he was shot, and a fingerprint found in the car. (RT 2378-2379.)  The court did not ackowledge Ed Allison's testimony to the effect that Salcido admitted that the person in the back seat of the car shot Mr. Justice. (Id.)

II.

DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY

FAILING TO ADDRESS THE POTENTIAL CONFLICT AND ENABLING

CO-COUNSEL TO WITHDRAW ON THE EVE OF TRIAL

The guarantee of effective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution comprise two correlative rights: the right to counsel of reasonable competence and the right to counsel's undivided loyalty.  (*Wood v. Georgia* (1981) 450 U.S.261, 272.)  The right to effective representation by counsel is guaranteed whether the attorney is one of his choosing or court appointed.  Such representation is lacking if counsel, unknown to the accused and without his knowledge assent, is in a duplicitous position where his full talents--as a vigorous advocate having the single aim of acquittal by all means fair and honorable--are hobbled or fettered or restrained by commitments to others."  (*Porter v. United States* (5th Cir. 1962) 298 F.2d 461, 463.)

"Competent, conflict-free defense counsel is vital to preserving a criminal defendant's right to a fair trial.  If defense counsel is prevented by a conflict of interest from asserting his client's contention without fear or favor, the integrity of the adversary system is cast into doubt because counsel cannot play the role necessary to ensure that the trial is fair."  (*Campbell v. Rice* (9th Cir. 2001) 265 F.3d 878.)

When there is a potential conflict of interest, the attorney is disqualified from representing the client unless the client makes a knowing, voluntary, and intelligent waiver of the potential conflict.  (*People v. Bonin* (1989) 47 Cal.3d 808, 837; *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 619-621; *People v Amaya* (1986) 180 Cal.App. 3d 1, 11.)  Only a potential conflict can be waived, an actual

**(48)**

conflict is not waivable.  (*People v. Sanford* (1985) 174 Cal.App.3d 11, 18–19.)

Because defense counsel is "in the best position professionally and ethically to determine when a conflict of interest exist or will probably develop," defense attorneys "have the obligation, upon discovering a conflict of interest, to advise the court at once of the problem." (*Holloway v. Arkansas* (1978) 435 U.S. 475, 485–86.)  Defense counsel is also ethically obligated to discuss the conflict of interest with his client.  (*United States v. McLain* (11th Cir. 1987) 823 F.2d 1457, 1464.)

Where counsel suffers from a conflict of interest but does not disclose the conflict to the court in a timely manner, the court has no duty to inquire. (*Campbell, supra,* citing *Cuyler v. Sullivan* (1980) 446 U.S. 335, 346–48.)  A defendant seeking to prove he was deprived of the effective assistance of counsel under these circumstances must show that an actual conflict of interest existed and that it had an "adverse effect" on his lawyer's performance.  (*Cuyler* at p.348.)

"Adverse effect" is not the same as "prejudice."  Unlike an ineffectiveness claim based on incompetent assistance of counsel, an ineffective claim based on divided loyalty does not require the defendant to show that he was prejudiced as a result of his counsel's conflict.  (*United States v. Christakis* (9th Cir. 2001) 238 F.3d 1164.)  The right to be represented by an attorney with undivided loyalty is among those constitutional rights so basic to a fair trial that, unlike with other Sixth Amendment claims, when a defendant alleges an unconstitutional actual conflict of interest, "prejudice must be presumed," and harmless error analysis does not apply.  (*Cuyler v. Sullivan, supra,* 446 U.S. at p. 349; *Flanogan v. United States* (1984) 465 U.S. 259, 268; *Holloway v. Arkansas, supra,* 435 U.S. at p. 489.)

Thus, the adverse effect inquiry focuses only on whether the conflict affected the defendant's defense, not whether the conflict may have affected the outcome of the trial.  To demonstrate "adverse effect," a defendant need not show the

(49)

the conflict of interest at issue caused his lawyers to lose a case he otherwise would have won, or even that it weakened his chance for victory.  Rather, the defendant must show merely that the conflict was sufficiently operative so as to influence his attorney's conduct, even if only in ways that cannot be proven in themselves to have damaged the defense.  Upon such demonstration, it is presumed that the conflict worked to the client's detriment in other ways as well, and reversal is required.  (*Cuyler v. Sullivan, supra*, 446 U.S. 335.)

Under *Cuyler*, a defendant needs only to meet the lower standard of showing that "the attorney's behavior seems to have been influenced" by the conflict. (*Sanders v. Ratelle* ( 9th Cir. 1994) 21 F.3d 1446, 1452.)  That means that where an attorney has a conflict of interest, a defendant need only show "that some effect on counsel's handling of particular aspects of the trial was likely."  (*Lockhart v. Terhune* (9th Cir. 2001) 250 F.3d 1223, citing (*United States v. Miskinis* (9th Cir. 1992) 966 F.2d 1263, 1268; *Mannhalt v. Reed, supra*, 847 F.2d at p. 583.)  Under *Cuyler*, if the record shows that when counsel with a conflict of interest does something or omits to do something contrary to what is expected of a reasonably competent attorney under like circumstances, an actual conflict is shown and a reversal is required. (*In re Darr* (1983) 143 Cal.App.3d 500, 511.)

The conflict in this case arose out of the fact that Mr. Horngrad had previously represented prosecution witnesses Christian Smith and Steve Margulies. (See CT 993 [independent counsel's report to the court].)  Though defense counsel had been aware of the conflict since at least the preliminary hearing in September of 1999, at which point it was discussed on the record (CT at Preliminary Examination Transcript of 9/22/99, at p. 2-20), counsel did nothing to resolve the issue until two weeks before trial was scheduled to commence in July of 2000.

By waiting until just before trial to raise the issue of the conflict and

(50)

withdraw from representing Salcido, former defense counsel placed Salcido's second counsel in the untenable position of attempting to assimilate, in a few short weeks, months of trial preparation performed by his former co-counsel. The effect of this effort was obvious. During the trial Salcido's counsel informed the court on many occasions that he did not have time to adequately prepare and that he did not feel ready to go forward. (RT 1253, 1413, 1550, 1971, 2005.)

A.  **Salcido and the Witnesses Effectively Waived the Conflict and Former Defense Counsel's Withdrawal Was Therefore Improper.**

At the preliminary hearing, and at the outset of trial, Mr. Salcido effectively waived any potential conflict of interest as to either of his counsel. In addition, both of the witnesses at issue waived the conflict at the preliminary hearing, and there is no indication they would have refused to do so had they again been asked at the start of the trial.

The report and declaration from the specially appointed defense counsel, Mr. Kelly, is determinative of this point. Mr. Kelly specifically noted that he explained all of the conflict issues to Mr. Salcido, and that Mr. Salcido still wished to waive the potential conflicts and continue with both his counsel representing him. There is simply no explanation as to why Mr. Horngrad still moved to withdraw, other than the inference that he did not want to spend considerable time trying the case in a county distant from his office. Similarly, there is no reasonable explanation as to why the waiver Salcido executed as to trial Counsel Rappaport could not also applied to Mr. Horngrad, since both counsels had the same potential conflicts concerning the same prosecution witnesses.[5]

---

[5] Mr. Salcido asserts that both defense counsel's reticence regarding open examination of their conflicts of interest might have stemmed, at least in part, from their failure to inform the court that they had directed Salcido's family to pay prosecution witness, Kojo Williams', attorney fees.

B.    Defense Counsel Horngrad Misled Salcido ON His Reason To Withdraw.

Salcido asserts that defense counse Horngrad told him that the prosecution
initiated concerns of a conflict of interest regarding Horngrad's representation.
At the eve of his trial, Salcido was misled by his attorney(s) into believing
that it was the prosecution who was against Horngrad representing Salcido due to
Horngrad's previous representation to the prosecution's witnesses.    Salcido asserts
that his second counsel, Rappaport, was in the same room during this conversation
and failed in his obligation to Salcido in "undivided loyalty."    Specifically,
Rappaport omitted to do something contrary to what is expected of a reasonably
competent attorney when he neglected to inform Salcido of Horngrad's false
statements regarding his withdrawal.

C.    The improper Withdrawal Of Counsel Led To Trial Counsel's
      Improper Withdrawal Of A Motion For A Mistrial.

Subsequent to Horngrad withdrawing from the defense, Rappaport
required Salcido's family to pay an additional $20,000 to perform the
work abandoned by Horngrad.    This second agreement included a cause
that limited trial counsels work to one trial.

During the testimony of the prosecution's key forensic witness, trial counsel
discovered that the government had failed to disclose numerous forensic evidence.
Initially trial counsel made a motion for a mistrial.    By this point in the trial
defense expert had spent months directly related to his potential testimony.    Also,
these forensic evidence that was not provided to the defense, was not available
to previous experts with whom the defense consulted.

Due to the crucial nature of the withheld forensic evidence, defense counsel,
immediately moved for a mistrial.    However, after a brief period of consideration,
defense counsel inexplicably convinced Salcido to withdraw the motion.    After

reviewing the new evidence, trial counsel informed the court that the new evidence could change his strategy in relation to examination of Ridolfi and the manner in which the defense prepared its case.  (RT 1250.)   Counsel also noted that he could not be ready to proceed in the time allowed by the court, and that he would not be adequately prepared to resume the examination of the criminalist on the date set by the court.  (RT 1413-1414.)   In response, the court simply stated that Salcido's counsel's comments "are noted."  (RT 1414.)   The court also rejected Salcido's motion to exclude the photos and to instruct the jury that the prosecution had failed its discovery obligations.  (RT 1357-58.)

Salcido's decision to agree with his counsel and withdraw the motion was undeniably attributed to the court informing Salcido that if the mistrial were granted, trial counsel would be allowed to withdraw.   The Court told Salcido that if a mistrial were granted, "he would probably no longer be your attorney and you would be subject to a court appointed attorney...You have an excellent attorney representing you but you have to know this.   If you were ever to consent to a mistrial, you're gonna probably lose him as your attorney."  (RT 1240.)

This warning by the court was based on false information provided by the defense counsel.   counsel told the court that his fee agreement with the Salcido family limited his representation to one trial, and that the family had indicated they would not be able to pay counsel a second trial fee.

In fact trial counsel's fee agreement bound him to represent Mr. Salcido through trial of the case, without qualification.   And though the second agreement, which counsel obtained through Horngrad's improper withdrawal, limited trial counsel's additional work to one trial, by its express terms, the second agreement did not "replace" the first.   Counsel was therefor bound to represent Salcido through a second trial.   Thereby, his representation of his obligation to

(53)

Mr. Salcido given to the Court, Mr. Salcido, and the Salcido family was inaccurate.

As a result, Salcido was forced to go through with a trial wherein forensic evidence was a key feature of the prosecution's case, as well as Salcido's planned defense, yet much of this pertinent forensic evidence was not disclosed to the defense until mid-trial. Salcido's defense thereafter went forward unprepared as to the crucial issues of the blood spatter evidence, and the trial counsel failed to present any testimony to refute the prosecution's theory.

### IIL.

### TRIAL COUNSEL DEPRIVED PETITIONER OF HIS RIGHT

### TO TESTIFY IN HIS OWN BEHALF AT HIS TRIAL

A criminal defendant has the absolute constitutional right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); See also *Jones v. Barnes*, 463 U.S. 745, 751 (1983)["A defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to....testify in his or her own behalf."]

The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that "are essential to due process of law in a fair adversary process." *Faretta v. California*, 422 U.S. at 819, n.15. "(T)he Fourteenth Amendment's guarantee that no one shall be deprived of the liberty without due process of law [which includes the] right to be heard and to offer testimony," necessarily includes the criminal defendant's right to testify in his own behalf. *Rock v. Arkansas*, 483 U.S. at 51.

The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor," a right that is guaranteed in the criminal courts of the states by the Fourteenth Amendment. *Rock v. Arkansas*, 483 U.S. at 50. "Logically included in the accused's

(54)

right to call witnesses whose testimony is 'material and favorable to his defense,' (citation), is a right to testify himself, should he decide it is in his favor to do so.   In fact, the most important witness for the defense in many criminal cases is the defendant himslef." Id.

> Even more fundamental to a personal defense than the right of self-
> representation....is an accused's right to present his own version of
> events in his own words.  A defendant's opportunity to conduct his
> own defense by calling witnesses is incomplete if he may not present
> himself as a witness.

Id. at 52.

The opportunity to testify is also necessary corollary to the Fifth Amendment's guarantee against compelled testimony.  *Rock v. Arkansas*, 483 U.S. at 52.  "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."  Id at 53, quoting, *Harris v. New York* 401 U.S. 222, 225 (1971).  The Fifth Amendment's privilege against self-incrimination is fulfilled only when an accused is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will."  *Rock v. Arkansas*, 483 U.S. at 52.

Petitioner was denied this fundamental right to participate in his defense. Petitioner repeatedly told his trial attorney prior to and during his trial that he wanted to exercise his right to testify in own defense at his trial.  (RT 733.) Defense counsel informed the Petitioner he would not allow petitioner to take the stand on a strategic decision.  "Inasmuch as (petitioner) was not accorded his constitutional right to testify,"  there is "no option but to reverse.   Neither the good faith of the trial court, the well-advised tactical considerations of the defense counsel, nor even the seemingly overwhelming evidence of guilt will enable us to sustain a conviction found upon such a deprivation."  *People v. Harris*, 191 Cal.App. 3d 819, 826 (1987).

The denial of Salcido's right to testify in his own defense in this case did

not occur in front of the court, much less as a result of the court's admonitions to the defendant.    Instead, the denial was the result of trial counsel's surprising Salcido with counsel's unilateral decision not to present any defense at the last minute in order to coerce the client into "deciding" not to testify in his own defense.    Though defense counsel may have believed that he engaged in such questionable tactics with the defendant's best interest at heart, here depriving the jury of Salcido's testimony undeniably harmed his defense.    There was simply no rational tactical explanation for counsel to deprive Salcido of his right to testify testimony for which Mr. Salcido, with the assistance of counsel and experts, had so assiduously prepared.

According to Mr. Salcido, trial counsel told him, during their brief discussion in a holding cell, that none of the pathologist hired by the defense would support the version of events Mr. Salcido intended to give the jury during his testimony. This of course was false.    And by critically misinforming Salcido as to the evidence available to support his testimony, trial counsel took from Mr. Salcido any opportunity to make a knowing informed decision as to whether to testify in his own behalf.

As described at some length above, had Salcido testified he would have provided the jury with an explanation of the killing of William Justice that could have been corroborated, and could have supported either not guilty verdicts or a conviction on lesser manslaughter offenses.    Absent any such explanation, it was hardly surprising that the jury convicted Mr. Salcido for the murder of a man who undeniably was shot in the head while seated with Mr. Salcido in the car Salcido was driving.    Put simply, this was a case that required testimony from Mr. Salcido to have any chance of success.

(56)

## <u>CONCLUSION</u>

Wherefore, for the foregoing reasons, petitioner respectfully request that this Court grant an order to show cause and evidentiary hearing, and upon final review, set aside his conviction.

Dated: _August 20, 2008_      Respectfully submitted,

Felix A. Salcido
In Pro Se

**(57)**

## PROOF OF SERVICE

I, _Eddie Stroud_ , certify that I am not a party to this cause and that a true copy of this document, Petition For Writ Of Habeas Corpus, was mailed first class postage prepaid in a sealed envelope addressed as shown below on this _20_ day of August 2008.

The United States District Court
Northern District Of California
450 Golden Gate Avenue
Clerk's Office, 16th Floor
San Francisco, CA 94127

_Eddie Stroud_
Eddie Stroud

Felix A. Salcedo, T-38674 P.V.S.P.
P.O. Box 8504, 03-124
Coalinga, CA 93210

LEGAL MAIL

Law Library
Facility D

PRIORITY MAIL

The United States District Court
Northern District of California
Att: Clerks Office, 16th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

U.S. POSTAGE
$0.00

THIS MAIL WAS GENERATED FROM
PLEASANT VALLEY STATE PRISON




